IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

RICHARD M. GREENE,

Plaintiff,

v.

T. NAPOLI,

Defendant.

Civil Action No.
9:11-CV-0792 (NAM/DEP)

---

APPEARANCES:

FOR PLAINTIFF:

RICHARD M. GREENE, *Pro Se*
10-A-4555
Cayuga Correctional Facility
P.O. Box 1186
Moravia, NY 13118

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN
Office of the Attorney General
State of New York
Department of Law
The Capitol
Albany, NY 12224

OF COUNSEL:

ROGER W. KINSEY, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Richard Greene, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights. Although originally naming additional defendants and asserting other causes of action as well, the scope of plaintiff's complaint has been narrowed and now includes only a claim against defendant T. Napoli, an employee at the correctional facility in which plaintiff was incarcerated at the relevant times. The complaint alleges that Napoli unlawfully intercepted and monitored Greene's outgoing mail in violation of his constitutional rights.

Currently pending before the court is defendant Napoli's motion for the entry of summary judgment dismissing plaintiff's remaining claim for failure to state a cognizable constitutional cause of action. For the reasons set forth below, I recommend that defendant's motion be granted.

## I. BACKGROUND[1]

Plaintiff is a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

---

[1] In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

*See* generally Complaint (Dkt. No. 1). At the times relevant to his claims, plaintiff was designated to the Cayuga Correctional Facility ("Cayuga"), located in Moravia, New York, where he remains incarcerated. *Id.*

On April 7, 2011, David A. Stallone, the superintendent at Cayuga, instituted a mail watch, requiring that all of plaintiff's incoming and outgoing mail be diverted to defendant Thomas Napoli, an inmate grievance supervisor at Cayuga and the designated mail watch person for the facility, for a period of sixty days.[2] Napoli Decl. (Dkt. No. 27-4) ¶¶ 3-4, 6-7 and Exh. B. Napoli understood the basis for the mail watch to be Superintendent Stallone's concern that plaintiff was attempting to file fraudulent UCC forms. *Id.* at ¶ 8. In accordance with the mail watch, Napoli was authorized to open envelopes containing plaintiff's mail, scan their contents, and confiscate those containing fraudulent UCC forms or otherwise evidencing plaintiff's misuse of the prison mail system. *Id.* at ¶ 9 and Exhs. B, C.

On June 6, 2011, defendant Napoli opened and reviewed a letter sent by the plaintiff to his mother discussing a plan to obtain a UCC form

[2] That mail watch order was renewed on August 18, 2011, and again on October 17, 2011. *See* Napoli Decl. (Dkt. No. 27-4) ¶ 7 and Exh. C.

and file a lien against his ex-wife.[3]  Napoli Decl. (Dkt. No. 27-4) ¶ 11 and

Exh. D.  After reading the letter defendant Napoli issued a misbehavior

report to the plaintiff accusing him of two violations of prison rules, one

prohibiting the filing of unauthorized liens (Rule 107.21) and the second

related to facility correspondence (Rule 180.11).  *Id.* at. ¶ 12 and Exh. E.

A Tier III disciplinary hearing was conducted on June 12, 2011 to

address the charges set forth in the misbehavior report.[4]  *Id.* at ¶ 13 and

Exh. F.  During the hearing Greene admitted attempting to use a lien as a

means of punishing his ex-wife and ascertaining her whereabouts, which

were apparently unknown to him at the time.  *Id.* at Exh. F. at pp. 10-14.

At the close of the hearing Greene was found guilty on both counts,

resulting in the imposition of a penalty which included twelve months of

disciplinary SHU confinement, a corresponding loss of package,

commissary and telephone privileges, and a recommended ten month

---

[3]     June 6, 2011 was the last effective date of the April 7, 2011, sixty-day
mail watch directive.

[4]     The DOCCS conducts three types of inmate disciplinary hearings.  *See* 7
N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can
result in minor punishments such as the loss of recreation privileges.  Tier II hearings
involve more serious infractions and can result in penalties which include confinement
for a period of time in the Special Housing Unit ("SHU").  Tier III hearings concern the
most serious violations and can result in unlimited SHU confinement and the loss of
"good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*,
525 U.S. 907, 119 S. Ct. 246 (1998).

loss of good time credits.[5]  *Id.* at pp. 15-16.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on July 12, 2011.  Dkt. No. 1.  In his

complaint, as originally constituted, plaintiff named the Cayuga

Correctional Facility, Corrections Captain Chapin, Plant Superintendent T.

Caza, T. Napoli, and Ms. S. Flanagan, a senior counselor at the facility, as

defendants, and asserted claims under the First Amendment as well as

the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, additionally

alleging that defendants are "operating in commerce without a license"

and engaged in criminal conduct.[6]  *See id.* Plaintiff's complaint was

---

[5]      The hearing officer's determination reflects that the correspondence
violation was plaintiff's third within three months, and that he was also previously found
guilty of attempting to file an unauthorized lien within that same time frame.  *See*
Napoli Decl. (Dkt. No. 27-4) Exh. F at p. 16.

[6]      In his complaint, which he declared under penalty of perjury is true and
correct, Greene asserted that prior to commencing this action he had not filed any
other lawsuits in any state or federal court relating to his imprisonment.  *See* Complaint
(Dkt. No. 1) § 5.  That sworn statement is demonstrably false.  On June 21, 2011,
approximately three weeks before initiating this action, plaintiff filed suit against the
DOCCS, Cayuga Superintendent Stallone, and another corrections officer at the
facility, also complaining of interference with his outgoing mail.  *See Greene v. Rich*,
9:11-CV-0691 (LEK/GHL) (N.D.N.Y.).  A third action was commenced by Greene on
September 8, 2011, after this action was opened, against the DOCCS, its
Commissioner, Superintendent Stallone, and the Cayuga Correctional Facility, similarly
complaining of prison conditions.  *See Greene v. Fischer*, 9:11-CV-1061 (LEK/DRH)
(N.D.N.Y.).  In his complaint in that action, also given under penalty of perjury, plaintiff
stated that the had not filed any prior lawsuits involving his imprisonment, despite
previously having initiated two such proceedings.  *See Greene*, No. 9:11-CV-1061
(LEK/DRH), Dkt. No. 1 at § 5.  That action was dismissed by the court as frivolous on
June 11, 2012.  *See id.* at Dkt. Nos. 1, 11.

accompanied by a motion for leave to proceed *in forma pauperis* ("IFP").
*See* Dkt. No. 4.

On October 4, 2011, then Chief United States District Judge
Norman A. Mordue issued a decision and order granting plaintiff's IFP
application and, after engaging in a *sua sponte* review of plaintiff's
complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A, dismissed 1)
plaintiff's claims against the Cayuga Correctional Facility; 2) his causes of
action under the FOIA and any deemed to have been asserted pursuant
to New York's FOIA counterpart, the Freedom of Information Law, N.Y.
Pub. Officers Law Article 6; 3) all claims against defendants Flanagan,
Chapin, and Caza; 4) his cause of action for harassment and interference
with his legal work; 5) plaintiff's claims for mental or emotional injury,
pursuant to 42 U.S.C. § 1997e(e), based upon his failure to make a
showing of accompanying physical injury; and 6) all other potential claims
referenced in plaintiff's complaint and the accompanying "nature of suit"
code listings, leaving only his cause of action against defendant Napoli for
tampering with his outgoing mail in violation of the First Amendment.  Dkt.
No. 9.

On February 29, 2012, following the close of discovery, defendant

Napoli moved for summary judgment seeking dismissal of plaintiff's remaining claim. Dkt. No. 27. Plaintiff has responded in opposition to that motion by the filing of various documents, most of which are entitled "truth affidavits".[7] *See* Dkt. Nos. 29, 31, and 33. In addition, plaintiff appears to have submitted a request to the court for interim injunctive relief precluding defendant from monitoring his outgoing mail while at Cayuga. *See* Dkt. No. 35; *see also* Dkt. Nos. 40, 41, 42, 43, and 44.

Defendant's summary judgment motion and plaintiff's subsequent application for interim injunctive relief are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on

---

[7] Among plaintiff's submissions is a letter in which he purports to seek a $1 million default judgment against defendant Napoli for failing to respond to Greene's "truth affidavit" and suggests that Napoli be deemed to be in involuntary bankruptcy. *See* Dkt. No. 33.

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed.

R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*,

477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled

to special latitude when defending against summary judgment motions,

they must establish more than mere "metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith

Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court

to consider whether *pro se* plaintiff understood nature of summary

judgment process).

        When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.

Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is

warranted only in the event of a finding that no reasonable trier of fact

could rule in favor of the non-moving party.  *See Building Trades

Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

B. Plaintiff's Failure to File a Responsive Local Rule 7.1(a)(3) Statement

Although the plaintiff has submitted several documents in opposition to defendant Napoli's motion, he has not responded directly to defendant's statement of material facts not in issue, submitted pursuant to Northern District of New York Local Rule 7.1(a)(3). Before turning to the merits of defendant's motion the court must first address the significance, if any, of this failure.

The court's rules require that a party seeking the entry of summary judgment submit a statement of material facts with respect to which, the moving party contends, there exists no genuine issue. *See* N.D.N.Y.L.R. 7.1(a)(3). The purpose underlying this rule, which is typical of many local court rules governing summary judgment motion practice, is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the grant of summary judgment. *Anderson v. Dolgencorp of N.Y., Inc.*, Nos. 1:09-cv-360, 1:09-cv-363, 2011 WL 1770301, at *1, n.2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[8] In

8 Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

order to fulfill this salutary purpose, it is obviously necessary for the court to have the benefit of both the moving party's statement and an opposition statement addressing the facts set forth in the initial statement.

Despite offering several submissions directed toward his claims and the defendant's motion, plaintiff Greene has failed to respond to defendant's Local Rule 7.1(a)(3) Statement. The consequences of this failure are significant. By its express terms, the governing rule provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Based upon plaintiff's failure, I recommend that the court invoke this rule and deem the facts set forth in Defendant's Local Rule 7.1(a)(3) Statement to have been admitted based upon Greene's failure to properly respond to that statement.[9] *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing a district court's discretion to

---

[9] Plaintiff was reminded of his obligation to submit a responsive Local Rule 7.1(a)(3) Statement in defendant's notice of motion. *See* Dkt. No. 27. That notice of motion was also accompanied by a document entitled "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," as required by this court's local rules in cases involving *pro se* litigants. *See* N.D.N.Y.L.R. 56.2.

adopt local rules similar to 7.1(a)(3)).

C. Analysis of Plaintiff's Mail Tampering Claim

In his complaint and various subsequent submissions, plaintiff asserts that prison officials at Cayuga are not authorized under any circumstances to monitor his outgoing mail, absent a contract with him granting permission to do so. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 6. The plaintiff is mistaken.

It is true that despite their circumstances, prison inmates do not shed all of the rights guaranteed to them under the constitution when passing through the prison gates. *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198 (1984). Analysis of whether, and if so to what extent, such individuals enjoy the benefits of constitutional protection in many instances is dependent upon the balancing of those rights against the legitimate, penological interests of prison officials, which often exist in tension with those rights. *Turner v. Safely*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987).

Among the protections enjoyed by prison inmates, though not unfettered, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek*, No. 05-CV-172,

2007 WL 3254373, at *6 (N.D.N.Y. 2007) (Sharpe, J.) (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)). That right, however, gives way to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities, in which case no constitutional violation has occurred. *United States v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996), *cert. denied*, 519 U.S. 938, 117 S. Ct. 319 (1996). Accordingly, "a prisoner's right to receive and send mail may . . . be regulated." *Harris v. Taylor*, No. 9:09-CV-0705, 2010 WL 3021531, at * 5 (N.D.N.Y. Jul. 14, 2010) (Lowe, M.J.) (citation omitted), *report and recommendation adopted*, 2010 WL 3021532 (N.D.N.Y. Jul. 29, 2010) (Kahn, J.).

Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner, 482* U.S. at 89, 107 S. Ct. at 2261. Applying this precept, and for reasons that are obvious, "[c]ourts have constitutionally afforded greater protection . . . to outgoing mail than to incoming mail." *Davis*, 320 F.3d at 351 (citations omitted). In addition, "courts have consistently afforded

greater protection to legal mail than to non-legal mail".  *Id.*  Nonetheless, the Second Circuit has held that "'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman*, 80 F.3d at 698 (quoting *Wolfish v. Levi*, 573 F.2d 118, 130 n. 27 (2d Cir. 1978)*, rev'd in part on other grounds sub nom., Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979)).

Courts in this circuit have been somewhat schizophrenic in their approaches to the test to be applied to a regulation or practice interfering with an inmate's free flow of incoming and outgoing mail.  *See Harris*, 2010 WL 3021531, at * 5 (collecting cases).  The majority of cases have applied the test articulated by the Second Circuit in *Davis v. Goord,* providing that "'[r]estrictions on prisoners' mail are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the governmental interest involved.'"  *See id.* (quoting *Davis*, 320 F.3d at 351); *e.g., LeBron v. Selsky*, No. 05-CV-172, 2009 WL 6312275, at * 11 (N.D.N.Y. Sep. 11, 2009) (Homer, M.J.), *report and recommendation adopted as modified*, 2010 WL 1235593 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *Midalgo v. Bass*, No. 9:03-CV-1128, 2006

WL 2795332, at * 12 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J.). Other courts have utilized the more generic formulation derived from the Supreme Court's decision in *Turner v. Safley*, providing that "when a prison regulation impinges on inmate's constitutional rights the regulation is valid if it is reasonably related to legitimate penological interest." *Turner*, 482 U.S. at 89, 107 S. Ct. at 2261. *Harris*, 2010 WL 3021531, at *5; *see also, e.g., Robinson v. N.Y. Dep't of Corr. Servs.,* No. 9:08-CV-911, 2009 WL 3246818, at *10-11 (N.D.N.Y. Sep. 30, 2009) (McAvoy, S.J.).

In this instance, the court does not have the benefit of an affidavit from Superintendent Stallone describing the basis for his initiating a mail watch of plaintiff's correspondence.[10] The court is therefore somewhat

[10] The DOCCS policy concerning inmate correspondence provides that outgoing mail may not be inspected "unless there is a reason to believe that the provisions of this or any directive or inmate rule or regulation have been violated, that any applicable state or federal law has been violated, or that such mail threatens the safety, security, or good order of a facility or the safety or well being of any person." DOCCS Directive No. 4422, § III.B.9(a). That provision goes on to require that a written authorization from the superintendent for the inspection of such outgoing mail "shall set forth specific facts forming the basis for the action." *Id.* In this instance, the court has not been provided with any authorization from the superintendent in compliance with this provision. It is well-established, however, that the failure of prison officials to comply with internal agency regulations is not actionable under 42 U.S.C. § 1983. *Cabassa v. Gummerson*, 01-CV-1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept. 24, 2008) (Hurd, J.). Accordingly, even if Superintendent Stallone did in fact fail to comply with this regulation by not setting forth specific facts forming the basis for his mail watch, that failure does not give rise to a cognizable claim in this action.

disadvantaged in its ability to determine whether the defendant's watch of plaintiff's mail ran afoul of the First Amendment under the controlling test. Nonetheless, based upon the evidence now before the court, I conclude that no rational juror could find that plaintiff's constitutional rights were violated, regardless of which test is applied.

Plaintiff, through his failure to respond, has admitted the portion of Defendant's Local Rule 7.1(a)(3) Statement reflecting Superintendent Stallone's concern that Greene was attempting, through use of mailed correspondence, to file fraudulent UCC forms. *See* Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 27-1) ¶ 3. That concern was borne out by the intercepted letter to plaintiff's mother outlining his plan to file fraudulent liens against his ex-wife, as determined by the Tier III hearing officer, and is also buttressed by the fact that Greene committed two prior correspondence violations and made at least one earlier effort to file an unauthorized lien within the three months preceding his Tier III hearing.[11] *See* Napoli Decl. (Dkt. No. 27-4) Exh. E at pp. 15-16. In view of the facts now before the court I conclude, as a matter of law, that plaintiff's First

[11] The filing of unauthorized UCC liens is not only improper, but indeed constitutes criminal conduct. N.Y. Penal Law § 170.10; *see also Fludd v. Goldberg*, 151 A.D.3d 153, 854 N.Y.S.2d 362 (1st Dep't 2008).

Amendment rights were not violated through the institution of the mail watch.[12]

D. Qualified Immunity

In addition to requesting dismissal of plaintiff's mail watch claim on the merits, in his motion defendant Napoli alternatively asserts his entitlement to qualified immunity. Qualified immunity shields government officials performing discretionary functions "from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)) (internal quotations omitted); *see also Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ]

---

[12] The interception of a prisoner's mail also potentially implicates rights under the Fourth Amendment. *See United States v. Felipe*, 148 F.3d 101, 108 (2d Cir. 1998); *see also LeBron,* 2009 WL 6312275, at * 11. In the end, however, the analysis is the same and boils down to whether a proper showing under *Davis* has been made for invoking the mail watch order.

possessed.' "  *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 61 (2d Cir.

2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692

(1999)) (alterations in original).  The law of qualified immunity seeks to

strike a balance between the need to hold government officials

accountable for irresponsible conduct and the need to protect them from

"harassment, distraction, and liability when they perform their duties

reasonably."  *Pearson*, 555 U.S. at 129 S. Ct. at 815; *see also Reichle*,

132 S. Ct. at 2093.

The determination of whether a government official is immune from

suit is informed by two factors.  *Doninger v. Niehoff*, 642 F.3d 334, 345

(2d Cir. 2011).  The inquiry turns on whether the facts alleged, taken in a

light most favorable to the plaintiff, show that the conduct at issue violated

a constitutional right,[13] and if so, whether that right is clearly established at

the relevant time.  *Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir. 2011)

(quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156); *Doninger*, 642 F.3d

at 345 (citing cases).[14]

---

[13]     When considering the first factor, "[i]f no constitutional right would have
been violated were the allegations established, there is no necessity for further
inquiries concerning qualified immunity."  *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.
Ct. 2151, 2156 (2001).

[14]     In *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir.
2009), the Second Circuit clarified that the "'objectively reasonable' inquiry is part of

Until recently, courts were required to perform the two-part qualified immunity analysis by considering those two factors in precisely that order. *Doninger*, 642 F.3d at 345 (citing *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151).[15] "Following the Supreme Court's decision in *Pearson v. Callahan*, however, we may now exercise our discretion in deciding the order in which to conduct the qualified immunity [inquiry]." *Id.* (citing *Pearson*, 129 S. Ct. at 821).

"The relevant question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.' " *Okin*, 577 F.3d at 430 n.9 (quoting *Pearson*). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.' " *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at

---

the 'clearly established' inquiry", further noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Id.* at 433 n.11 (citation omitted).

[15] Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 524 (1991) (per curiam)).

818).

Here, it is clear that the right at stake – the right of prison inmates to the free flow of incoming and outgoing mail absent interference for the purpose of preventing illegal activities or otherwise reasonably related to legitimate penological concerns – was clearly established at the relevant times. Defendant Napoli indicates in his affidavit that he was given a directive by the superintendent at Cayuga to implement a mail watch, and understood the mail watch to be based upon concerns that plaintiff was attempting to file fraudulent UCC forms. *See* Napoli Decl. (Dkt. No. 27-4) ¶ 8. Given these facts I conclude that no reasonable official in defendant Napoli's position would believe that plaintiff's clearly established First and Fourth Amendment rights were violated through the institution of the mail watch and the monitoring of the plaintiff's incoming and outgoing mail. *Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2001). Defendant is therefore entitled to dismissal of plaintiff's claims against him on this alternative basis.

## IV. SUMMARY AND RECOMMENDATION

The record now before the court reflects that the monitoring of plaintiff's incoming and outgoing mail and the interception of a non-legal

piece of correspondence written to his mother in furtherance of a scheme to file fraudulent liens was proper and related to a legitimate penological concern over detecting illegal conduct.  Accordingly, I recommend the entry of summary judgment dismissing plaintiff's claims on the merits or, alternatively, concluding that in any event defendant Napoli is entitled to qualified immunity.  I further recommend that plaintiff's motion for injunctive relief be denied in light of this determination.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 27) dismissing all remaining claims in this action be GRANTED, and judgment be entered in favor of defendant, and that plaintiff's application for interim injunctive relief (Dkt. No. 35) be DENIED, in light of this determination.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: August 2, 2012
Syracuse, NY



C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Janet ANDERSON, Plaintiff,
v.
DOLGENCORP OF NEW YORK, INC., Defendant.
Betty Pulver, Plaintiff,
v.
Dolgencorp of New York, Inc., Defendant.
Nos. 1:09–cv–360 (GLS\RFT), 1:09–cv–363 (GLS\RFT).

May 9, 2011.

Beasley, Allen Law Firm, Roman A. Shaul, Esq., Elizabeth A. Cordello, Esq., of Counsel, Montgomery, AL, for the Plaintiffs.

Hinman, Howard Law Firm, James S. Gleason, Esq., Dawn J. Lanouette, Esq., of Counsel, Binghamton, NY, for the Defendant.

Morgan, Lewis Law Firm, Joel S. Allen, Esq., Ronald. E. Manthey, Esq., of Counsel, Dallas, TX.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, District Judge.

**I. *Introduction***

***1** In this consolidated action, plaintiffs Janet Anderson and Betty Pulver allege that their former employer, defendant Dolgencorp of New York, Inc. (Dollar General) deprived them of lawful overtime wages in violation of the Fair Labor Standards Act (FLSA).[FN1] (*See* No. 09–cv–360, 2d Am. Compl., Dkt. No. 4; No. 09–cv–363, 2d Am. Compl., Dkt. No. 4.) Pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363, Dkt. No. 27.) For the reasons that follow, the motions are denied.

FN1. 29 U.S.C. § 201, *et seq.*

**II. *Background***[FN2]

FN2. Unless otherwise noted, the facts are derived directly from Dollar General's various Statements of Material Facts (SMF) and plaintiffs' responses thereto. (*See* No. 09–cv–360, Def. SMF (Anderson), Dkt. No. 38:1; No. 09–cv–360, Def. Common SMF, Dkt. No. 39; No. 09–cv–360, Pls. Common SMF Resp., Dkt. No. 44:1; No. 09–cv–360, Anderson SMF Response, Dkt. No. 46:1; No. 09–cv–363, Pulver SMF Resp., Dkt. No. 27:1; No. 09–cv–363, Def SMF (Pulver), Dkt. No. 29:1.) In that regard, the court notes that plaintiffs have failed in most instances to specifically admit or deny Dollar General's factual assertions as required by Local Rule 7.1(a)(3), instead choosing—in a somewhat boilerplate fashion—to "object" to the "implications" of those assertions or to assert additional facts that do not directly or necessarily contradict them. (*See generally, e.g.,* Anderson SMF Resp., Dkt. No. 46:1; *see also* N .D.N.Y. L.R. 7.1(a)(3) (requiring a "non-movant's response [to] mirror the movant's Statement of Material Facts by *admitting and/or denying each of the movant's assertions* in matching numbered paragraphs" (emphasis added)).) As plaintiffs' counsel is likely aware, however, the purpose of the Rule 7.1(a)(3) response requirement is not to highlight and broadly contradict intended "implications" of a movant's factual assertions, or to imply the inaccuracy of those assertions; it is to aid the court in isolating the relevant facts so that it may discern whether and to what extent disputes relating to those facts exist. Thus, a non-movant's failure to tailor her responsive SMFs in accordance with the Local Rules significantly impedes the court's ability to effectively and efficiently resolve these critical inquiries.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> Accordingly, to the extent plaintiffs have failed to properly respond to Dollar General's statements of fact, the court will, where it deems appropriate, treat those statements as admitted for purposes of this motion. *Id.* ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

**A. *Dollar General***

Defendant Dollar General is a retailer of basic consumable goods, such as cleaning supplies, health and beauty aids, foods and snacks, housewares, toys, and basic apparel. (*See* No. 09–cv–360, Def. Common SMF ¶ 1, Dkt. No. 39.) As of 2005, Dollar General operated approximately 7,500 stand-alone Dollar General Stores in thirty states, with an average sales volume of over $1 million per store. (*See id.* at ¶ 2.) Each Dollar General store is staffed by a Store Manager, an Assistant Manager (ASM), a Lead Clerk, and multiple store clerks. (*See id.* at ¶ 3.) Of these employees, Store Managers occupy the highest level of supervisory authority and are the only employees paid on a salaried basis. (*See id.*) Each Store Manager reports to a District Manager (DM), each of whom oversees from fifteen to twenty-five stores. (*See id.* at ¶ 4.)

During the relevant times, Dollar General described a Store Manager's general responsibilities as "the management of all employees in the effective planning and implementation of all store processes, including ordering, receiving, stocking, presentation, selling, staffing and support." (No. 09–cv–360, Shaul Aff., Ex. 11, Store Manager Job Description, Dkt. No. 45:11 (filed under seal) .) Encompassed within these broadly-defined responsibilities are the specific, "essential" duties to:

- Recruit, select and retain qualified employees according to federal and state labor laws and company policies; ensure store is properly staffed;

- Provide proper training for employees; conduct performance evaluations; identify gaps for appropriate solutions and/or counseling, up to and including termination;

- Make recommendations regarding employee pay rate and advancement;

- Communicate performance, conduct and safety expectations regularly; coordinate meetings and events to encourage safety, security and policies;

- Ensure that the store is appropriately staffed and effectively opened and closed each day;

- Evaluate operating statements to identify business trends (including sales, profitability, and turn), expense control opportunities, potential shrink, and errors;

- Ensure that all merchandise is presented according to established practices; utilize merchandise fixtures properly including presentation, product pricing and signage;

***2** • Maintain accurate inventory levels by controlling damages, markdowns, scanning, paperwork, and facility controls;

- Ensure the financial integrity of the store through strict cashier accountability, key control, and adherence to stated company security practices and cash control procedures;

- Provide superior customer service leadership;

- Maintain a clean, well-organized store; facilitate a safe and secure working and shopping environment;

- Ensure that store is adequately equipped with tools necessary to perform required tasks; and

- Complete all paperwork and documentation according to guidelines and deadlines.

(*Id.*)

The job description further outlines certain "Working Conditions and Physical Requirements" associated with the Store Manager position. (*See id.*) These include: "[f]requent walking and standing"; "[f]requent bending, stooping and kneeling to run check out station, stock merchandise, and unload trucks"; "occasional climbing";

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and "frequent and proper lifting of up to 40 pounds [, and] occasional lifting of up to 65 pounds." (*Id.*)

With respect to compensation, in addition to their weekly salaries, Store Managers are generally eligible for certain bonuses, such as annual "Teamshare" bonuses and quarterly "in stock" bonuses. (*See* No. 09–cv–360, Def. Common SMF ¶ 13, Dkt. No. 39 .) Teamshare bonuses are tied to the financial performance of the Store Manager's individual store and the manager's individual performance as a manager. (*See id.*) To the extent that Assistant Managers have also been eligible for Teamshare bonuses, it appears that their eligibility never exceeded 30% of what a Store Manager could earn. (*See id.* at ¶ 14.) As to in-stock bonuses, they were awarded in the amount of $250 per quarter if certain in-stock goals were met, and only to Store Managers. (*See id.* at ¶¶ 13, 14.)

In assessing the financial performance of a Store Manager's individual store, Dollar General considers whether and to what extent the store is meeting its quarterly and annual sales goals, minimizing inventory shrink and controllable expense, and maximizing profit. (*See* No. 09–cv–360, Allen Aff., Ex. 3, Store Manager Performance Evaluation Form, Dkt. No. 41:3 (filed under seal). Relatedly, in evaluating a Store Manger's managerial and leadership skills, Dollar General examines the manager's performance in seven focus areas: sales volume, controllable expense, inventory shrink, merchandising/in stock, training and development, customer satisfaction, and safety awareness. (*See id.*)

**B. *Janet Anderson***

In February 2002, plaintiff Janet Anderson was hired by Dollar General as an ASM for Store No. 8576 in Burnt Hills, New York. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 1, Dkt. No. 38:1.) In April 2002, Anderson was promoted to the position of Store Manager, which she held until her resignation in November 2002. (*See id.* at ¶ 2.) According to Anderson, other than the on-the-job training she received as an ASM, she did not receive any training when she was promoted to Store Manager. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶ 20, Dkt. No. 46:1.)

***3** As a Store Manager, Anderson was paid a fixed weekly salary of $425.00, was eligible for the performance-based bonuses discussed above, and worked an average of fifty hours per week. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶¶ 6, 8, 25, Dkt. No. 38:1.) According to Anderson, she understood when she took the Store Manager position that she would be working more than forty hours per week, and that her salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶¶ 6, 7; No. 09–cv–360, Anderson SMF Resp. ¶ 7, Dkt. No. 46:1.) During Anderson's tenure as Store Manager, the next highest paid employee, an ASM, earned $7.00 per hour and worked an average of thirty-one hours per week. (*See id.*)

With respect to her job functions, Anderson acknowledged in deposition that she performed all of the duties outlined in the Store Manager job description, and agreed that the description provides an accurate general summary of her position as Store Manager. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 15, Dkt. No. 38:1.) In line with that testimony, Anderson explained that she was responsible for supervising the other store employees, including an ASM, a "Third–Key" or Lead Clerk, and the other store clerks, and for performing other managerial duties. (*See id.* at ¶ 3.)

As part of her supervisory duties, Anderson testified that she trained employees on store policy and other related issues; directed, supervised, and evaluated employees' work; coached, disciplined, and counseled employees where necessary; recommended employee pay raises and promotions to her DM (recommendations that were always accepted); and scheduled employees' hours. (*See id.* at ¶¶ 14, 16.) With respect to scheduling, Anderson managed approximately 168 to 212 labor hours per week, meaning that she allocated Dollar General's labor hour allotment amongst the employees she supervised. (*See id.* at ¶ 4.)

In addition to these supervisory tasks, Anderson also performed other duties, including interviewing and hiring employees; monitoring and evaluating weekly sales reports and store operating reports; ensuring that cash registers "balanced"; completing daily paperwork, such as payroll and bank deposits; managing inventory levels; ensuring that merchandise was properly staged and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

stocked, largely in accordance with Dollar General "Plan–O–Grams" [FN3]; leading team meetings; and ensuring that the store was properly open and closed. (*See id.* at ¶¶ 14, 16.)

FN3. "Plan–O–Grams" are store diagrams that direct the placement of products in a store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 23, Dkt. No. 38:1.) According to Anderson, however, because her store did not comport with the standard Plan–O–Gram layout, she relied largely on her own discretion to merchandise approximately fifteen of the store shelves. (*See id.*)

Anderson also performed non-managerial tasks in her role as Store Manager. Specifically, she testified to running the cash register, stocking shelves, facing products on the shelves, helping unload delivery trucks, and cleaning the store.[FN4] (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 4, 6, 7, Dkt. No. 46:1.) With respect to the division of her time, Anderson testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 26, Dkt. No. 38:1.) Anderson agreed, however, that when she was performing non-managerial tasks, she would continue to monitor and manage the operation of the store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 27, Dkt. No. 38:1.) Anderson further testified that if Dollar General would have allotted larger labor hour budgets, she would have been able to focus more time on her managerial duties and less on non-managerial tasks. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4.) According to Anderson, the labor budget was allocated such that only two employees, including herself, could typically be working at one time. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 5–7, Dkt. No. 46:1.) Often, then, as Anderson testified, she would stock the shelves, unload a delivery truck, or clean the store while the only other employee working would run the cash register. (*See id.*)

FN4. In addition to her routine duties, Anderson was also sent to two other Dollar General stores for two days each to set up the stores by setting up shelving and stocking merchandise. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶ 19, Dkt. No. 46:1.)

***4** In performing her duties as Store Manager, managerial or otherwise, Anderson was expected to act in accordance with Dollar General's standard policies and procedures. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 19, Dkt. No. 38:1.) Those policies and procedures, which were contained in the company's Standard Operating Procedures Manual (SOP), provided direction in how to perform certain store operations. (*See id.*) According to Anderson, however, while the SOP provided general guidance and direction, it did not cover every issue that would arise in the store on a daily basis. (*See id.*)

During her tenure as Store Manager, Anderson reported to DM Bob Seaman. (*See id.* at ¶ 12.) Mr. Seaman, unlike Anderson, did not have an office in or a key to Anderson's store, but would visit the store on a periodic basis. (*See id.*) According to Anderson, Mr. Seaman visited her store approximately once every five to six weeks. (*See id.*) During those visits, which typically lasted one hour, Mr. Seaman would walk through the store with Anderson and provide her with ideas and recommendations for improving the store. (*See id.*) Anderson testified that implementation of these ideas and recommendations was not mandatory, explaining that she used some of Mr. Seaman's suggestions but not others. (*See id.*) Apart from these store visits, it appears from Anderson's testimony that her communications with Mr. Seaman were relatively infrequent. According to Anderson, she spoke with Mr. Seaman on the telephone approximately six times—about once per month—and received a voice mail message from him every four or five weeks. (*See id.*) And with respect to those voice mail messages, Anderson testified that they were typically "district wide" and not specific to Anderson or her store. (*See id.*) Overall, despite Mr. Seaman's oversight, Anderson felt that she was "in charge" of her store, and further testified that Mr. Seaman did not interfere with the performance of her managerial duties. (*See id.* at ¶¶ 13, 17.)

Ultimately, as noted above, Anderson resigned from her employment with Dollar General in November 2002. (*See id.* at ¶ 2.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

C. ***Betty Pulver***

Plaintiff Betty Pulver was hired as a Store Manager for Dollar General in April 2002. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 1, Dkt. No. 27:1.) At the time of her hiring, Pulver understood that she would be responsible for opening and managing a new store in Hudson, New York. (*See id.;* No. 09–cv–363, Pulver Dep. at 45–46, Dkt. No. 27:4.) Prior to opening the Hudson store, however, and for approximately one month after being hired, Pulver worked at the Broadway store in Schenectady, New York, apparently for training purposes. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 29:1.) Pulver testified, however, that while at the Broadway Store, the only training she received related to loading and unloading delivery trucks and stocking shelves. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 10, Dkt. No. 29:1.) According to Pulver, she received no instruction with respect to following Plan–O–Grams or completing paperwork, and was given no experience running a cash register, making a schedule, or opening or closing the store. (*See id.*) Pulver testified that the Store Manager who was supposed to train her went on vacation a week after she started, leaving no training instructions with the ASM who was left in charge of the store. (*See* No. 09–cv–363, Pulver Dep. at 50–51, Dkt. No. 27:4.)

***5** In May 2002, with the opening of the Hudson store behind schedule, Pulver was transferred to open a different store, the State Street store. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.) According to Pulver, it wasn't until this transfer that she received training on completing paperwork, scheduling, Plan–O–Grams, etc. (*See* No. 09–cv–363, Pulver Dep. at 53–54, Dkt. No. 27:4.) Anderson testified that this training, which was conducted over the telephone, occurred over the course of one month, but did not specify the frequency or duration of each session. (*See id.*) Ultimately, in July 2002, Pulver was transferred to open the Hudson store, where she remained as Store Manager until her resignation in July 2003. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.)

In “opening” the Hudson and State Street stores, Pulver supervised crews of twenty-five employees hired on a temporary basis to assist in setting up the stores. (*See id.* at ¶ 3.) Once the Hudson store was set up and ready to be opened, Pulver made recommendations as to which of the temporary employees should be hired on a permanent basis to staff the store's ASM and “Third Key Clerk” positions. (*See id.*) After the necessary hiring decisions were made and the Hudson Store was opened, Pulver began performing the duties and responsibilities associated with the day-to-day operations of the store. (*See, e.g., id.* at ¶¶ 4, 5, 12.)

Like Anderson, Pulver agreed in deposition that the duties she regularly performed as Store Manager matched those recited in Dollar General's description of the Store Manager position. (*See id.* at ¶ 14.) Those duties, as with Anderson, included managing the Hudson store's labor budget of 160 to 240 labor hours per week; directing and supervising the work of the ASM, Third Key Clerk, and store clerks Pulver supervised; ordering store merchandise; ensuring that merchandise was properly staged and stocked; interviewing and hiring employees; scheduling employees; ensuring the store was appropriately staffed and properly opened and closed each day; ensuring the safety and security of the store and employees; ensuring that all store paperwork was properly completed and forwarded to the Dollar General corporate office; recommending employees for promotion (recommendations that were always accepted); implementing Dollar General directives regarding, among other things, new store policies and procedures, product recalls, and compliance with state and local laws; and training, disciplining, counseling, and, under certain circumstances, firing employees.[FN5] (*See id.* at ¶¶ 4, 5, 12, 13, 15, 21.)

FN5. Pulver had the authority to terminate employees for certain types of misconduct, such as failing to report to work or cash register shortages, without District Manager approval. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 13, Dkt. No. 29:1.) In other situations, however, such as those involving employee performance issues, Pulver was required to seek her District Manager's approval before she could terminate an employee. (*See id.*) According to Pulver, her termination recommendations were always

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

followed. (*See id.*)

In addition to these and similar duties, Pulver testified to also performing non-managerial duties, such as stocking shelves, running the cash register, cleaning the store, and unloading delivery trucks. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 2, Dkt. No. 29:1.) Like Anderson, Pulver testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 26, Dkt. No. 27:1.) She further agreed in deposition that when she was performing nonmanagerial tasks, she was simultaneously managing the store, evaluating employees, and ensuring proper customer service. (*See id.*) And like Anderson, Pulver agreed that Dollar General's limited labor hour budget required her to spend more time on non-managerial tasks than she otherwise would have. (*See* No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.)

***6** Also like Anderson, Pulver was required to comply with Dollar General SOP, and to follow Dollar General Plan–O–Grams in merchandising her store. (*See id.* at ¶¶ 22, 23.) But also similar to Anderson, Pulver testified that the SOP did not address every situation that could arise in the store on a daily basis, requiring her to exercise discretion in those situations. (*See id.* at ¶ 22.) As to Plan–O–Grams, Pulver testified that because her store did not always comport with the Plan–O–Gram layout, she would exercise discretion in deciding what products to place on approximately ten to twenty percent of the store shelves. (*See id* . at ¶ 23.)

As with all Dollar General Store Managers, Pulver reported to a DM. (*See id.* at ¶ 10.) Similar to Anderson's experience in that regard, Pulver's DM would visit the Hudson store for between one and two hours to review store paperwork and discuss employee performance and ways to improve the store's overall performance. (*See id.*) Pulver recalls only five of these visits occurring during her tenure as Store Manager of the Hudson store, and testified that she rarely spoke to her DM on the telephone and that she could not recall receiving any voice mail messages from him. (*See id.*) Rather, Pulver was responsible for leaving weekly voicemail reports for her DM regarding her store's sales performance. (*See id.*) Like Anderson, Pulver testified that her DM did not interfere with the performance of her managerial duties. (*See id.* at ¶ 16.)

With respect to compensation, Pulver was hired at a salary of $423.00 per week. (*See id.* at ¶ 6.) Beginning in July 2002, however, and continuing until the end of her employment in July 2003, Pulver's weekly salary was $480.00. (*See id.*) Like Anderson, Pulver testified that she understood when she was hired that this weekly salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶ 7.) Pulver testified to working between sixty and seventy hours per week as Store Manager of the Hudson store. (*See* No. 09–cv–363, Pulver SMF Response, Additional Facts, ¶ 1, Dkt. No. 29:1.) During that time, the next highest paid employee in the Hudson store, an ASM, earned $7.00 per hour and worked an average of thirty to thirty-five hours per week. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 8, Dkt. No. 27:1.) In Pulver's view, she was “worth more” than the other store employees because she had more responsibilities, including hiring, firing, interviewing, scheduling, assigning, disciplining, and training employees in her store. (*See id.* at ¶ 9.) According to Pulver, she was “in charge” of her store. (*See id.* at ¶ 11.)

**D. *Procedural Background***

On March 21 and 29, 2004, Pulver and Anderson consented to join numerous other plaintiffs in this collective FLSA action against Dollar General, alleging that Dollar General improperly classified them as exempt from the FLSA's overtime compensation requirement. (*See* No. 09–cv–363, Ex. B, Pulver Consent, Dkt. No. 27:11; No. 09–cv–360, Ex. B, Anderson Consent, Dkt. No. 38:10; No. 09–cv–363, 2d Am. Compl., Dkt. No. 4; No. 09–cv–360, 2d Am. Compl., Dkt. No. 4.) While the collective action was originally filed in the Northern District of Alabama, Pulver and Anderson's claims, among others, were transferred to this court, where jurisdiction and venue is proper. (*See* No. 09–cv–360, Dkt. No. 1; No 09–cv–363, Dkt. No. 1 .)

***7** On May 11, 2009, Magistrate Judge Randolph F. Treece consolidated Anderson and Pulver's cases for discovery, pretrial proceedings, and the filing of common summary judgment briefing. In addition, Judge Treece designated Anderson's case, No. 09–cv–360, as the lead case, directing all filings to be made to that docket. (No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

09–cv–363, Dkt. No. 25.)

Now pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363, Dkt. No. 27.)

### III. *Standard of Review*

The standard for the grant of summary judgment is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F.Supp.2d 192, 194–95 (N.D.N.Y.2007).

### IV. *Discussion*

#### A. *Motion to Strike*

Defendants have moved to strike certain evidence offered by plaintiffs in opposition to the current motions. (*See* No. 1:09–cv–360, Dkt. No. 50.) That evidence includes documents relating to a 2004 Dollar General Survey, articles about Dollar General, Dollar General Story Newsletters, and numerous other Dollar General internal documents. Because the court has not relied on this evidence in rendering its decision, Dollar General's motion to strike is denied as moot. And to the extent the motion seeks to preclude this evidence at trial, it is denied as premature.

#### B. *The FLSA Overtime Compensation Requirement*

As noted above, plaintiffs allege that Dollar General deprived them of overtime wages in violation of FLSA's overtime compensation requirement. Dollar General responds that plaintiffs, as Store Managers, were properly classified as "executive" employees and are therefore exempt from the FLSA overtime requirement.

Under the FLSA, an employer must pay overtime to employees working more than forty hours per week. 29 U.S.C. § 207(a)(1). However, individuals "employed in a bona fide executive ... capacity" are exempt from the FLSA's overtime requirements. 29 U.S .C. § 213(a)(1). Congress has not defined what it means to be a "bona fide executive employee," instead delegating that responsibility to the Department of Labor (DOL), which has promulgated a body of clarifying regulations. *See* 29 U.S.C. § 213(a)(7); 29 C.F.R. § 541, *et seq.* Under the pre–2004 regulations,[FN6] whether an employee qualifies for the executive exemption is a question of law, and is determined based on "different legal tests according to salary level." *Donovan v. Burger King Corp.,* 675 F.2d 516, 518 (2d Cir.1982) (citation omitted). Salaried employees earning more than $250 per week, like plaintiffs here, must satisfy the so-called "short test" to qualify for the exemption. *Id.* (citing 29 C.F.R. § 541.1(f)). To satisfy this test, the employee must be one who regularly directs the work of two or more other employees, and whose "primary duty" is management. *Id.*

> FN6. Effective August 23, 2004, the DOL regulations defining the executive exemption were amended. *See* 69 Fed.Reg. 22,122 (Apr. 23, 2004). Because the relevant employment of each plaintiff in this case terminated before the effective date of these amendments, the court agrees with Dollar General—and plaintiffs do not appear to dispute—that the pre–2004 regulations should be applied to plaintiffs' claims. *See, e.g., Clougher v. Home Depot U.S.A., Inc .,* 696 F.Supp.2d 285, 290 n. 6 (E.D.N.Y.2010) (applying pre–2004 regulations to pay periods predating amendment and amended regulations to pay periods postdating amendment); *Baden–Winterwood v. Life Time Fitness, Inc.* 566 F.3d 618, 629 (6th Cir.2009) (same); *Slusser v. Vantage Builders, Inc.,* 576 F.Supp.2d 1207, 1215 n. 4 (D.N.M.2008) ("The revised FLSA regulations adopted ... in August of 2004 do not apply retroactively.").

***8** In this case, there is no dispute that Anderson and Pulver regularly directed the work of two or more employees. (*See* No. 09–cv–360, Allen Aff., Ex. 1, Joint Stipulations of Fact ¶ 4, Dkt. No. 41:1; No. 09–cv–360, Pls. Common Response Br., Dkt. No. 44 (focusing solely on issue of primary duty).) Rather, the only issue in dispute is whether Anderson and Pulver's primary duty as Dollar General Store Managers was management.

Whether an employee's primary duty is management under the regulations is determined based on the following five factors:

(1) time spent in the performance of managerial duties; (2) relative importance of managerial and non-managerial duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid employees doing similar non-exempt work.

*Donovan,* 675 F.2d at 521 (citing 29 C.F.R. § 541.103). Thus, the primary duty inquiry is "necessarily fact-intensive." *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1264 (11th Cir.2008); *see* 29 C.F.R. § 541.103 (2002) ("[The] determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."). And given this "deeply factual ... inquiry ... courts are often reluctant to grant summary judgment based on the executive exemption ." *Indergit v. Rite Aid Corp.,* Nos. 08 Civ. 9361 & 08 Civ. 11364, 2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010). Further, in examining the primary duty factors, courts must be mindful that "[the executive] exemption must be narrowly construed," and that "[t]he employer has the burden of proving that the employee clearly falls within [its] terms." *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 204 (2d Cir.2009) (citations and internal quotation marks omitted).

**1. Time Spent on Managerial Activities**

As to the first factor, the court must consider the amount of time Anderson and Pulver spent on managerial duties. " 'In the ordinary case[,] it may be taken as a good rule of thumb that ... an employee who spends over 50 percent of [her] time in management would have management as [her] primary duty.' " *Donovan,* 675 F.2d. at 520 n. 5 (quoting 29 C.F.R. § 541.03). " 'Time alone, however, is not the sole test.' " *Id.* (quoting 29 C.F.R. § 541.03). Where an employee " 'does not spend over 50 percent of [her] time in managerial duties, [she] might nevertheless have management as [her] primary duty if the other pertinent [factors] support such a conclusion.' " *Id.* (quoting 29 C.F.R. § 541.03). In general, however, how an employee spends her time working is a question of fact for a jury. *Icicle Seafoods, Inc. v.. Worthington,* 475 U.S. 709, 714 (1986).

Here, Dollar General argues that plaintiffs' deposition testimony should "end the legal analysis in its favor" because it conclusively demonstrates that plaintiffs' spent more than half of their time on managerial activities. The court disagrees. As to Anderson, Dollar General points to the following exchange:

***9** Q: .... When you're just performing management type duties, would you say that would be half of the time?

A: At least.

Q: Okay. So over half?

A: Yes

(No. 09–cv–360, Anderson Dep. at 211:7–12, Dkt. No. 38:4.) However, when later asked how much time she spent on non-managerial duties, Anderson responded, "[e]asily half the day," arguably implying that she may have spent more than half the day on those duties. (*Id.* at 242:5–12.) Following this response, the following exchange ensued:

Q: You're not changing your testimony that you spent more time performing managerial duties than you did nonmanagerial duties, are you?
A: No, I don't think so.

(*Id.* at 242:22–25.) Pointing to this latter exchange, Dollar General dismisses Anderson's contention that she spent "half of her day" on managerial duties, arguing that Anderson's "testimony is unequivocal that she spent more time performing managerial duties than non-managerial duties." (No. 09–cv–360, Def.Resp.(Anderson), at 4–5; Dkt. No. 52.)

Having reviewed the deposition transcript, and construing all reasonable inferences in Anderson's favor, the court is not persuaded that Anderson's testimony compels summary judgment. Specifically, given Anderson's arguably inconsistent responses, her less than definitive "clarification" of those responses, and the fact that her testimony was based upon what appear to be rough estimations of the time she spent on certain duties, the court is not satisfied that Anderson's testimony is conclusively unequivocal.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The same is true with respect to Pulver. As to her testimony, Dollar General points to the following exchange as unequivocal proof that she spent more than half her time on managerial activities:

Q: ... So you spent more than 50 percent of your time on managerial work before you even think about what you did when you were doing the nonmanagerial work and you were still supervising and operating the store, but just out and out managerial work, you spent more than have your time on it didn't you?

A: Sitting down and thinking about it all, yes, maybe at the time I didn't feel like I was doing, you know. But sitting down here and talking and thinking about it, yes.

(No. 09–cv–363, Pulver Dep. at 252:24–25, 253:2–10, Dkt. No. 27:4.) As with Anderson's testimony, however, additional portions of Pulver's testimony weigh against characterizing this exchange as an unequivocal admission. For example, when the "time spent" issue first arose, Pulver testified as follows:

Q: And if we were trying to get a handle on how much time you spent on the non-managerial duties, stocking, cleaning, waiting on customers, running a cash register, cleaning up, those would be less than half of the time?
A: I wanna say no because a lot of paperwork I took home and did on my own time. The scheduling did home, on my own time. I did a lot of stocking and—

Q: I'm not saying you didn't do a lot of stocking.

***10** A: But I spent as much time—I want to say as much time doing both. I mean, I was constantly on the floor helping and stocking.

Q: So you would say about 50/50 doing management/nonmanagement?

A: Yes.

(*Id.* at 247:13–25, 248:2–5.) Again, having construed all reasonable inferences in Pulver's favor in light of this arguably inconsistent testimony, the court disagrees with Dollar General that it is entitled to summary judgment on the time spent issue with respect to Pulver. Accordingly, Dollar General's motions for summary judgement as to both Anderson and Pulver are denied insofar as they seek dismissal based on the time spent issue.

**2. Relative Importance of Managerial and Non–Managerial Duties**

This finding, however, does not end the primary duty inquiry. As noted above, "time alone is not the sole test," and the court must proceed to an examination of the second factor—the relative importance of managerial and non-managerial duties. This factor evaluates which of plaintiffs' duties—managerial or non-managerial—were more important to the employer. *See* Donovan, 675 F.2d at 521. In gauging this relative importance, "many courts look to[, among other things,] a manager's training, evaluation, and factors affecting eligibility for bonuses and pay raises." *Mayne–Harrison v. Dolgencorp, Inc.,* No. 1:09–CV–42, 2010 WL 3717604, at *20 (N.D.W.Va. Sept. 17, 2010) (citing examples). As many courts have recognized, however, resolving this "difficult and intensive factual inquiry" is generally "inappropriate at summary judgment." *Indergit,* 2010 WL 1327242, at *6 (collecting cases).

Here, in arguing that plaintiffs' managerial duties were most important to it, Dollar General points primarily to the Store Manager job description, which lists the variety of essential job functions that are managerial in nature; plaintiffs' compensation structure, which provides for higher weekly earnings and store-performance-based bonuses; and the fact that Store Managers were evaluated on the basis of management-focused criteria.

In response, plaintiffs point to, among other things, the fact that the Store Manager job description explicitly contemplates the frequent performance of manual labor; that plaintiffs' received very little training in preparation for their role as Store Manager; that plaintiffs' weekly pay, when accounting for the number of hours worked, was comparable to other employees; and that Dollar General's restrictive labor budget forced plaintiffs to perform more non-managerial tasks than they otherwise would have. Based primarily on these facts, plaintiffs argue that a reasonable jury could find that their non-managerial duties were more important to Dollar General than their managerial duties.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Undoubtedly, each of the facts cited by Dollar General offers support for the conclusion that it placed significant value on the plaintiffs' performance of managerial duties. Moreover, the court is not persuaded based on plaintiffs' submissions that the second factor should conclusively weigh in their favor. Nonetheless, the court does agree with plaintiffs that summary judgment on this issue, as in most cases, is not warranted here.

***11** As to training, for example, plaintiffs' testimony calls into question the nature and amount of critical management training plaintiffs actually received. As other courts have recognized, the extent to which an employer trains its managers is relevant in determining the value that employer places on managerial duties. *See, e.g., In re Dollar General Stores FLSA Litigation,* Nos. 5:09–MD–1500–JG, 4:09–CV–57–BR, 4:09–CV–58–BR, 2011 WL 197804, at *10 (E.D.N.C. Jan. 19, 2011) (finding that plaintiff's "value to Dollar General [was] shown by the fact that, unlike the other employees in her store, she went through four weeks of training before she was assigned her own store"). In this case, Anderson testified to receiving no additional training when promoted to Store Manager, and Pulver testified that the brunt of her managerial training occurred over the phone. When viewed in a light most favorable to plaintiffs, these facts cut against a finding in favor of Dollar General.

Similarly, with respect to the Store Manager job description, while Dollar General is correct that it lists numerous managerial functions as "essential," the accuracy of that label is at least somewhat lessened in light of both the limited managerial training plaintiffs appear to have received and the fact that the job description also explicitly contemplates the frequent performance of manual labor.

And most significantly in the court's view is the restrictiveness with which Dollar General appears to allot its labor budget. As noted above, both plaintiffs testified that Dollar General's limited labor budget forced them to spend more time on non-managerial duties than they otherwise would have. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4; No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.) As Anderson explained, the labor budget operated such that she could typically only schedule herself and one additional employee to be in the store at one time, often requiring her to perform non-managerial tasks such as stocking and cleaning. (No. 09–cv–360, Anderson Dep. at 236–37, 238–40, Dkt. No. 38:4.) Pulver testified to operating under similar constraints, explaining that "[w]e all complained about not getting enough hours, every store manager did." (No. 09–cv–363, Pulver Dep. at 161, Dkt. No. 27:4.) Pulver further testified that she "wasn't getting the help she needed" with, among other things, "[h]iring certain employees for key positions," which "put more pressure on [her] to open and close stores everyday, rearrange [her] schedule to open and leave and then come back and leave." (*Id.* at 160–61.) Given this testimony, the court is unable to definitively conclude, especially in light of other record evidence, that no reasonable jury could find that Dollar General more highly valued plaintiffs' non-managerial duties. *See, e.g., Pierce v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 4:09cv097, 2011 WL 398366, at *9 (M.D.Pa. Feb. 3, 2011) (denying summary judgment and holding that a reasonable jury could plausibly conclude that plaintiff's managerial duties were less highly valued where employer limited employee's ability to perform managerial tasks by failing to allot more labor hours); *Plaunt v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 1:09cv084, 2010 WL 5158620, at *8 (M.D.Pa. Dec. 14, 2010) (same).

***12** On balance, then, having considered the parties' competing arguments and reviewed the record evidence in a light most favorable to plaintiffs, the court is not convinced that Dollar General has conclusively demonstrated an entitlement to summary judgement with respect to the second factor.

**3. Relationship Between Salary and Other Employee Wages**[FN7]

FN7. Ordinarily, the court would next turn to an examination of the third and fourth factors—the frequency with which discretion was exercised and freedom from supervision. In this case, however, because the court discerns questions of fact with respect to the fifth factor—the relationship between plaintiffs' salary and other employees' wages—the court need not do so, for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> even if the third and fourth factors were found to decidedly weigh in Dollar General's favor, Dollar General's failure to conclusively establish the fifth, in light of the court's findings above, weighs heavily against summary judgment.

The fifth factor in the primary duty analysis compares an employee's salary to the wages of non-exempt employees performing similar work. In this case, the parties agree that the relevant comparison is between plaintiffs and their respective ASMs, each of whom, at all relevant times, earned $7.00 per hour.

Dollar General argues that this factor weighs conclusively in its favor because plaintiffs earned significantly more than their ASMs. In drawing that conclusion, Dollar General compares plaintiffs' weekly salaries with the weekly earning potential of their respective ASMs. With respect to Anderson, for example, Dollar General compares her $425.00 weekly salary to her ASM's potential weekly earnings of $280.00, and concludes that "Anderson's weekly salary was at least 151 % of the weekly earnings of her next highest paid employee." (No. 1:09–cv–360, Def. Mem. of Law (Anderson) at 14, Dkt. No. 38:2.) Dollar General also highlights the fact that "Anderson was eligible for up to $10,000 per year in bonuses based upon her store's performance, where her ASM was eligible only for up to $3,000 in bonuses." (*Id.*)

As to Pulver, Dollar General relies on the same calculation, comparing Pulver's weekly salary—which ranged from $423.00 to $480.00—to her ASM's potential weekly earnings of $280.00, and finding Pulver's salary to be 151% to 171% of those earnings. (No. 1:09–cv–363, Def. Mem. of Law (Pulver) at 13, Dkt. No. 27:2.)

Plaintiffs counter that their salaries were not significantly higher than their ASMs' potential wages when considering the amount of hours they worked. As to Anderson, for instance, she testified to working an average of fifty hours per week as a Store Manager. When dividing her $425.00 weekly salary, she contends, her effective hourly rate would have been $8.50 an hour, only $1.50 more per hour than her ASM. (*See* No. 1:09–cv–360, Anderson Mem. of Law at 11, Dkt. No. 46.)

Converting Pulver's weekly salary to an hourly rate produces similar results. As noted above, Pulver earned $425.00 per week in the beginning of her employment, and later earned $480.00 per week. Thus, when considering Pulver's testimony that she worked an average of sixty to sixty-five hours a week, her effective hourly rate was between $6.51 and $7.08 initially, and between $7.38 and $8 .00 once her salary increased. (*See* No. 1:09–cv–363, Pulver Mem. of Law at 11, Dkt. No. 29.) Based on these figures, Pulver argues, the gap in earnings between her and her ASM is not so significant as to compel summary judgment on this issue. (*Id.* at 11–12.)

As the parties' submissions reflect, there is some divergence of opinion with respect to which of these methods of calculation and comparison is the "correct" one. *Compare, e.g., Moore v. Tractor Supply Co.,* 352 F.Supp.2d 1268, 1279 (S.D.Fla.2004) (declining to reduce salary to hourly rate), *with Johnson v. Big Lots Stores, Inc.,* 604 F.Supp.2d 903, 918 (E.D.La.2009) (finding hourly rate analysis both relevant and appropriate to proper executive exemption determination). To the limited extent that courts in this Circuit have addressed the issue, however, they have not foreclosed use of the method espoused by plaintiffs, suggesting that the hours worked by an employee can be taken into account. *See Donovan,* 675 F.2d at 522 (finding that "[a]ssistant [m]anagers earning $250 or more were paid substantially higher wages even *taking their longer hours into account"* (emphasis added)); *Clougher v. Home Depot U.S.A., Inc.,* 696 F.Supp.2d 285, 293 (E . D.N.Y.2010) (2010) ("[T]here is nothing in the record to render [plaintiff's] counter-argument implausible; namely, that his hourly pay rate, where properly calculated, is substantially less than comparable hourly-wage supervisors.... Given the potential import of an hourly-wage analysis, this Court is compelled to reject [defendant's] all too pat concern for the burdens of engaging in such 'mathematical gymnastics.' " (citations omitted)).

***13** This court likewise declines to reject plaintiffs' hourly rate conversion. In the court's view, converting plainitffs' weekly salary into an approximate hourly wage is an appropriate way of finding a common basis with which to compare the wages paid to others. As one court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

reasoned, "[t]o ignore the fact that [a plaintiff] worked more than forty hours per week would largely frustrate the purpose of this inquiry: to determine whether the employer sought to subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs the same non-exempt tasks as hourly employees." *Plaunt,* 2010 WL 5158620, at *13 ("Without some standard unit, there can be no useful comparison in this already-amorphous inquiry."). The persuasiveness of this reasoning is enhanced, in the court's view, when considering the overarching principle that "[e]xemptions from the FLSA are to be narrowly construed against the employer, and [it is] the employer [that] has the burden of establishing an exemption." *Pignataro v. Port Auth. of N.Y. & N.J.,* 593 F.3d 265, 268 (3d Cir.2010); *Young,* 586 F.3d at 204.

Thus, in viewing the wage and salary evidence in a light most favorable to plaintiffs—i.e., in accordance with the hourly-rate conversion—the court finds that the question of whether the difference in plaintiffs' salary was so significant as to justify their exemption is one more properly left to a jury. *See* *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1271 (11th Cir.2008) (finding that "[g]iven the relatively small difference between the store managers' and assistant managers' hourly rates[—two or three dollars—] it was within the jury's province to conclude that this factor either did not weigh in [defendant's] favor or at least did not outweigh the other factors in Plaintiffs' favor").

And finally, with respect to Anderson, while having considered that she was, in addition to her salary, eligible for a larger bonus than was her ASM, the court is not convinced that that fact compels a contrary result. While a jury could find that this eligibility differential, in light of Anderson's higher salary, renders her compensation significant enough to justify the exemption, it could similarly find that her compensation, including the bonus eligibility, fails to meet that threshold. *See* *Clougher,* 696 F.Supp.2d at 293 ("[D]isparate compensation, even where it includes performance bonuses, stock options, and other tokens of executive employment, has never been held strictly dispositive." (citing, inter alia, *Johnson,* 604 F.Supp.2d at 904 (finding fact that bonuses paid to exempt workers is not strictly dispositve)).) Thus, Anderson's bonus eligibility, while relevant, does not, in the court's view, conclusively tip the scales in favor of summary judgment.

Accordingly, having failed to demonstrate that the fifth factor weighs definitively in its favor, and in light of the court's findings with respect to the first and second factors, Dollar General's motions for summary judgment as to the primary duty issue are denied.

**C. *Liquidated Damages***

***14** Finally, Dollar General claims it is entitled to summary judgment on plaintiffs' claims for liquidated damages because it acted in good faith in classifying plaintiffs as exempt employees. (*See* No. 09–cv–360, Def. Common Br., at 26, Dkt. No. 40.) At this juncture, the court declines to rule on this issue and denies Dollar General's motion with leave to renew at a later stage of the litigation.

**V. *Conclusion***

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Dollar General's motion to strike certain evidence (No. 09–cv–360, Dkt. No. 50) is **DENIED;** and it is further

**ORDERED** that Dollar General's motions for summary judgment as against Janet Anderson (No. 09–cv–360, Dkt. No. 38) and Betty Pulver (No. 09–cv–363, Dkt. No. 27) are **DENIED;** and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Anderson v. Dolgencorp of New York, Inc.
Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

***1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

***2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

***3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

***4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

***5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See* *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see* *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See* *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U.S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See* *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord* *Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See,e.g.,* *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

***6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

***7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *SeeOsier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

***8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *SeeMeiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *SeeDavis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."* *Id.* (Emphasis supplied). *Accord* *Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See* *Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

***9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See* *Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see* *supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See* *Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See* *Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

CONCLUSION

***10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Elvin LeBRON, Plaintiff,

v.

D. SWAITEK, et al., Defendants.

No. 9:05-CV-172 (GLS/DRH).

Nov. 2, 2007.

Elvin LeBron, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***MEMORANDUM-DECISION AND ORDER***

GARY L. SHARPE, U.S. District Judge.

**I. *Introduction***

***1** Plaintiff Elvin LeBron brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, ninety-two employees of the New York State Department of Correctional Services ("DOCS"), violated his constitutional rights under the First and Fourteenth Amendments. LeBron's amended complaint was referred to Magistrate Judge David R. Homer pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Northern District of New York. Upon the motion of sixty-nine of the defendants, Judge Homer issued a Report-Recommendation and Order recommending dismissal of all claims against the moving defendants. *See Report-Recommendation and Order; Dkt. 127.*[FN1] Additionally, Judge Homer recommended that the amended complaint be dismissed without prejudice as to the non-moving defendants, for failure to serve. *Id.* Now pending before the court is LeBron's timely objection to the Report-Recommendation. *See Dkt. 130.*

FN1. The Clerk is directed to append Judge Homer's Report-Recommendation to this decision, and familiarity is presumed. *See Dkt. 127.*

Upon careful consideration of the arguments, the record, and the applicable law, the court concludes that five of LeBron's seven claims should be dismissed in their entirety. However, the claim denominated "Claim Four" in LeBron's amended complaint survives, but only to the extent that it states a due process claim against certain defendants, and to the extent that it states a First Amendment retaliation claim against certain defendants. Additionally, the claim denominated "Claim Seven" survives, but only to the extent that it states a First Amendment claim of interference with mail. Thus, for the reasons stated below, the Report-Recommendation is adopted in part and rejected in part.

**II. *Standard of Review***

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a Magistrate Judge. If a party has objected to specific elements of the Magistrate Judge's findings and recommendations, this court reviews those findings and recommendations *de novo*. *See Almonte v. N.Y. State Div. of Parole,* No. 9:04-CV-484, 2006 WL 149049, *6-7 (N.D.N .Y. Jan. 18, 2006). Even in those cases where no party has filed an objection, this court reviews the findings and recommendations of a Magistrate Judge under a clearly erroneous standard. *Id.*

LeBron has filed several specific objections to Judge Homer's Report-Recommendation. *See generally Dkt. 130.* First, LeBron objects to Judge Homer's recommendation that Claims One and Two be dismissed as untimely.[FN2] Second, LeBron objects to Judge Homer's determination that LeBron was not subjected to the type of atypical and significant confinement that is required to establish a due process claim. Third, LeBron argues that Judge Homer erroneously concluded that the named defendants lacked the authority to expunge his disciplinary record. Finally, LeBron asserts that Judge Homer failed to consider his First Amendment claims, and that the Report-Recommendation erroneously recommended dismissal of Claim Four in spite of Judge Homer's determination that said claim was not barred by the statute of limitations. In light of LeBron's specific objections, the court has reviewed the foregoing determinations *de novo*. The court has reviewed the remainder of Judge Homer's Report-Recommendation for clear error.

FN2. LeBron also argues that Claim Five is not barred by the statute of limitations. However, Judge Homer did not hold that Claim Five was time-barred.

### III. *Discussion*

#### A. *Equal Protection and Fourth Amendment Claims*

***2** LeBron asserts seven claims in his amended complaint, each alleging "First Amendment, due process, and equal protection violations." *See Dkt. 6 at ¶¶ 38, 84, 112, 200, 251, 291, 352* . Judge Homer determined that LeBron's amended complaint is devoid of any allegations that would support an equal protection claim. LeBron has not challenged this determination, and this court agrees with Judge Homer's conclusion. Accordingly, LeBron's equal protection claims are dismissed.

On its face, LeBron's amended complaint asserts no Fourth Amendment claims. However, reading the amended complaint liberally, Judge Homer recognized that LeBron may have alleged a deprivation of his Fourth Amendment protection against unreasonable searches and seizures. Even assuming that LeBron had alleged a Fourth Amendment violation, Judge Homer concluded that LeBron had no viable claim on that ground. *See Dkt. 127, p. 15, n. 14.* LeBron has not objected to this conclusion, and the court is in full agreement with Judge Homer. Accordingly, LeBron's Fourth Amendment claims, if any, are dismissed.

#### B. *Due Process Claims*

Judge Homer has recommended that the due process claims asserted in Claims One, Two, Five, Six, and Seven be dismissed in their entirety. The Report-Recommendation may also be construed as recommending dismissal of the due process claim asserted in Claim Four, although it mentions this claim only in passing. *See Dkt. 127, p. 12, n. 11.*[FN3]

FN3. As to Claim Three, Judge Homer construed this claim as asserting only a violation of LeBron's right of access to the courts. Thus, neither Judge Homer's Report-Recommendation, nor this opinion, should be read as ignoring the purported "due process" claim asserted in Claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Three. Rather, as discussed below, Claim Three is dismissed in its entirety, because LeBron has failed to state a claim for denial of access to the courts.

Upon *de novo* review, the court agrees with and adopts Judge Homer's recommendation that the due process claims asserted in Claims One, Two, Five, Six and Seven should be dismissed. With respect to Claim Four, the court concludes that the due process claim asserted therein should survive dismissal only with respect to those defendants whose personal involvement is alleged.

**1. Claims One and Two are Barred by the Statute of Limitations**

Judge Homer recommended dismissal of Claims One and Two on statute of limitations grounds. In his objections to the Report-Recommendation, LeBron asserts that a prisoner must exhaust his state remedies as well as his administrative remedies before bringing a § 1983 claim. Thus, with respect to Claim Two, he argues that his state action tolled the running of the statute of limitations until January 14, 2002, the date that the results of the subject disciplinary proceedings were administratively reversed. *See Dkt. 130, p. 1.* [FN4]

FN4. LeBron also argues that Claims Five, Six, and Seven are not time-barred. *See Dkt. 130, p. 1.* However, Judge Homer did not base his dismissal of these claims on the statute of limitations. LeBron also argues that Claim One constituted an ongoing violation for which the statute of limitations did not accrue until July 2, 2000. *Id.* Even accepting this as true, the complaint, deemed filed on January 13, 2005, was still untimely with respect to Claim One.

LeBron's contention that pursuit of state remedies tolls the statute of limitations in a § 1983 action is an incorrect statement of law. *See Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) ("We have held ... that a plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983."). Thus, under the three year statute of limitations applicable to LeBron's § 1983 claims,[FN5] Claims One and Two are time-barred. As Judge Homer noted, the statute of limitations began to run on these claims when LeBron knew his rights were violated. *See Singleton v.. City of New York,* 632 F.2d 185, 191 (2d Cir.1980). As such, LeBron's first and second causes of action accrued, at the latest, on June 19, 2000 and August 24, 2000, respectively, the dates that his administrative appeals were denied. Therefore, LeBron's objections based on tolling of the statute of limitations are without merit.

FN5. *See Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994).

***3** Accordingly, defendants' motion to dismiss is granted as to the due process claims asserted in Claims One and Two. Moreover, to the extent that Claims One and Two assert equal protection and First Amendment claims, such claims are dismissed as untimely as well.

**2. Claims One, Two, Five, Six and Seven Fail to State a Due Process Claim**

In Claims One, Two, Five, Six and Seven, LeBron asserts due process violations arising out of procedurally improper disciplinary hearings. As a threshold matter, in order to establish a due process violation, a prisoner must demonstrate that a liberty interest has been infringed. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 484

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

(1995)).

With respect to Claims One, Two, Five, and Seven, Judge Homer determined that LeBron could not establish, as a matter of law, that the confinement to which he was subjected was "atypical and significant," because in each case LeBron was sentenced to keeplock of 30 days or less. *See Dkt. 127, pp. 11-12.* The court concurs with Judge Homer's conclusion-which LeBron does not contest-that, absent additional allegations of atypicality, keeplock of 30 days or less is not alone "atypical and significant" confinement. *See Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *Davidson v. Murray,* 371 F.Supp.2d 361, 368-69 (W.D.N.Y.2005).[FN6] Therefore, LeBron has not established that a liberty interest has been infringed. Accordingly, the due process claims asserted in Claims One, Two, Five, and Seven are dismissed.

> FN6. LeBron's amended complaint contains no allegations that would indicate that the keeplock confinement to which he was sentenced was atypical and significant. In his objections to the Report-Recommendation, LeBron has attempted to supplement the allegations in his amended complaint by setting forth a laundry list of deprivations to which he was subjected. The court will not consider these belated allegations. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998) (noting that it is within the district court's discretion to refuse to allow supplementation of the record upon its review of a Report-Recommendation); *Bester v. Dixion,* No. 03-cv-1041, 2007 WL 951558, *3 (N.D.N.Y. March 27, 2007) ("Allowing Plaintiff to raise in his objections legal and factual arguments not presented to the Magistrate Judge defeats the very purpose of the report and recommendation procedure ....").

With respect to Claim Six, LeBron has alleged that he was sentenced to 180 days in the special housing unit ("SHU"). The court need not decide whether a sentence of this length is "atypical and significant," because, as Judge Homer noted, LeBron's sentence was administratively reversed before he had served any portion of it. *See Dkt. 127, pp. 12-14.* LeBron has not contested Judge Homer's finding in this regard. The court agrees with Judge Homer that LeBron suffered no interference with a liberty interest with respect to Claim Six, and, accordingly, the due process claim asserted in Claim Six is dismissed.

**3. Claim Four States a Due Process Claim With Respect to Certain Defendants**

The court agrees with Judge Homer that Claim Four is not barred by the statute of limitations. *See Dkt. 127, pp. 10-11.* Since LeBron has alleged a loss of good time credit as a result of the subject disciplinary hearing, LeBron's cause of action did not accrue until October 23, 2002, when the disciplinary hearing was administratively reversed.[FN7] *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999).

> FN7. Moreover, it appears that the last event giving rise to Claim Four occurred on January 21, 2002, *see Dkt. 6, ¶ 164,* within three years of the deemed filing of LeBron's complaint on January 13, 2005.

Although Claim Four survives dismissal on statute of limitations grounds, it fails to adequately allege the personal involvement of many of the defendants. It is axiomatic that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citation and quotation omitted).[FN8]

> FN8. In assessing whether Claim Four states a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

due process claim, the court has considered only the issue of personal involvement. The parties have not briefed the issue of whether the disciplinary hearing conducted on or about January 16, 2002, was, in fact, procedurally improper, and the court will not address that issue at this time.

***4** Under a liberal construction of LeBron's amended complaint, defendants Mehrmann, Faulkner, and McLaughton are the only defendants who are alleged to have conducted or participated in the allegedly procedurally defective disciplinary hearing conducted on or about January 16, 2002. *See Dkt. 6,* ¶¶ *149-162.* Accordingly, LeBron has stated a due process claim with respect to these three defendants.[FN9]

FN9. However, as discussed below, these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron has also alleged that certain defendants failed to reverse his sentence upon being notified of the due process violations that occurred at his disciplinary hearing. *See Dkt. 6,* ¶¶ *166-198.* The Second Circuit has held that an official has the requisite personal involvement for liability under § 1983 when, *inter alia,* "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A number of district courts have held that the language in *Colon* should not be construed so broadly as to impose liability on any and all officials to whom a prisoner complains. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (collecting cases). This makes eminent sense; certain officials, even those in supervisory positions, simply may not have the authority to review and redress a prisoner's complaints. However, personal involvement will be found "where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Id.* LeBron's amended complaint adequately alleges, for purposes of withstanding a motion to dismiss under Rule 12(b)(6), that the following defendants reviewed his appeals, and declined to rectify the alleged constitutional violations: L. Leclaire,[FN10] Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, LeFevre, Pasquil, Annucci, Murphy, and McCoy. *See Dkt. 6,* ¶¶ *166-198.* Accordingly, LeBron has stated a due process claim with respect to these defendants.[FN11]

FN10. LeBron's amended complaint does not specify which of the three "LeClaire" defendants is alleged to have denied his grievances; however, the defendants have indicated that it was "L. LeClaire." *See Dkt. 112, p. 14.*

FN11. However, as discussed below, several of these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron also alleges that certain defendants planted evidence and wrote misbehavior reports prior to the January 16, 2002, disciplinary hearing. *See Dkt. 6,* ¶¶ *134-147.* However, the filing of a misbehavior report-even a false one-"does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams,* 781 F.2d at 324. Similarly, the act of planting evidence does not, of itself, violate due process. Due process is implicated only at the point that a prisoner is denied the procedural protections that would enable him to prove that the evidence against him has been fabricated. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The plaintiff, as all other prison inmates, has the right not to be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

deprived of a protected liberty interest without due process of law."). Accordingly, LeBron fails to state a due process claim with respect to those defendants who are only alleged to have engaged in conduct prior to the disciplinary hearing.

***5** In summary, Claim Four states a due process claim only with respect to the following 18 defendants: Mehrmann, Faulkner, McLaughton, L. LeClaire, Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Lefevre, Pasquil, Annucci, Murphy, and McCoy. Accordingly, with the exception of these 18 defendants, the due process claims asserted in Claim Four are dismissed *with prejudice* as to all other defendants. Moreover, the due process claims asserted in Claim Four are dismissed *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, Lefevre, and Pasquil, for failure to serve. [FN12]

FN12. The docket indicates that John Mehrmann has been served. *See Dkt. 80.* However, the acknowledgment of service indicates that, in fact, a "James Meehan" was served. *Id.*

**C. *First Amendment Claims***

In his objections to the Report-Recommendation, LeBron notes that Judge Homer failed to analyze his First Amendment claims.[FN13] This is only partly correct. Judge Homer did address LeBron's claim of denial of access to courts, which is a species of First Amendment claim. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *Cancel v. Goord,* No. 00-cv-2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001). Nevertheless, to the extent that LeBron's amended complaint may also be read as alleging First Amendment retaliation claims and claims of interference with outgoing mail, the court will address the merits of such claims in the first instance herein.

FN13. Each of LeBron's seven claims may be read as asserting some form of First Amendment claim. However, as noted above, Claims One and Two are barred by the statute of limitations. Thus, in this section, the court discusses only the First Amendment claims asserted in Claims Three through Seven.

**1. *Retaliation Claims***

With respect to Claims Four, Five, and Six, LeBron's objections to the Report-Recommendation clarify that he believes that defendants retaliated against him after he had engaged in protected speech. *See Dkt. 130, p. 3.* To survive dismissal, a plaintiff asserting a First Amendment retaliation claim must advance non-conclusory allegations "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis,* 320 F.3d at 352 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In regards to causation, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (citation omitted).

In Claim Four, LeBron alleges that his complaints of harassment and his filing of a "facility claim" led to multiple acts of retaliation, including random searches of his cell, the planting of contraband in his cell, and the fabrication of misbehavior reports. *See Dkt. 6, ¶¶ 115-141.* With respect to the first prong of a retaliation claim, LeBron's complaints of harassment constituted protected speech. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). As to the second prong, LeBron has alleged that the defendants took adverse action against him, in the form of retaliatory misbehavior reports and the retaliatory planting of evidence. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239-240 (S.D.N.Y.2005).[FN14] Finally, LeBron has sufficiently alleged the causation element of a First Amendment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

retaliation claim by showing a temporal proximity between his protected speech and the adverse actions taken against him. *See Dkt. 6, ¶¶ 132-147.*

FN14. By contrast, the alleged searches of LeBron's cell provide no support for a First Amendment retaliation claim. Inmates have no reasonable expectation of privacy in their prison cells, and thus "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005) (collecting cases).

***6** Thus, Claim Four states a claim for First Amendment retaliation. Accordingly, the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is denied with respect to all defendants, with the exception of defendants Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment retaliation claim asserted in Claim Four is dismissed with respect to defendants Woodroof, Olson, M. LeClaire, and Bushie, because LeBron has not alleged that these defendants participated in any prohibited retaliatory conduct.[FN15]

FN15. Additional defendants named in Claim Four have also moved for dismissal, arguing lack of personal involvement. *See Dkt. 112, pp. 13-15.* However, the court is unable to conclusively determine, at this stage, that these additional defendants were not involved in the alleged retaliatory conduct (or the failure to redress). Hence, the retaliation claim alleged in Claim Four is dismissed only with respect to Woodruff, Olson, M. LeClaire, and Bushie.

Turning now to Claims Five and Six, LeBron has failed to state a retaliation claim. There are, quite simply, no allegations of retaliation in Claim Five. LeBron asserts that he was issued a misbehavior report, *see Dkt. 6, ¶ 217,* but nowhere in the amended complaint does he state that this misbehavior report was issued in retaliation for his exercise of First Amendment rights.[FN16] The same is true of Claim Six; the claim does not allege, even in conclusory terms, that any retaliatory conduct occurred.

FN16. In his opposition to the motion to dismiss, LeBron makes conclusory allegations of retaliation. *See Dkt. 121, p. 7.* However, unlike Claim Four, discussed above, the allegations in Claim Five of the amended complaint provide no basis for believing that circumstantial evidence might exist that would support LeBron's bare allegations of retaliation. *See Boddie v. Schnieder,* 105 F .3d 857, 862 (2d Cir.1997) (dismissing, upon motion pursuant to Rule 12(b)(6), allegations of retaliation that were "unsupported, speculative, and conclusory").

**2.** ***Access to Courts Claims***

Construing LeBron's amended complaint broadly, Judge Homer interpreted Claims Three and Five as alleging a denial of access to courts. Judge Homer recommended that these claims be dismissed. LeBron has not objected to this recommendation. The court agrees with Judge Homer's conclusion that Claims Three and Five do not state a claim for denial of access to courts, because LeBron has failed to allege any actual injury. *See Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' *i.e.,* took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' ") (citing *Lewis v. Casey,* 518 U.S. 343, 349-51 (1996)) (internal citations omitted). Accordingly, to the extent that Claims Three and Five allege a denial of access to courts, these claims are dismissed.[FN17] Moreover, to the extent that Claim Six may be read as alleging a denial of access to courts, this claim is dismissed as well,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

for the same reasons.

FN17. The court declines to provide LeBron the opportunity to amend his complaint, yet again, to include allegations of injury. In a Conditional Order of Dismissal, dated March 7, 2005, the court explicitly advised LeBron that his allegations regarding denial of access to courts were inadequate, and that "[i]n order to establish standing for a claim for denial of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials." *See Dkt. 4, p. 5.* The court accepted LeBron's amended complaint because it cured many of the defects of the original complaint. *See Dkt. 7.* However, upon closer review, at least insofar as the denial of access to courts claims are concerned, LeBron's amended complaint suffers from the same infirmities as his original complaint.

**3. *Interference With Mail Claim***

In Claim Seven, LeBron alleges that two of his outgoing letters were confiscated. *See Dkt. 6, ¶¶ 296, 299.* LeBron does not assert that the confiscation of the two letters interfered with his access to the courts, and, indeed, does not even allege that the letters constituted legal mail. Thus, he has not stated a claim for denial of access to courts. Accordingly, to the extent that Claim Seven may be read as asserting a claim of denial of access to courts, such claim is dismissed.

However, apart from the right of access to courts, "a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351; *see Moore v. Gardner,* 199 F.Supp.2d 17, 33 (W.D.N.Y.2002) ("Although prisoners' First Amendment mail claims are often intertwined with claims for denial of court access, they may exist separately."). Thus, the court will address whether LeBron has stated a claim for the violation of his First Amendment rights arising out of the confiscation of two pieces of outgoing mail.

***7** In short, for purposes of a Rule 12(b)(6) motion, he has. The Second Circuit has held that restrictions on a prisoner's mail are justified only if they further the substantial governmental interests of security, order, and rehabilitation. *Davis,* 320 F.3d at 351 (citation omitted). Moreover, "courts have consistently afforded greater protection ... to outgoing mail than to incoming mail." *Id.* (citations omitted). This is because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989).

It may be the case that the confiscation of LeBron's outgoing mail was justified by legitimate governmental interests. However, the defendants have not proffered any reasons for the confiscation,[FN18] and thus, it would be inappropriate to dismiss LeBron's claim at this time. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (reversing the district court's dismissal of claims relating to interference with plaintiff's outgoing and incoming mail, and noting that even two instances of mail interference may be sufficient to suggest a continuing activity); *Knight v. Keane,* 247 F.Supp.2d 379, 384 (S.D.N.Y.2002) (affirming magistrate judge's determination that dismissal was inappropriate where the record evidence was insufficient to establish that inspection of plaintiff's mail was based on good cause). Accordingly, Claim Seven survives to the extent that it alleges a violation of LeBron's First Amendment right to send mail.[FN19]

FN18. The defendants' brief in support of their motion to dismiss did not address the First Amendment claim asserted in Claim Seven. *See Dkt. 112, pp. 23-25.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN19. In holding that the First Amendment mail claim asserted in Claim Seven survives, the court rejects the defendants' argument that LeBron has failed to exhaust his administrative remedies with respect to Claim Seven. The parties dispute the issue of exhaustion, and the court is not able to resolve this dispute on the basis of the facts before it. Moreover, LeBron has suggested that even if he did not exhaust his administrative remedies, such failure to exhaust may be attributed to inhibitions imposed by the defendants. *See Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) ("Defendants may ... be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures.").

Additionally, the court rejects the defendants' argument that venue for Claim Seven is improper. As defendants correctly note, venue is proper in "a judicial district where any defendant resides ." 28 U.S.C. § 1391(b). In this case, at least one defendant named in Claim Seven resides in the Northern District of New York. *See Dkt. 11 (Acknowledgement of Service as to Anthony Annucci).* The defendants have not argued that Annucci was not personally involved in the First Amendment violations asserted in Claim Seven; indeed, as stated above, the defendants' brief does not address Claim Seven insofar as it asserts a First Amendment claim. Moreover, for the reasons discussed above in connection with Claim Four, the court is unwilling to hold, at this stage of the proceedings, that LeBron's amended complaint does not state a claim with respect to defendants such as Annucci, who are alleged only to have failed to remedy a claimed constitutional violation.

**D. Injunctive Relief**

Judge Homer recommended that LeBron's request for injunctive relief be denied because LeBron has sued the defendants in their individual capacities only. LeBron has objected to this recommendation, arguing that "it is a given that the named defendants are in a position to expunge the disciplinary determinations made against plaintiff." *Dkt. 130, p. 3.* Notwithstanding LeBron's unsupported assertion to the contrary, the court agrees with Judge Homer that the injunctive relief LeBron seeks is unavailable because the defendants have been sued in their individual capacities. *See Ziemba v. Armstrong,* No. 3:02-cv-2216, 2004 WL 1737447, *2 (D.Conn. July 30, 2004) ("Injunctive relief may only be recovered from parties in their official capacities.") (citations omitted). Accordingly, LeBron's claims for injunctive relief are dismissed.

**IV. *Conclusion***

Having considered LeBron's objections and reviewed Judge Homer's findings of fact and conclusions of law, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of all of LeBron's equal protection and Fourth Amendment claims, as well as the due process claims asserted in Claims One, Two, Three, Five, Six, and Seven. The court rejects the Report-Recommendation to the extent that it recommends the complete dismissal of the due process claim asserted in Claim Four. The due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy.

***8** As to the First Amendment claims, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of the denial of access to courts claims asserted in Claims Three and Five. Additionally, all First Amendment claims asserted in Claims One, Two, Three, Five, and Six are dismissed. The First Amendment retaliation claim asserted in Claim Four survives as to all defendants except Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment claim of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

interference with mail asserted in Claim Seven survives as to all defendants.

Finally, the court adopts the Report-Recommendation to the extent that it recommends dismissal of LeBron's requests for injunctive relief.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Homer's September 25, 2006 Report-Recommendation (*Dkt. No. 127* ) is accepted in part and rejected in part; and it is further

**ORDERED** that Claims One, Two, Three, Five, and Six are dismissed in their entirety; and it is further

**ORDERED** that the equal protection claims asserted in Claims Four and Seven are dismissed; and it is further

**ORDERED** that the Fourth Amendment claims asserted in Claims Four and Seven, if any, are dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Seven is dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy, and that such dismissal is *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, LeFevre, and Pasquil, but is *with prejudice* as to all other defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is DENIED as to all defendants *except* that the motion to dismiss the First Amendment retaliation claim asserted in Claim Four is GRANTED as to defendants Woodroof, Olson, M. LeClaire, and Bushie; and it is further

**ORDERED** that the denial of access to courts claim asserted in Claim Seven is dismissed as to all defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment claim of interference with outgoing mail asserted in Claim Seven is DENIED; and it is further

**ORDERED** that the defendants' motion to dismiss LeBron's claims for injunctive relief is GRANTED; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

N.D.N.Y.,2007.

LeBron v. Swaitek

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2010 WL 3021531 (N.D.N.Y.)

(Cite as: 2010 WL 3021531 (N.D.N.Y.))

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Freddie HARRIS, Plaintiff,
v.
Justin A. TAYLOR, Jonathan Nocera, Alan Taylor, Defendants.
No. 9:09–CV–0705 (LEK/GHL).

July 14, 2010.
Freddie Harris, Rome, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Roger W. Kinsey, Esq., of Counsel, Albany, NY, for Defendants.

***ORDER and REPORT–RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Freddie Harris, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), alleges that Defendants Justin Taylor and Jonathan Nocera violated his constitutional rights by confiscating and inspecting his outgoing mail to the Internal Revenue Service. He further alleges that Defendant Alan Taylor violated his constitutional rights when he conducted a disciplinary hearing on charges that Plaintiff attempted to file false tax returns. Currently pending before the Court is Plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Dkt. No. 19) and Defendants' cross-motion for summary judgment (Dkt. No. 20). For the reasons that follow, I recommend that Plaintiff's motion be denied and Defendants' motion be granted.

**I. FACTUAL AND PROCEDURAL SUMMARY**

On April 21, 2008, Plaintiff wrote to the District Attorney of Kings County, asking him to prepare and file IRS form 1099OID reflecting an "appearance bond in the amount of $15,000,000." Plaintiff asserted that it was "mandatory" that the District Attorney file the form and that "if a response is not received ... within [ten] days ... it will be assumed that you have chosen to dishonor me." (Am. Compl., Dkt. No. 16 at 9–10.)

On May 5, 2008, Plaintiff wrote to the District Attorney again. He stated that the District Attorney was in "serious tax delinquency" because he had not responded to Plaintiff's previous letter. Plaintiff stated that if the District Attorney did not respond within five days, he would file his own 1099OID listing the District Attorney as "the originator of the eligible issue(s), the payer tax I.D. number as being 'refused'." (Dkt. No. 16 at 12–13.)

On May 15, 2008, the District Attorney's office responded that it had received Plaintiff's correspondence and was "unable to assist" Plaintiff. (Dkt. No. 16 at 14.)

In early 2008, the mailroom at Gouverneur Correctional Facility ("GCF"), where Plaintiff was then incarcerated, received an unusual amount of inmate mail addressed to the IRS. All of the mail was from different inmates, but each envelope was addressed with the same handwriting. Defendant Justin A. Taylor ("Taylor"), the superintendent of GCF, was informed of this fact and that a publication titled *The American Bulletin* was circulating in the prison. *The American Bulletin* advocated the filing of fraudulent tax returns by inmates as a form of protest. (Taylor Decl., Dkt. No. 20–3 ¶ 5.) Taylor was familiar with a similar scheme that had occurred earlier in his career at a different facility. (Taylor Decl. ¶ 6.)

Taylor contacted John Crowley, a New York State Department of Correctional Services ("DOCS") Inspector General Investigator. Crowley provided Taylor with details of a tax scheme at a different facility in which

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

inmates claimed false withholding credits attributed to "appearance bonds." The inmates used IRS forms 1099INT, 1099OID, 1096, 1040, and letters to District Attorneys requesting an IRS filing based on their indictment number and social security number. The scheme Crowley described was nearly identical to the examples provided in *The American Bulletin.* (Taylor Decl. ¶ 8.)

***2** Taylor believed that in order to investigate whether a similar scheme was taking place at GCF, he would need to open and review inmate mail addressed to the IRS. (Taylor Decl. ¶ 9.) Taylor reviewed DOCS Directive No. 4421, dated May 11, 2001. (Taylor Decl. ¶ 10.) Under Directive 4421, any correspondence by an inmate to a federal agency is classified as "privileged correspondence." Such correspondence "shall not be opened, inspected, or read without express written authorization from the facility superintendent." The superintendent "shall not authorize the reading of ... privileged correspondence unless there is a reason to believe that ... any applicable state or federal law has been violated, or that the content of such correspondence threatens the safety, security, or good order of a facility or the safety or well being of any person." The superintendent's authorization must be in writing and set forth the facts forming the basis for the action. The directive advises superintendents to consult with the DOCS office of counsel before issuing such an authorization. If, after reading the contents of privileged correspondence, there is reason to believe that, *inter alia,* federal law has been violated, the correspondence may be confiscated. If the correspondence is confiscated, the inmate must be given written notice unless doing so would be inconsistent with the need to safeguard an investigation. (Defs.' Ex. A, Dkt. No. 20–5.)

Taylor contacted DOCS Associate Counsel Thomas Goetz and explained the situation to him. Based on the facts Taylor gave him, Goetz advised that Taylor had sufficient reason to open and review the contents of the envelopes addressed to the IRS. (Taylor Decl. ¶ 12.) Thereafter, Taylor prepared an authorization to open the suspected envelopes. He personally opened the envelopes. The envelopes contained IRS forms 1099INT, 1099OID, 1096, 1040, and letters to District Attorneys requesting an IRS filing based on the inmates' indictment numbers and social security numbers. Each return sought an IRS refund in excess of several hundred thousand dollars. (Taylor Decl. ¶ 14.)

Taylor opened an envelope from Plaintiff addressed to the IRS. It contained a 1099OID form claiming that District Attorney Charles J. Hynes withheld a total of $15,000,000 in federal income tax as "holder in due course" for Plaintiff. It also included a 1096 form in which Plaintiff claimed $15,000,000 in income for 2008 as a result of an "appearance bond" and $4,200,000 in federal income tax had been withheld from his income in 2008. (Taylor Decl. ¶ 21.)

On January 22, 2008, Defendant Jonathan Nocera, an investigator in the DOCS Inspector General's office, was assigned to investigate the possible tax scheme at GCF. (Nocera Decl., Dkt. No. 20–2 ¶ 9.) As part of his investigation, he reviewed the mail to the IRS that Taylor had confiscated. Defendant Nocera found that all of the confiscated mail was "consistent with the tax scam advocated in *The American Bulletin."* (Nocera Decl. ¶ 11.) Based on conversations with Special Agent Kelly Ewald of the IRS Criminal Investigations Division, Nocera determined that the inmates' tax forms "had the hallmarks of a fraudulent tax return" and that they were "most likely part of a prison-based tax scam to defraud the Internal Revenue Service." (Nocera Decl. ¶ 12.)

***3** Regarding Plaintiff's mail to the IRS, Nocera considered it to be part of a tax scam because (1) it demanded an excessive tax refund; (2) it lacked supporting documentation substantiating a tax refund in that amount; (3) Plaintiff had listed a private address rather than his current address as an inmate; and (4) Plaintiff had used tax forms 1099OID and 1096 to claim large withholding credits attributed to an appearance bond. (Nocera Decl. ¶ 13.) Plaintiff correctly notes that the assertion by Defendant Nocera regarding his return address is inaccurate. (Dkt. No. 22 at 7.) Plaintiff's envelope to the IRS listed GCF as his return address. (Defs.' Ex. C, Dkt. No. 20–7.)

On June 30, 2008, Taylor sent Plaintiff a letter informing him that his IRS forms had been confiscated.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2010 WL 3021531 (N.D.N.Y.)

(Cite as: 2010 WL 3021531 (N.D.N.Y.))

(Taylor Decl. ¶ 22.)

Over nine months later, on April 10, 2009, Defendant Nocera issued a misbehavior report charging Plaintiff with soliciting and making false and misleading statements. (Dkt. No. 16 at 15; Taylor Decl. ¶ 23; Nocera Decl. ¶ 16.) The report stated that "it was found that [Plaintiff] submitted a fraudulent U.S. Income Tax Return ... This was done in an attempt to solicit the IRS for monies he was not entitled. [Plaintiff] admitted this during interview." (Dkt. No. 16 at 15.)

Defendant Alan Taylor ("A.Taylor") conducted a disciplinary hearing on April 16, 2009. (Dkt. No. 20–10; Taylor Decl. ¶ 24; Nocera Decl. ¶ 17.) Plaintiff testified at the hearing. (Dkt. No. 20–10; Taylor Decl. ¶ 25.) [FN1] Defendant A. Taylor found Plaintiff guilty and sentenced him to four months in the Special Housing Unit ("SHU") and the loss of various privileges. (Taylor Decl. ¶ 26; Nocera Decl. ¶ 17.) In his written disposition, Defendant A. Taylor stated that the evidence he relied on was the misbehavior report and a statement that had been prepared by Defendant Nocera and signed by Plaintiff. (Dkt. No. 16 at 17.) Plaintiff appealed. The disposition was later reversed by Norman R. Bezio, the Director of the Special Housing/Inmate Disciplinary Program. (Dkt. No. 16 at 18; Dkt. No. 19–4 at 37.)

FN1. Defendant Taylor declares that Defendant Nocera testified at the hearing (Taylor Decl. ¶ 26), but the hearing transcript (Dkt. No. 20–10) does not indicate that Defendant Nocera did so.

On June 11, 2009, Defendant Nocera completed his investigative summary report and concluded that fourteen inmates had attempted to file fraudulent tax returns. All fourteen inmates were found guilty of prison disciplinary charges. (Nocera Decl. ¶ 18.) All of the confiscated tax returns and tax forms were forwarded to the IRS' Criminal Investigative Division for further investigation and possible criminal prosecution. (Nocera Decl. ¶ 19.) A federal grand jury in this District later returned indictments against a number of inmates for running prison-based tax refund schemes between 2003 and 2005. (Taylor Decl. ¶ 30.)

In this action, Plaintiff alleges that Defendants Taylor and Nocera violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments by confiscating his mail and inspecting it outside of his presence. (Dkt. No. 16 ¶ 7.) He further alleges that Defendant A. Taylor violated his Eighth and Fourteenth Amendment rights "when he allowed a defective disciplinary hearing to commence." *Id.*

***4** Plaintiff now moves for summary judgment. (Dkt. No. 19.) Defendants have opposed the motion and filed a cross-motion for summary judgment. (Dkt. No. 20.) Plaintiff has filed a reply. (Dkt. No. 22.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2010 WL 3021531 (N.D.N.Y.)

(Cite as: 2010 WL 3021531 (N.D.N.Y.))

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

***5** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A. First Amendment**

Plaintiff alleges that Defendants Taylor and Nocera violated his First Amendment rights by confiscating and inspecting his mail to the IRS. (Dkt. No. 16 ¶ 7.) Defendants argue that this claim should be dismissed. (Dkt. No. 20–19 at 9–18.) Defendants are correct.

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). A prisoner's right to receive and send mail may, however, be regulated. *See, e.g., Davidson v. Mann,* 129 F.3d 700, 702 (2d Cir.1997.) When challenges are brought to such regulations, "courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351. District courts in the Second Circuit have articulated the test for analyzing regulations on prisoners' mail in two ways. Some courts have applied the formulation set out in *Davis,* which states that "[r]estrictions on prisoners' mail are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the governmental interest involved." *Id.* (citations and punctuation omitted). [FN3] Other courts have applied the formulation set out in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), which states that "when a prison regulation impinges on inmates'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89.[FN4] The Second Circuit itself has applied both standards. *Davis,* 320 F.3d at 351 (applying *Davis* test to prisoner's claim that mailroom clerk, on two occasions, opened outgoing legal mail); *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (applying *Turner* test to prisoner's challenge to prison regulation limiting keeplock prisoners to one stamp per month for personal, non-legal use); *Duamutef v. Hollins,* 297 F.3d 108 (2d Cir.2002) (applying *Turner* test to prisoner's claim that prison officials violated his First Amendment rights by placing a watch on all of his outgoing and incoming non-privileged mail).

FN3. Examples of courts applying the *Davis* test include *LeBron v. Selsky,* No. 05–CV172, 2009 U.S. Dist. LEXIS 126401, at *35–36, 2009 WL 6312275, at *11 (N.D.N.Y. Sept. 11, 2009) (Suddaby, J.) (Homer, M.J.) (applying *Davis* test to prisoner's claim that prison officials violated his First Amendment rights by placing him under a 'mail watch' and monitoring all of his outgoing mail) and *Midalgo v. Bass,* No. 9:03–CV–1128, 2006 U.S. Dist. LEXIS 69030, 2006 WL 2795332, at *12 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J.) (Treece, M.J.) (applying *Davis* to prisoner's claim that officer read his outgoing legal mail).

FN4. Examples of courts applying the *Turner* test include *Robinson v. New York State Dept. of Correctional Services,* No. 9:08–CV–911, 2009 U.S. Dist. LEXIS 92294, at *29–36, 2009 WL 3246818, at *10–11 (N.D.N.Y. Sept.30, 2009) (McAvoy, J.) (DiBianco, M.J.) (applying *Turner* to prisoner's claim that his outgoing mail was delayed while commissary purchase of stamps was processed) and *Mitchell v. New York State Dept. of Correctional Services,* No. 06–CV–6278, 2009 U.S. Dist. LEXIS 5157, at *11–14, 2009 WL 185757, at *3 (W.D.N.Y. Jan. 26, 2009) (applying *Turner* to prisoner's claim that mailroom tampered with his mail).

***6** Defendants' conduct here satisfies either standard. Confiscating and inspecting the envelopes addressed to the IRS furthered the substantial governmental interests of security and order because Defendants Taylor and Nocera reasonably concluded, based on their knowledge of other prison tax schemes and the fact that *The American Bulletin* was advocating the use of similar methods at GCF, that inmates were attempting to file false and misleading tax returns. Defendants took steps no greater than necessary to investigate their reasonable suspicions. Therefore, I find that Defendants' conduct was constitutional pursuant to the *Davis* standard.

As for the *Turner* standard, the burden is on the plaintiff to show that Defendants' conduct was not reasonably related to legitimate penological interests. *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). Plaintiff has not produced any evidence that would allow a reasonable juror to reach that conclusion. The Second Circuit "has repeatedly found, without doubt, a valid, rational connection between the decision to impose a watch on a prisoner's mail and the desire to ensure the good order of the prison and the rehabilitation of prisoners by preventing a prisoner from engaging in illegal activities while incarcerated." *Duamutef,* 297 F.3d at 112 (citation and punctuation omitted); *see also* *United States v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("The investigation and prevention of ongoing illegal activity constitute legitimate penological objectives."). Here, the undisputed facts show that Defendants Taylor and Nocera inspected the outgoing mail to the IRS in order to prevent illegal activity. Therefore, I find that Defendants' conduct was constitutional pursuant to the *Turner* standard. Accordingly, I recommend that the Court grant Defendants' motion for summary judgment dismissing Plaintiff's First Amendment claim.

**B. Fourth Amendment**

Plaintiff alleges that Defendants Taylor and Nocera violated his Fourth Amendment rights when they confiscated and inspected his mail to the IRS. (Dkt. No. 16 ¶ 7.) Defendants have not addressed this argument.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or

seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation marks and citation omitted). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests ." *Skinner,* 489 U.S. at 619 (internal quotation marks and citations omitted). In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted), *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Where a search is conducted in prison, the standard applied is the *Turner* test. *Covino,* 967 F.2d at 75; *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998) ("[T]he interception of [an inmate's] correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail."). As discussed above, Defendants' conduct satisfies the *Turner* test. Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's Fourth Amendment claim.

**C. Eighth Amendment**

***7** Plaintiff alleges that Defendants violated his Eighth Amendment rights. (Dkt. No. 16 ¶ 7.) Defendants have not addressed this claim.

In order for Plaintiff to state a claim under the Eighth Amendment, he must show: (1) that the conditions of his confinement resulted in a deprivation that was *sufficiently serious;* and (2) that the defendants acted with *deliberate indifference* to his health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. In considering the types of conditions that constitute a substantial risk of harm, the court considers not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but also any indications that unwilling exposure to that risk violates contemporary standards of decency, in that society does not choose to tolerate this risk in its prisons. *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 2482, 125 L.Ed.2d 22 (1993).

None of Plaintiff's allegations against Defendants Taylor and Nocera suggest that they were deliberately indifferent to any condition that posed an excessive risk to Plaintiff's health or safety. As to Defendant A. Taylor, Plaintiff may be attempting to allege that A. Taylor violated his Eighth Amendment rights by sentencing him to serve a four-month sentence in the SHU. However, the complaint's allegations regarding Plaintiff's SHU confinement do not state an Eighth Amendment claim. Although the service of a disciplinary sentence under ordinary conditions prevailing in the SHU "may implicate other constitutional rights, [it] does not rise to a level of constitutional significance under the Eighth Amendment and ... fails to support a claim of cruel and unusual punishment under that provision." *Monroe v. Janes,* No. 9:06–CV–0859 FJS/DEP, 2008 U.S. Dist. LEXIS 13029, 2008 WL 508905 at *7 (N.D.N.Y. Feb.21, 2008) (dismissing Eighth Amendment claim where prisoner alleged merely that he had served 76 days in the SHU) (*citing Warren v. Irvin,* 985 F.Supp. 350, 357 (W.D.N.Y.1997)).[FN5] Here, Plaintiff does not allege that his confinement in the SHU was served in anything other than ordinary conditions. Thus, he has not alleged or presented evidence of any cruel and unusual punishment that would provide the foundation for an Eighth Amendment claim. Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's Eighth Amendment claims.

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**D. Due Process**

Plaintiff alleges that Defendant A. Taylor's conduct during the disciplinary hearing violated his right to due process. (Dkt. No. 16 ¶ 7.) Defendants argue that this claim should be dismissed. (Dkt. No. 20–19 at 18–19.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants are correct.

***8** In order to prove a claim that his procedural due process rights were violated, a plaintiff must show that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's confinement in the SHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether a disciplinary confinement in the SHU constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. For SHU confinements of an "intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64–65. Here, where Plaintiff was sentenced to four months in the SHU, neither party has produced any evidence regarding the conditions Plaintiff faced in the SHU and how they compared to routine prison conditions. In the absence of a detailed record from either party, I will turn to the issue of whether Plaintiff received all the process he was due.

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). In some circumstances, such as where the inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, an inmate may also be entitled to assistance from another inmate or from prison staff in preparing his defense. *Id.* at 570.

***9** Plaintiff argues that he did not receive fair notice of the hearing. (Dkt. No. 16 at 6.) Fair notice requires the charging officer "to be sufficiently specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (punctuation and citation omitted). Plaintiff argues that he did not receive fair notice because Defendant Nocera's "misbehavior report [wa]s approximately [eleven] months old [a]nd ... was never served on Plaintiff within [twenty-four] hours before [the] hearing." (Dkt. No. 16 at 6.) The hearing transcript indicates that Plaintiff testified that he was served with a copy of the misbehavior report on April 14, 2009, at 7:15 a.m. (Defs.' Ex. F, Dkt. No. 20–10 at 2.) The hearing began fifty-two hours later, on April 16, 2009, at 11:35 a.m. *Id.* The charges in the misbehavior report were not vague, and fifty-hours was a sufficient period of time for Plaintiff to prepare a defense. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding his claim that he received constitutionally insufficient notice.

Plaintiff does not appear to allege that he was denied his right to call witnesses. The hearing transcript indicates that he did not request anyone to testify in his behalf. (Dkt. No. 20–10 at 2.)

The complaint, read broadly, may allege that Defendant A. Taylor was not impartial. Specifically, Plaintiff alleges that Defendant A. Taylor "ignor[ed] the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff's documentary evidence." (Dkt. No. 16 at 6.) It is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord,* 180 F.Supp.2d 532, 539 (S.D.N.Y.2002) (citing *Francis v.. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff,* 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (emphasis in original) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000)). Here, the evidence shows that Defendant A. Taylor's ruling was not arbitrary. At the hearing, Plaintiff testified that he had read *The American Bulletin,* which said that the District Attorney's office "is using our social security numbers and they opened up (inaudible) in our names. So I had decided my freedom of right, my [F]irst [A]mendment right and I wrote to the District Attorney two letters ... and asked him if it was true. They ignored me ... and just told me they cannot assist me." (Dkt. No. 20–10 at 3.) Plaintiff testified that *The American Bulletin* instructed that if an inmate was ignored by the District Attorney, he would "have to bring them up on the Federal level. So what I did from that point on, I got a 1099 and a 1096 ... and I mailed [them] to the IRS ... I was only exercising my ... [F]irst [A]mendment right ... I have a right to communicate with the outside world. So I wanted to see if this stuff was true ... I wasn't trying to do nothing illegal. I was just, it was information that I was given and I wanted to see how true it was. It's not something I was doing on my own. I wasn't trying to get no money from the IRS. I was just trying to report the District Attorney Office to the IRS. As this thing tells us how to do it." (Dkt. No. 20–10 at 4.) Plaintiff testified that, contrary to Defendant Nocera's statement in the misbehavior report that Plaintiff admitted that he prepared the tax forms "in an attempt to solicit the IRS for monies he was not entitled" (Dkt. No. 16 at 15), "I was only ... answering the questions that he ... asked me and I signed the report that he made. But, it seems like he's trying to make it seem like I submit to his fraudulent (inaudible) or something like that." (Dkt. No. 20–10 at 5.) After Plaintiff testified, Defendant A. Taylor adjourned the hearing until April 20, 2009. (Dkt. No. 20–10 at 6.) When the hearing reconvened, Plaintiff stated again that he had not done anything illegal. (Dkt. No. 20–10 at 7.) Defendant A. Taylor adjourned the hearing to prepare his written disposition. *Id.* Defendant A. Taylor reconvened the hearing on April 22, 2009. He found Plaintiff guilty of both charges, stating that he relied on the misbehavior report. *Id.* Given the evidence before him, Defendant A. Taylor's disposition was based on sufficient evidence. Although Plaintiff asserted that he was simply trying to get information, the forms he prepared indicated, under penalty of perjury, that over $4 million dollars in federal income tax were withheld in 2008. It was not arbitrary for Defendant A. Taylor to conclude that a reasonable person with Plaintiff's income (*see* Dkt. No. 2) could not have believed this to be true. The fact that Defendant A. Taylor's decision was subsequently administratively reversed (Dkt. No. 19–4 at 37) does not change this analysis. "New York law requires prison disciplinary rulings to be supported by sufficiently relevant and probative information to constitute *substantial* evidence. This requirement is sterner than the 'some evidence' standard necessary to afford due process." *Sira,* 380 F.3d at 76 n. 9 (emphasis added). Thus, although Defendant A. Taylor's decision may not have complied with New York law, it was based on sufficient evidence to satisfy the federal Due Process Clause.

***10** Plaintiff does not appear to allege that he was denied his right to assistance at the hearing. The hearing transcript indicates that he waived his right to an assistant. (Dkt. No. 20–10 at 2.) Therefore, I find that Plaintiff has not raised a triable issue of fact that Defendant A. Taylor violated his right to procedural due process. Accordingly, I recommend that the Court grant Defendants' motion for summary judgment dismissing this claim.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Because I find that Defendants are entitled to summary judgment dismissing each of Plaintiff's claims, I recommend that the Court deny Plaintiff's motion for summary judgment (Dkt. No. 19).

**ACCORDINGLY,** it is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**ORDERED** that the Clerk provide Plaintiff with a copy of *Monroe v. Janes,* No. 9:06–CV–0859 FJS/DEP, 2008 U.S. Dist. LEXIS 13029, 2008 WL 508905 at *7 (N.D.N.Y. Feb.21, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 19) be ***DENIED;*** and it is further

**RECOMMENDED** that Defendants' cross-motion for summary judgment (Dkt. No. 20) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Harris v. Taylor
Not Reported in F.Supp.2d, 2010 WL 3021531 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2010 WL 3021532 (N.D.N.Y.)

(Cite as: 2010 WL 3021532 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Freddie HARRIS, Plaintiff,
v.
Justin A. TAYLOR, Jonathan Nocera, Alan Taylor, Defendants.
No. 9:09–CV–705 (LEK/GHL).

July 29, 2010.
Freddie Harris, Rome, NY, pro se.

Roger W. Kinsey, Office of Attorney General,Albany Albany, NY, for Defendants.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

***1** This matter comes before the Court following a Report–Recommendation filed on July 14, 2010 by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report–Rec. (Dkt. No. 24). On July 26, 2010, Plaintiff Freddie Harris ("Plaintiff") filed objections to Report–Recommendation. Dkt. No. 25 ("Objections").

This Court is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* Where, however, an objecting " 'party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.' " *Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007) (citations and quotations omitted); see also *Brown v. Peters,* No. 95–CV–1641, 1997 WL 599355, at *2–3 (N .D.N.Y. Sept. 22, 1997). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

The Court has considered the Objections, has undertaken a de novo review of the record, and has determined that the Report–Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 24) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Plaintiff's Motion for summary judgment (Dkt. No. 19) is **DENIED,** and it is further

**ORDERED,** Defendants' Cross–Motion for summary judgment (Dkt. No. 20) is **GRANTED,** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Harris v. Taylor
Not Reported in F.Supp.2d, 2010 WL 3021532 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Elvin LEBRON, Plaintiff,
v.
Donald SELSKY; Glenn S. Goord; Anthony J. Annucci; Lucien J. LeClaire, Jr.; John H. Nuttall; John J. Donelli; Thomas Ricks; B. Granish; S. Stuart; Bruce J. Smith; John J. LeClaire; R. Wells; C.O.; Sgt. Sorenzon; Gregory L. Boyton; A.C. Rocque; Lt.; J. Colby, Lt.; Capt. Faulkner; David L. McNulty; B. Jarvis; William Burke; Kevin L. McLaughlin; Thomas C. Sanders; Peggy Walcott; Richard D. Roy; John Mehrmann; C.C. Pasquil; M. LeFerve; Captain Racette; Joseph E. McCoy; Robert J. Murphy; Mr. Jeffrey Hale; McKernon, C.O.; J. Litweiler, Sgt.; Lt. Marshall; Paul Chappins, Jr.; Michael McGinnis, Supt.; D. Hillard; D. Sullivan, Capt.; Lt. Donahue; Sgt. Wetzel; and M. Sheahan, Captain, Defendants.
No. 05-CV-172 (GTS/DRH).

Sept. 11, 2009.
Elvin LeBron Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, James J. Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

***1** Plaintiff pro se Elvin LeBron ("LeBron"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, ninety-five DOCS employees, violated his constitutional rights under the First and Fourteenth Amendments. Am. Compl. (Docket No. 6). Presently pending is the motion of the remaining forty-two defendants for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 179. LeBron opposes the motion. Docket No. 185. Additionally, LeBron has moved to supplement his amended complaint and to strike defendants' submissions. Docket Nos. 186, 187. Defendants oppose the motion to strike. Docket No. 191. For the following reasons, it is (1) recommended that defendants' motion be granted in part and denied in part, (2) recommended that the amended complaint be dismissed without prejudice as to the unserved defendants, and (3) ordered that LeBron's motions be denied.

**I. Procedural Status**

By a Memorandum-Decision and Order dated November 2, 2007, Lebron's First, Second, Third, Fifth, and Sixth causes of action were dismissed. Docket No. 132. Additionally, in the Fourth cause of action, the only claims remaining are for violations of LeBron's due process rights for (1) the refusal to answer and rectify Lebron's multiple complaints as to defendants Selsky, Goord, Annucci, L. Leclaire, Donelli, Ricks, Sanders, Roy, Pasquil, Leferve, Racette, McCoy, and Murphy (Docket No. 132 at 11-12, 13-14), and (2) the failure of defendants Faulkner, McLaughlin, and Mehrmann to ensure proper procedural due process during LeBron's disciplinary hearing (Docket No. 132 at 11, 13-14). Furthermore, the Fourth claim survives to the extent that LeBron alleges that he was issued a retaliatory misbehavior report and fell victim to the planting of false evidence in his cell due to LeBron's previous filing of a grievance against prior defendant Woodroof. Docket No. 132 at 15-17. Lastly, in the Seventh cause of action, the only remaining claim is his First Amendment interference with mail claim. Docket No. 132 at 18-20.

**II. Background**

The facts are related herein in the light most favorable

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2009 WL 6312275 (N.D.N.Y.)

(Cite as: 2009 WL 6312275 (N.D.N.Y.))

to LeBron as the non-moving party. *See* Section II(A) *infra*. Further, at all relevant times, LeBron was an inmate in the custody of DOCS.

**A. Retaliatory Misbehavior Report and Planting of Evidence**

While incarcerated at the Adirondack Correctional Facility on November 29, 2001, Lebron was advised by former defendant Woodroof that the white hooded sweatshirt LeBron was wearing was against facility regulations. LeBron Dep. (hereinafter "Dep.") (Docket No. 179-3) at 42-44. Woodroof stated that LeBron could either receive a misbehavior report for the violation or send the sweatshirt home. *Id.* at 44. LeBron chose to mail the sweatshirt home. *Id.* at 44. On December 12, 2001, LeBron filed a grievance [FN2] against Woodroof alleging harassment regarding the sweatshirt. Docket No. 179-4 at 1. LeBron subsequently mailed the hooded sweatshirt home, incurring approximately $6 in shipping fees. *Id.* at 7. LeBron then submitted to the facility a claim for reimbursement which was denied by defendant Jarvis on December 18, 2001. *Id.* at 8. Defendant Sorenzen condoned the actions of Woodroof in threatening to give LeBron a misbehavior report if he failed to send the sweatshirt home. *Id.* at 1; Dep. at 44-46. LeBron's grievance was denied by the IGRC on December 27, 2001 (*Id.* at 16), denied by defendant Sanders, the Superintendent, on January 4, 2002 (*Id.* at 17), and denied by CORC on January 30, 2002 (*Id.* at 22).[FN3]

FN2. "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

FN3. Defendants Burke and McLaughlin then initiated a new policy which provided that when an inmate was dressed in inappropriate attire, the inmate was to be issued a misbehavior report and the clothing was to be confiscated. Docket No. 179-4 at 24.

***2** After the grievance was filed, corrections staff began to search LeBron's living quarters on a regular basis. Dep. at 46. On December 28, 2001, LeBron filed another grievance regarding the frequent searches following his earlier grievance against Woodroof. Docket No. 185-5 at 9; *see also* Docket No. 179-5 at 1 (asserting that the first four searches occurred on November 30 and December 3, 11, and 28, 2001; Dep. at 49-50, 61-62. LeBron advanced concerns that correctional staff would continue to search his cell and eventually plant evidence or issue a false misbehavior report in retaliation for his filing the December 12, 2001 grievance. Docket No. 185-5 at 9. A notation on the grievance on January 15, 2002 indicated that the investigation revealed "no wrong doing on the part of security staff." *Id.*

On January 10, 2002, McLaughlin received a telephone call from defendant Walcott, a DOCS official in Albany, advising McLaughlin that LeBron possessed contraband because the letter LeBron had sent to Albany contained white-out correction fluid, which was banned from inmates. Disciplinary Hearing (hereinafter "Hearing") (Docket No. 179-7) at 23; Dep. at 66-68. LeBron never remembered writing to Walcott and could not remember whether he ever used white-out on a letter that may have been forwarded to her in Albany. Dep. at 66-67. LeBron contends that white-out is not contraband. *Id.* at 67.[FN4]

FN4. The letter containing the white-out was never produced to LeBron during the disciplinary hearing. Hearing at 27. Additionally, it does not appear that the letter was provided during discovery in this action.

Based on the information that LeBron possessed contraband, McLaughlin ordered LeBron's cell searched.[FN5] Hearing at 24. On January 10, 2002, defendants Smith and J. LeClaire were ordered to search LeBron's cell. Docket Nos. 179-5 at 14-18, 185-5 at 10. Three bottles of white-out and a razor blade sheath, which constituted contraband items and a weapon, were discovered in LeBron's inmate locker. Docket Nos. 179-5 at 14-18, 185-5 at 10, 179-6 at 17-20. Defendant Rocque reported the incident, defendant Boyton was notified,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

LeBron was handcuffed, and Boyton, LeClaire, and Smith escorted LeBron to the Special Housing Unit ("SHU") [FN6] for confinement pending the disciplinary hearing. Docket Nos. 179-5 at 14-18, 185-5 at 10, 179-6 at 15. The misbehavior report was reviewed by defendant Colby. Docket Nos. 179-5 at 13, 179-6 at 2.

FN5. During his deposition, LeBron claimed that Faulkner ordered the cell searches. Dep. at 50. However, the hearing transcript and Faulkner's declaration indicate otherwise. Hearing at 24; Faulkner Decl. (Docket No. 179-13) ¶¶ 3-7 (indicating that random searches were performed according to a computer program and the January 10, 2002 cell search was directed by a different office other than Faulkner's).

FN6. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**B. Disciplinary Hearing**[FN7]

FN7. Both parties refer to the testimony given during the hearing by LeClaire. However, no testimony is contained in the hearing transcript. The parties do not appear to contend that the hearing tapes have been destroyed in expunging the disposition from LeBron's record, but contrary to LeBron's claims, the transcript remains. Dep. at 89-92 (stating that hearing tapes were erased prior to expungement).

On January 12, 2002, LeBron received an inmate misbehavior report regarding the contraband found in his cell locker. Docket No. 179-6 at 6; Dep. at 81. Mehrmann was appointed to assist LeBron and met with him on January 14, 2002 at approximately 8 a.m. Docket No. 179-6 at 7. LeBron requested that inmate Jeffrey Washington and J. LeClaire testify at the hearing and that various other documents and photographs be provided. Docket Nos. 179-5 at 15, 179-6 at 7-8.

The hearing began on January 16, 2002 and continued until January 23, 2002. Hearing at 1.[FN8] At the hearing, LeBron indicated that he was dissatisfied with Mehrmann's assistance because Mehrmann failed to provided him with (1) unredacted log book pages from the date of the incident, and (2) log entries from dates of prior cell searches of November 30, December 3, 11, and 25 and January 10, the gym and the SHU. Hearing at 2-7; Dep. at 82-83 (stating that he could not specifically recall what Mehrmann failed to provide him). Faulkner denied the requests as they were irrelevant to the misbehavior report because they occurred on dates and in places other than where the contraband was discovered. Hearing at 2-7. LeBron also requested and was denied inventory sheets pertaining to the number of razors and bottles of white-out within the facility. *Id.* at 10. The requests were denied because such inventories were not maintained by the facility. *Id.* at 10. LeBron also requested and was denied the opportunity to to dust the contraband and his cell for fingerprints. *Id.* at 10.

FN8. LeBron contended that the hearing began prematurely as twenty-four hours had not passed between meeting with his inmate assistant and the hearing's commencement. Dep. at 84.

***3** LeBron continued to argue that white-out was not contraband, a contention rejected by Faulkner, because it was not allowed in the facility, it could not be sent to inmates in packages, and it could not be purchased by inmates in the commissary. Hearing at 11-12; *see also* Dep. at 73 (concurring with Faulkner's statements about white-out's unavailability). LeBron also requested that a second officer be called to testify in place of an individual that he mistakenly named. Hearing at 12. The request was honored and the corrections officer testified on January 17. *Id.* at 22-23.

As to inmate Washington's testimony, LeBron was informed that Washington had advised defendant Wells on January 15, 2002 that he declined to testify because he did not wish to be involved. Hearing at 13. LeBron requested that Faulkner interview Washington in the belief that Washington witnessed the search. *Id.* at 14. Faulkner

agreed and interviewed Washington on January 17, 2002. Faulkner reported that Washington stated that he did not see the cell search.[FN9] *Id.* at 27; Docket Nos. 179-5 at 17, 179-6 at 12. When Faulkner asked if LeBron had any additional witnesses, LeBron identified an inmate, Steven McFarlin, who had also allegedly witnessed the search but had since been paroled and was living in New York City. *Id.* at 14-15, 40-41.

FN9. During his deposition, LeBron claimed that when he spoke to Washington, Washington admitted that he witnessed the search on January 10 and "kn[e]w they didn't find anything because they didn't pull anything out of [LeBron's locker]." Dep. at 54-55.

After addressing the preliminary requests and complaints, Faulkner read the misbehavior report into the record and LeBron entered a plea of not guilty. Hearing at 15-16. While discussing the facts of the case, LeBron asserted that the contraband items were planted in his cell in retaliation for the grievance against Woodroof. *Id.* at 19-20; Dep. at 57-58, 68-69. LeBron further asserted that (1) he had never lodged grievances against LeClaire or Smith, the defendants who found the contraband; (2) Woodroff was not a party to that misbehavior report; and (3) all previous "retaliatory" searches were conducted by different officers, all of whom were not involved in the final search with LeClaire and Smith. *Id.* at 20-22.

The following day, the replacement witness for LeBron testified. Hearing at 22-23. The witness was questioned by both Faulkner and LeBron. *Id.* On January 18, McLaughlin testified regarding the telephone call he received from an individual in Albany advising that she had received a letter from LeBron containing white-out. *Id.* at 23-24; *see also* Dep. at 64-67 (explaining that LeBron was told by both McLaughlin and Granish that they each received the telephone call from Walcott in Albany), 85-86. The cell search was then ordered. *Id.* at 24, 27. LeBron was given the opportunity to question McLaughlin. *Id.* at 24. He asked one question and was presented with "a readable copy of the tape on the evidence ...." *Id.*[FN10] Following the hearing, LeBron wrote to Faulkner and McLaughlin, posing at least eighteen questions to McLaughlin that he was unable to ask during the hearing because LeBron was unaware that he would be testifying. *Id.* at 28-29; Docket No. 179-6 at 22-26. McLaughlin answered the questions over the weekend, and Faulkner read the answers into the record during the hearing when it resumed the following week. Hearingat 29-30; Docket No. 179-6 at 27-28.

FN10. During his deposition, LeBron indicated that Faulkner prohibited McLaughlin from answering LeBron's questions. Dep. at 86-88.

***4** On January 17, after McLaughlin's testimony, Faulkner again reviewed the relevance of each document LeBron had requested from his inmate assistant. Hearing at 25-26. Faulkner also listed the documents LeBron received from his inmate assistant, including copies of three memoranda. *Id.* at 26; *see also* Docket No. 179-6 at 30-32 (copies of memoranda). LeBron objected to the documents, claiming that they had not been provided to him. Hearing at 26. Faulkner provided LeBron with additional copies of the memoranda on January 22 during the hearing. *Id.* at 28. When the second set of copies was given to LeBron, he conceded that he had already received the memoranda. *Id.* [FN11]

FN11. The hearing transcript appears to have a slight abridgment between 11 a.m. and 2:15 p.m. Hearing at 27. Between two long sections of transcript is a short paragraph of Faulkner discussing his interview with Washington and the reasons for the cell search. *Id.* It does not appear that testimony continued but that a break was taken and the tape needed to be reversed. It does not appear that a material portion of transcript is omitted.

After Faulkner reviewed the various memoranda and the answers McLaughlin had submitted to LeBron's written questions, defendant Smith testified that he had been instructed to search for bottles of white-out and that they recovered multiple bottles and a razor blade hidden in a medicine packet. Hearing at 32. Lebron was then given the opportunity to question Smith. *Id.* at 33. During the questioning, LeBron was chastised multiple times by Faulkner for asking questions already answered or which were irrelevant. *Id.* at 32-36. LeBron was warned not to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ask harassing questions to Smith and after posing four additional harassing questions, LeBron's questioning was terminated. *Id.* at 36-38. LeBron was still permitted to read additional objections into the record. *Id.* at 39-42. Objections included the failure to provide the whited-out letter that Walcott received and the inability to find former inmate McFarland and elicit his testimony. *Id.* At the conclusion of that day's proceedings, Faulkner indicated that he would attempt to find McFarland through parole and department records. *Id.* at 41.

On the final day of the hearing, Faulkner received testimony from a non-party corrections officer, Carl Provost, who stated that LeBron refused to leave his cell to hear the disposition of the hearing. Hearing at 43. Provost advised that LeBron clearly understood the consequences of refusing to participate in the final day of his hearing. *Id.*[FN12] Faulkner indicated that he attempted to contact McFarland through the parole department, and no forwarding telephone number was provided and there was no way to contact McFarland. *Id.* at 43. In LeBron's absence, Faulkner indicated that he found LeBron guilty of two of the three charges, he sentenced LeBron to 180 days of confinement and six months loss of good time, and a copy of the disposition would then be delivered to LeBron by Provost. *Id.* at 44; Docket Nos. 179-5 at 12, 179-6 at 4. Later that day, LeBron appealed the disposition claiming that he was denied his rights to attend the hearing when he informed the escort officer that he was unable to walk and the escort officer did not obtain accommodations to assist him to the hearing.[FN13] Docket No. 179-8.

FN12. LeBron denies ever refusing to attend the final day of the hearing. Dep. at 101-102.

FN13. Medical records indicate that from November 2001 until February 2002, the time period prior, during, and subsequent to the hearing, LeBron made no complaints of, pain, or trouble walking. Docket No. 190-2

On January 25, 2002, LeBron received a memorandum from Sanders affirming the disciplinary disposition because Sanders "f[ound] no compelling reason to change, modify or alter the decision rendered to you." Docket No. 185-5 at 26. Identical responses were received from defendants Selsky on April 26, 2002 and Murphy on July 25, 2002. Docket Nos. 185-5 at 45, 179-9 at 45. On October 23, 2002, Selsky wrote to defendant McGinis, then the Superintendent, advising that the disposition of the hearing had been reversed and expunged. Docket No. 185-5 at 78.

**C. Interference with Mail**

***5** On July 26, 2003, defendants Chappins and McGinnis directed that LeBron be placed on mail watch for sixty days and that all his outgoing mail be forwarded to Chappins. Docket No. 179-10 at 2. The mail watch was extended on October 27 and December 29, 2003, and it was noted that LeBron received 180 days of disciplinary segregation for violating facility correspondence rules. Docket No. 179-10 at 3-4. Another extension was issued on February 27, 2004. Docket No. 179-10 at 4.

LeBron was issued a misbehavior report on February 27, 2004 for correspondence violations. Docket No. 179-12 at 1. LeBron claimed that two pieces of his mail intercepted on February 23 and 25, were illegally opened and examined without sufficient cause. Dep. at 7, 13; Docket No. 179-12 at 1. LeBron filed multiple grievances pertaining to the allegedly false accusations and improper interference with his mail. Docket Nos. 179-12 at 1-9, 185-5 at 96-168. During his disciplinary hearing regarding the misbehavior report held on March 2, 2004, LeBron pleaded guilty to the charges in the misbehavior report. Docket No. 190-3 at 2-4.[FN14]

FN14. During his deposition, LeBron identified and read the confiscated letters, one of which instructed the recipient to send a second enclosed letter to an inmate at Attica Correctional Facility. Dep. at 41-42. Inmate-to-inmate correspondence is prohibited by DOCS without DOCS approval. *See* *Turner v. Safley,* 482 U.S. 78, 91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (upholding a regulation prohibiting this limitation on inmate correspondence); *Purnell v. Lord,* 952 F.2d 679, 685 (2d Cir.1992).

**II. Discussion**

As discussed previously, all that remains are LeBron's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims that (1) the January 10, 2002 search and misbehavior report were filed in retaliation for the grievance LeBron filed against Woodroof, (2) multiple supervisory defendants failed to intervene to remedy the wrongs that followed from the cell search, (3) he was denied procedural due process during his January 23, 2002 disciplinary hearing, and (4) certain defendants interfered with his legal mail. Defendants seek judgment on all claims.

**A. Legal Standard**

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

***6** When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

**B. Exhaustion**

As a threshold matter, defendants contend that LeBron has failed to exhaust his administrative remedies. Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). Exhaustion is generally achieved through the IGP. *See* N.Y.Comp.Codes R. & Regs. tit. 7, § 701.1 et *seq.* (2001); *see also* note 8 *supra.* However, "[t]he New York IGP regulations do not state that a prisoner's grievance must name the responsible party." *Espinal v. Goord,* 558 F.3d 119, 126 (2d Cir.2009). Therefore, "[b]ecause ... the IGP does not articulate an identification requirement, it is plain that a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies." *Id.*

Here, defendants contend that not all defendants in this case were included in LeBron's various grievances. However, there is no dispute that LeBron sufficiently filed grievances which pertained to the alleged retaliation (Docket Nos. 179-5 at 1, 185-5 at 9; Dep. at 49-50,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2009 WL 6312275 (N.D.N.Y.)

(Cite as: 2009 WL 6312275 (N.D.N.Y.))

61-62); the false misbehavior report from January 10, 2002, subsequent disciplinary hearing, and disposition rendered January 23, 2002 (Docket Nos. 179-8, 179-9 at 7, 19, 21, 38-39, 43); and the investigation, search, and resulting misbehavior report regarding his outgoing mail in Southport (Docket Nos. 179-12, 185-5 at 96, 102, 104, 107, 109, 114, 116, 125, 133, 136-38, 142, 148, 154, 167-68). As such, the content of these grievances placed all potentially related defendants on notice of their involvement in the grievances and any potential, subsequent litigation. Naming each involved defendant was not required to exhaust LeBron's administrative remedies.

***7** To the extent that defendants contend that exhaustion did not occur through the filing and subsequent appeal of LeBron's grievances, such contentions are also without merit. The record indicates that LeBron filed and appealed the majority of his grievances and sought special reconsideration by the superintendents under their powers of discretionary review. Docket No. 185-5 at 26, 45. Such actions demonstrate that LeBron exhausted all methods of obtaining administrative relief available to him.

Accordingly, defendants' motions on this ground should be denied.

**C. Personal Involvement**

Defendants contend that LeBron has failed to establish the personal involvement of any of the "correspondence defendants." FN15 " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> FN15. "Correspondence defendants" were those apprised of the alleged constitutional violations through LeBron's correspondence with individuals both within and outside the grievance process.

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

**1. Burke, Murphy, and Selsky**

Burke signed a grievance denial on February 11, 2002, stating that the hearing on January 23, 2002 addressed all the issues raised by LeBron. Docket No. 179-5 at 3, 7. Both Murphy and Selsky, in their capacities as Superintendent, denied LeBron's requests for reconsideration of his January 23, 2002 disciplinary hearing because there were not "sufficient grounds to reconsider the previous decision on that hearing [and that f]urther administrative action w[ould] not be forthcoming." Docket Nos. 179-9 at 45, 185-5 at 45. On October 23, 2002, Selsky determined that the same hearing would be reversed and expunged. Docket No. 185-5 at 78.

From this correspondence and construing the facts in the light most favorable to LeBron, it appears that Burke, Murphy, and Selsky all reviewed the hearing, evaluated the evidence and findings, and responded to LeBron. This demonstrated personal knowledge of the potentially unconstitutional segregation which was occurring and continuing. Such investigation and response suffices to establish personal involvement. *See Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1234 (S.D.N.Y.2003) ("Personal involvement will be found, however, if an

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

official acts on a prisoner's grievances or otherwise responds to them.") (citations omitted).

***8** Accordingly, defendants' motion should be denied on this ground.

**2. L. LeClaire**

LeClaire was often delegated the responsibility to investigate and respond to LeBron's various complaints. Docket No. 179-9 at 6, 11, 23, 27, and 35. LeClaire was also directly contacted by LeBron regarding various complaints, including his issues at Adirondack. *Id.* at 21. LeClaire responded to complaints about the retaliation which allegedly resulted in the false misbehavior report and January 23 hearing. *Id.* at 5, 29, 31, 34, and 52.

Viewing the facts in the light most favorable to LeBron, L. LeClaire was uniquely involved in the investigation and potential perpetuation of LeBron's administrative segregation. L. LeClaire was charged with the investigation of many of LeBron's complaints and memorialized his findings in correspondence to LeBron. This suffices to establish personal involvement. *See Atkins,* 251 F.Supp.2d at 1234.

Accordingly, defendants' motion on this ground should be denied.

**3. Granish, Hale, and Sheahan**

Granish responded to at least five requests from LeBron for information between March and July, 2002 and another in October 2002. Docket No. 185-5 at 33, 39, 62-63, 66, 73, 79. Hale was presumably involved with the grievance procedure at Southport Correctional Facility as all correspondence between he and LeBron occurred in 2004 while LeBron was incarcerated there. The correspondence concerned multiple grievances about actions occurring during LeBron's incarceration at Southport and the ability to consolidate such grievances. *Id.* at 91, 100-101, 106, 108, 115, 119, 120-21, 128-29, 139, 147. Sheahan was involved with the movement, classification, and placement of LeBron during his incarceration. *Id.* at 105, 127. As such, these defendants were not directly involved in any constitutional violation occurring while LeBron was incarcerated at Adirondack in January. Moreover, LeBron has proffered no evidence that Granish, Hale or Sheahan created a policy which allowed constitutional violations to continue or was grossly negligent in managing subordinates.

Accordingly, defendants' motion as to Granish, Hale, and Sheahan on this ground should be granted.

**4. Goord**

Goord delegated to subordinates the task of responding to LeBron's various complaints. The record reflects at least eighteen items of correspondence that were sent to LeBron from a third party, at the direction of Goord. Docket Nos. 179-9 at 5, 10, 19, 34; 185-5 at 31, 52, 58, 71, 77, 90, 93, 155, 172, 179, 184, 187, 193, 195. The record also shows correspondence from Goord to LeClaire instructing him to tend to LeBron's claims on at least five occasions. Docket No. 179-9 at 6, 11, 23, 27, 35. LeBron makes no assertions that Goord was personally involved in the actual events giving rise to his constitutional claims, merely that Goord was aware of the occurrences and allowed unlawful conduct to continue.

However, the fact that an official failed to investigate a letter alleging a constitutional violation fails to establish personal involvement. *Westbrook v. CUNY,* 591 F.Supp.2d 207, 225 (E.D.N.Y.2008). Thus, Goord's failure to investigate the substance of these letters personally does not give rise to a claim of personal involvement. "The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation." *Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (citing *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F Supp.2d 342, 347 (W.D.N.Y.2007)). As the record has shown, Goord referred multiple letters of complaint to the appropriate individuals for investigation and response. This action is insufficient to sustain a claim of personal involvement. Finally, LeBron has proffered no evidence that Goord created a policy which allowed constitutional violations to continue or was grossly negligent in managing others.

***9** Accordingly, defendants' motion as to Goord should be granted.

**5. Nuttal, Hillard, Roy, Annucci, McCoy, Ricks, and McNulty**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

There is no dispute that none of these seven defendants were directly involved in the events giving rise to the disciplinary hearing on January 23, 2002 or the mail watch. However, some were apprised of and involved in the alleged continuing constitutional violations which occurred.

Nuttal was contacted by LeBron and was advised that his present issues would best be discussed with, and determined through, the Inmate Grievance Office. Docket No. 185-5 at 90. Hillard was contacted about a control-and-movement order to which he responded that he had no authority over such matters and referred LeBron to Sheahan for further information. Docket No. 185-5 at 105. Annucci also wrote multiple letters to LeBron directing him to more appropriate departments to address his complaints. Docket Nos. 179-9 at 41-42, 185-5 at 76. Ricks referred most of the correspondence he received from LeBron to Donelli or Donaldson as they were the appropriate parties to address LeBron's concerns. Docket No. 185-5 at 27, 34, 41-42, 46. LeBron contacted McNulty to commence a criminal action against the defendants involved in the retaliatory misbehavior report and McNulty forwarded LeBron's complaints to the Inspector General's Office as that office was responsible for investigating such complaints. Docket No. 179-9 at 21. It is well-settled that referring letters to others for investigation and response is insufficient to demonstrate personal involvement. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). Thus, the fact that correspondence occurred between LeBron and defendants, or defendants and others, to refer complaints is insufficient to constitute personal involvement. Additionally, LeBron has proffered no evidence that any of these defendants created a policy which allowed constitutional violations to continue or was grossly negligent in managing other defendants.

Similarly, a letter was forwarded to Roy. Docket No. 179-9 at 2. Roy did not respond. McCoy received copies of certain correspondence exchanged between the administration and LeBron. *Id.* at 10, 19, 21. Additionally, McCoy was accused of never responding to LeBron's complaints. *Id.* at 21. Sending letters and grievances alone will not suffice to sustain a claim for personal involvement. *See Sealey,* 116 F.3d at 51 (finding that the failure of an individual to respond to a complaint is insufficient to allege personal involvement); *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) (reinforcing that a defendant "cannot be held liable on the sole basis that he did no act in response to letters of protest sent by [the inmate] ...."); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation). Finally, LeBron has proffered no evidence that McCoy or Roy created a policy which allowed constitutional violations to continue or was grossly negligent in managing other defendants.

***10** Accordingly, defendants' motion as to Nuttal, Hillard, Roy, Annucci, McCoy, Ricks, and McNulty [FN16] should be granted.

> FN16. To the extent that LeBron claims that McNulty violated his constitutional rights by failing to institute criminal charges at his behest, such allegations fail to state a claim because there exists no constitutionally protected right to file criminal charges against anyone. *See Langworthy v. Dean,* 37 F.Supp.2d 417, 422 (D.Md.1999) ("[A] right to compel the prosecution of criminal activity does not exist.").

**D. Retaliation**

LeBron contends that the basis for the January 10, 2002 cell search and subsequent misbehavior report were false in retaliation for LeBron's December 12, 2001 filing of a grievance against Woodroff. Eight defendants were allegedly personally involved. Sorenzon received notice that LeBron was fearful that a search would result in planted contraband and a false disciplinary charge. Docket No. 185-5 at 9. Sorenzon investigated the complaint and assured LeBron that this would not occur while LeBron was simultaneously issued the disciplinary report. *Id.* Walcott called McLaughlin, who ordered the search which was executed by J. LeClaire and Smith. Hearing at 23; Docket No. 179-5 at 14; 185-5 at 10. Boyton was notified by Roque of the results of the search and LeBron was escorted to SHU. Docket Nos. 179-5 at 14, 18, 185-5 at 10, 179-6 at 15. Prior to the misbehavior report being served, it was reviewed by Colby. Docket Nos. 179-5 at 13, 179-6 at 2. After being sentenced to 180 days of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2009 WL 6312275 (N.D.N.Y.)

(Cite as: 2009 WL 6312275 (N.D.N.Y.))

confinement, LeBron sought assistance and additional review from Burke, Sanders, Murphy, Selsky, and L. LeClaire. Docket Nos. 179-9 at 45, 185-5 at 26, 45. On October 23, 2002, the disposition was reversed and expunged from LeBron's record. Docket No. 185-5 at 78.

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (*citing Graham,* 89 F.3d at 79). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Construing the facts in the light most favorable to LeBron, he has sufficiently alleged facts to support a retaliation claim. First, LeBron indisputably was engaged in filing grievances, an activity protected by the First Amendment. Almost immediately thereafter, LeBron voiced concerns about retaliatory disciplinary charges by defendants. There followed the cell search and disciplinary charges and the document purportedly from LeBron containing the white-out has never been produced nor has Walcott's sworn statement. On this record, then, a question of credibility is presented as to whether, as claimed by LeBron, he ever used white-out in a letter to Walcott or, as claimed by defendants, such a letter was received by Walcott. If LeBron's assertion is credited, no basis existed for the cell search and he never possessed white-out, supporting his claim that the search and charges were done in retaliation for his grievances.

***11** To the extent that defendants' claim LeBron's assertions are conclusory, such contentions are without merit. LeBron must prove a negative-that he did not possess white-out or include white-out in a letter to Walcott. By its nature, this requires a conclusory assertion of a denial. Moreover, without any supporting testimony or physical evidence, defendants' claims appear conclusory.

Accordingly, defendants' motion as to this claim should be denied.

**E. Mail Tampering**

Still remaining are LeBron's First Amendment claims against defendants Chappins, McGinis, Wetzel, Marshall, Sullivan, and Donahue for the unconstitutional interception and examination of his mail.

**1. Mail Watch**

The interception of a prisoner's mail has been analyzed under both the First and Fourth Amendments. *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998). " '[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison,' " but "it must be recognized that a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system." *Felipe,* 148 F.3d at 107 (*quoting Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). The Supreme Court has held "that the interception of a defendant's prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail." *Id.* at 108 (*citing United States v. Workman,* 80 F.3d 688, 698-99 (2d Cir.1996) (concluding "that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable under the [First and] Fourth Amendment[s].").

In this case, LeBron claims that defendants "tampered" with his mail through the mail watch.[FN17] Before defendants found the letters in question but after the mail watch had already been instituted for undisclosed reasons, LeBron was issued a misbehavior report, convicted, and sentenced to 180 days of segregated confinement for violating facility correspondence rules. Docket No. 179-10 at 3-4. Thus, regardless of what occurred prior to December 29, 2003, from that point on, defendants had reasonable cause to inspect Lebron's mail based on his proven misuse of the mail. LeBron's second violation, at issue in this case, occurred on February 27, 2004. During the subsequent disciplinary hearing, LeBron candidly admitted to violating the facility correspondence rules, further bolstering defendants' reasons for the mail

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2009 WL 6312275 (N.D.N.Y.)

(Cite as: 2009 WL 6312275 (N.D.N.Y.))

watch. Therefore, on this record, defendants did not violate LeBron's rights as their penological interests in maintaining compliance with facility rules outweighed LeBron's constitutional rights.

> FN17. Mail watch "allow[s] a prison superintendent to authorize the inspection of outgoing and incoming mail if there is reason to believe that the correspondence threatens the safety of any person or the good order of the facility." *Felipe,* 148 F.3d at 105.

Thus, defendants' motion for summary judgment should be granted on this ground.

**2. Denial of Outgoing Mail**

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citations omitted). While legal mail is afforded the greatest protection, "greater protection [is afforded] to outgoing mail than to incoming mail." *Id.* (citations omitted). "Restrictions ... are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved." *Id.* (citations omitted).

***12** As previously discussed, LeBron had a documented failure to adhere to facility correspondence rules which gave rise to concerns for institutional safety for those incarcerated within the facility and those persons outside the facility with whom the inmate was communicating. A mail watch is a recognized method of accomplishing such a balance between penological interests and an inmate's constitutional rights. As previously discussed, defendants had a reasonable basis to institute the mail watch. Moreover, the mail in question was not legal mail and, thus, was afforded less protection. Additionally, the procedure was the least restrictive given the circumstances.

Therefore, defendants' motion on this ground should be granted.

**F. Fourteenth Amendment**

LeBron contends that his right to due process was violated when he was given a false misbehavior report and denied certain rights during his disciplinary hearing by Mehrmann, Faulkner, McLaughlin, and Wells.

**1. Due Process**[FN18]

> FN18. Construing the multitude of letters attached to LeBron's response, it appears that Faulkner, Perham, Racette, and Donelli were allegedly involved in the denial of LeBron's credit for prehearing confinement relating to the current case. However, Perham, Racette and Donelli were not personally involved in the events surrounding the hearing and, thus, claims against them cannot lie. Moreover, while it is undisputed that LeBron possessed a liberty interest in remaining free from segregated confinement, no facts have been proffered regarding the impact of LeBron's prehearing confinement claims. Additionally, no procedural due process violations were established.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants' claims under *Sandin*. *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000).

As LeBron spent more than thirty days in keeplock, questions of fact exist as to the liberty interest asserted by LeBron. Accordingly, defendants' motion on this ground should be denied.

**a. Fair and Impartial Hearing**

While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

**i. Notice**

***13** Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are ....“ *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (citations omitted). "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct ... charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges ....“ *Taylor v. Rodriguez,* 238 F.3d 188, 192-93 (2d Cir.2001) (citations omitted). Such notice guarantees a meaningful hearing whereupon a prisoner can properly defend himself against the pending charges. *Id.* at 193.

In this case, LeBron contends that he received insufficient notice of the hearing because it occurred less than twenty-four hours after he met with Mehrmann. However, the record indicates that LeBron met with Mehrmann on January 14, two days prior to his hearing. Docket No. 179-6 at 7. More importantly, this does not define the applicable legal standard. LeBron was required to receive meaningful notice of the charges in the disciplinary report, which occurred when he was provided with the misbehavior report on January 12, four days before the commencement of the hearing. *Id.* at 6; Dep. at 81. There is no dispute that the misbehavior report served as adequate notice.

Accordingly, LeBron received all the notice he was due and defendants' motion should be granted on this ground.

**ii. Opportunity to Present Defense**

LeBron claims that he was denied (1) adequate inmate assistance because he was not provided with papers which he requested from Mehrmann, (2) the ability to question witnesses adequately, and (3) the time to place objections and questions on the record.

"[P]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). Such an assistant is designed to help disabled inmates "gather [ ] evidence, obtain[ ] documents and relevant tapes, and interview [ ] witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Id.* at 898. The Second Circuit has also held "that for inmates disabled by confinement in SHU ... the right to substantive assistance is an obligation ... [to] be provided in good faith and the best interests of the inmate." *Id.* Any violations of this right to assistance are reviewed to assess "whether the error was harmless or prejudicial." *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991).

In this case, it is undisputed that LeBron was provided with multiple documents including redacted log sheets from the date in question and memoranda from the defendants. Despite these documents, LeBron claimed that he had received inadequate assistance because he was denied other requested log sheets for dates other than January 10 and from areas other than the cellblock in which his cell was located. Hearing at 2-7. As stated by Faulkner, these items were most likely unavailable to the inmate assistant because they were irrelevant to the pending charges. *Id.* at 10. Mehrmann also failed to provide inventory sheets for razors and white-out, but LeBron was again told that such information was not available as those documents were neither created nor kept

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2009 WL 6312275 (N.D.N.Y.)

(Cite as: 2009 WL 6312275 (N.D.N.Y.))

in the ordinary course of business. *Id.* The inmate assistant also spoke with inmate Washington and recorded his desire to abstain from testifying. *Id.* at 13. Therefore, it does not appear that the inmate assistant was remiss in any material respect.

***14** Even if the inmate assistant was deficient, such errors were harmless as LeBron had sufficient access to the witnesses and documentary evidence. Faulkner agreed to substitute one of LeBron's misidentified witnesses. Hearing at 12, 22-23. Faulkner also interviewed Washington after he declined to testify [FN19] to determine if he possessed any pertinent information for the disciplinary hearing. *Id.* at 27; Docket Nos. 179-5 at 17, 179-6 at 12. He did not. Hearing at 27; Docket Nos. 179-5 at 17, 179-6 at 12. Faulkner also allowed LeBron to question witnesses at the hearing, including McLaughlin. Moreover, when LeBron expressed surprise at McLaughlin's testimony, Faulkner granted LeBron's written requests to question McLaughlin, solicited the answers over the weekend, and read the answers into the record when the hearing resumed. Hearing at 28-30; Docket No. 179-6 at 22-28. Furthermore, when LeBron stated that he was not provided with the memorandum from Mehrmann, Faulkner made and provided LeBron with additional copies, despite LeBron's later admission that he had received the memoranda and reviewed them in preparation for the hearing. Hearing at 26, 28.

FN19. In previous litigation LeBron has been apprised of "[a] prison disciplinary hearing officer['s lack of] ... power to force an inmate to testify, and when an inmate refuses, the hearing officer need not call that witness." *LeBron v. Artus,* No. 06-CV-532 (VEB), 2008 WL 111194, at *10 (W.D.N.Y. Jan.9, 2008) (*citing Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993))

Finally, when LeBron added McFarlin as a witness, Faulkner attempted to locate McFarlin for testimony. His reasonable attempts were thwarted by the failure of McFarlin to leave a forwarding telephone number when released from DOCS custody. Hearing at 43. Any additional efforts to locate McFarlin in the general population of Manhattan to which McFarlin relocated would have been extraordinary, burdensome, and beyond the bounds of reasonable efforts.

Therefore, any potential defect in the assistance provided by Mehrmann was remedied by Faulkner. *Powell,* 953 F.2d at 750. Accordingly, defendants' motion should be granted on this ground.

#### iii. Right to Call Witnesses

LeBron complains that he was prohibited from asking Smith all of the questions he had planned. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials ...." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N.Y.2002). Deference to a hearing officer's judgment regarding witnesses that will present irrelevant or unnecessary testimony and the overall goal of institutional safety are important considerations to balance against an inmate's procedural due process rights. *Id.; see also Wolff,* 418 U.S. at 566 (holding that the goals of the correctional institution remain a paramount consideration); *Scott v. Kelly,* 962 F.2d 145, 146-47 (2d Cir.1992) ("It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." (internal quotation marks and citations omitted)).

LeBron was given ample opportunity to question Smith. However, his questions soon became argumentative and ssought to elicit no relevant testimony. Hearing at 32-42. LeBron was warned twice that such questioning would result in a termination of his questioning of the witness. *Id.* LeBron continued his argumentative questioning and the witness was excused. Deference to such a judgment by the hearing officer is necessary to maintaining order at the hearing. Faulkner's actions were appropriate in light of LeBron's failure to abide by Faulkner's warnings.

***15** Accordingly, defendants' motion should be granted on this ground.

#### iv. Fair and Impartial Hearing Officer[FN20]

FN20. To the extent that LeBron contends that Faulkner tampered with the tape recording of the hearing, such serious allegations raise questions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> concerning the impartiality of the hearing officer. *Odom v. Kerns,* No. 99-CV-10668 (KMK/MHD), 2008 WL 2463890, at *11 (S.D.N.Y. June 18, 2008) (citations omitted). LeBron indicates that Faulkner's actions were responsible for deleting the testimony of J. LeClaire, whose testimony was allegedly inconsistent with his written reports and was arguably exculpatory. *See* note 7 *supra.* First, these allegations are belied by the hearing transcript, which presents a clear and unabridged narrative of the hearing. Second, the substance of the hearing transcript and Faulkner's reliance on J. LeClaire's testimony which was bolstered by the memorandum and the misbehavior report contradict LeBron's conclusory allegations that J. LeClaire's testimony contradicted his prior reports. On this a motion for summary judgment, more than conclusory allegations need be proffered to raise a question of fact. Accordingly, defendants are entitled to judgment on any such claims.

Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487-88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

As discussed, and as the record reflects, Faulkner provided LeBron with every opportunity to present his defense. Faulkner allowed witnesses to be substituted, interviewed inmates after they refused to testify, attempted to locate a witness who had been released from DOCS custody, provided LeBron with additional documentation at LeBron's request which LeBron had already received, allowed LeBron to question all witnesses, and even submit additional questions to McLaughlin and elicit responses to read into the record to develop the record further for LeBron's hearing. *See e.g.,* Hearing at 12, 22-23, 26-30, 43. These actions, and the five days of testimony refute LeBron's conclusory allegations of partiality and bias by Faulkner. Moreover, the physical evidence presented plus the testimony from multiple sources provided Faulkner with more than some evidence upon which to find LeBron guilty of the charges in the misbehavior report.

Accordingly, defendants' motion should be granted on this ground.

**v. Disposition**

As noted above, the Second Circuit has held that once "the procedural due process requirements have been met, its function is to determine whether there is *some* evidence which supports the [disciplinary] ... decision." *Franco v. Kelly,* 854 F.2d 584, 588 (2d Cir.1988); *see also Luna,* 356 F.3d at 487-88; *Hill,* 472 U.S. at 455. Here, even construing the facts in the light most favorable to LeBron, there is sufficient information to conclude that there was presented at the hearing at least some evidence of his guilt of possessing contraband and a weapon. The misbehavior report, memoranda, and pictures of the confiscated items all supported Faulkner's determination that LeBron was guilty of two of the charges.

LeBron contends, however, that he was not apprised of the disposition because he did not attend the final day of his hearing. Dep. at 101-102. LeBron's conclusory allegations that his constitutional rights were violated by the failure of defendants to provide him with assistance to the hearing and the subsequent disciplinary hearing are belied by the record. Medical records indicate that LeBron had no reported injuries or complaints of pain for months prior and subsequent to the disciplinary hearing. Docket No. 190-2. These records are supported by the testimony of non-party Provost that LeBron adamantly refused to attend his hearing and understood the consequences of that refusal. Hearing at 43.

***16** Accordingly, defendants' motion should be granted on this ground.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. False Misbehavior Reports**

LeBron alleges that he was issued a false misbehavior report in violation of his constitutional rights on January 10, 2002. As discussed *supra,* an inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman,* 808 F.2d at 951. "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. As discussed *supra,* construing the record in the light most favorable to LeBron, material questions of fact exist whether the evidence underlying the charges was fabricated or possessed by LeBron as charged. *See* subsection II(D) *supra.* Accordingly, defendants' motion on this claim should be denied.

**3. Qualified Immunity**

Defendants claim that even if plaintiff's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03-CV-1157, 2006 WL 839525, at *16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning any of LeBron's claims with regard to the due process he was provided at his disciplinary hearing or the mail tampering because, as discussed *supra,* accepting all of his allegations as true, LeBron has not shown that any of defendants violated his constitutional rights. However, with respect to LeBron's claims surrounding the retaliation and false misbehavior report, questions of fact have been raised. As to those claims, it is undisputed that an inmate had a well-established right to be free from retaliation from corrections officers and administrators before the alleged violations occurred. *See generally Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (discussing an inmate's right to be free from retaliatory acts for constitutionally protected activities).

***17** Accordingly, it is recommended that defendants' motion on this ground be granted in the alternative as to all claims and defendants except for LeBron's First Amendment retaliation and Fourteenth Amendment false misbehavior report causes of action.

**III. Defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders**

Summonses for service of process upon defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders were issued on May 18, 2005. *See* Docket Entry dated 5/18/05. LeBron was granted in forma pauperis status, Docket No. 4, and the United States Marshals Service attempted service, in August 2005 but the summonses for these five defendants were returned unexecuted. Docket Nos. 55 (Pasquil), 56 (Leferve), 91 (McLaughlin, Sanders, and Mehrmann). A summons was reissued for McLaughlin on December 8, 2005. *See* Docket Entry 12/8/05. The Marshals Service attempted service again on February 24, 2006 but was unsuccessful. Docket No. 123. LeBron has never provided the Marshals Service with any other address for any of these defendants and they have not otherwise appeared in this action.

On November 21, 2007, over two years after summonses were first issued, LeBron moved for an order for defendants' counsel to accept service on behalf of the aforementioned defendants. Docket No. 136. On March 19, 2008, that motion was denied. Docket No. 144.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

However, DOCS counsel was requested to advice the Clerk of the current employment status of the defendants for reissuance of the summonses. *Id.* DOCS counsel responded on July 25, 2008 (Docket No. 158), and summonses were reissued for Sanders and Mehrmann. Docket No. 159. The summonses were again returned unexecuted as to Sanders and Mehrmann. Docket No. 164.

Fed.R.Civ.P. 4(m) requires that a complaint be served upon a defendant within 120 days after the complaint is filed or the complaint may be dismissed as to any unserved defendant without prejudice. *See also* N.D.N.Y.L.R. 4.1(b). The original complaint naming defendants here was filed on February 9, 2005. Docket No. 1. More than 120 days have passed since either the complaint was filed or any of the summonses, for any of these five defendants, were issued. Accordingly, it is recommended that the action be dismissed as to these defendants without prejudice pursuant to Rule 4(m) and Local Rule 4.1(b).

**IV. Motion to Supplement**

LeBron seeks to supplement his amended complaint by adding a new defendant in place of a previously dismissed "John Doe" defendant and changing the name of a previously named defendant, from Pasquil to Perham. Docket No. 186.

Fed.R.Civ.P. 15(d) allows a party to supplement a pleading with matters that occurred after the filing of the original complaint but which pertain to the original pleading.[FN21] *Albrecht v. Long Island R.R.,* 134 F.R.D. 40, 41 (E.D.N.Y.1991). A party may supplement to include subsequent occurrences "absent prejudice to the nonmoving party." *Id.* "It is also proper to permit the filing of a supplemental pleading to add additional parties." *Tobin v. Rell,* No. 05-CV-1079, 2007 WL 1520111, at *2 (D.Conn. May 18, 2007) (*citing Griffin v. County Sch. Bd. of Prince Edward County,* 377 U.S. 218, 227, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) (other citation omitted)).

FN21. Fed.R.Civ.P. 15(d) states: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time."

***18** The standard for a motion to supplement is the same as for a motion to amend the pleadings under Fed.R.Civ.P. 15(a). *Klos v. Haskell,* 835 F.Supp. 710, 715 (W.D.N.Y.1993) (Fisher, M.J.), *adopted by* 835 F.Supp. 710 (W.D.N.Y.1993) (Telesca, J.). Rule 15(a) provides that a court should grant leave to amend "freely ... when justice so requires." When exercising its discretion, a court must examine whether there has been undue delay, bad faith, or dilatory motive on the part of the moving party. *Evans v. Syracuse City School District,* 704 F.2d 44, 46 (2d Cir.1983) (*citing Foman,* 371 U.S. at 182). The court must also examine whether there will be prejudice to the opposing party. *See, e.g., Ansam Associates Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (permitting proposed amendment would be especially prejudicial once discovery has been completed and a summary judgment motion filed). Finally, where it appears that granting leave to amend is unlikely to be productive or the amendment is futile, it is not an abuse of discretion to deny leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted).

Moreover, in the case of proposed amendments where new defendants are to be added, the Court must also look to Fed.R.Civ.P. 21. Rule 21 states that a party may be added to an action "at any stage of the action and on such terms as are just." Rule 21 is "intended to permit the bringing in of a person, who through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable." *United States v. Commercial Bank of N.A.,* 31 F.R.D. 133, 135 (S.D.N.Y.1962) (internal quotations omitted). Addition of parties under Rule 21 is also guided by the same liberal standard as a motion to amend under Rule 15. *Fair Housing Dev. Fund Corp. v. Burke,* 55 F.R.D. 414, 419 (E.D.N.Y.1972).

In the four and one-half years since LeBron filed his original complaint, defendants have filed a motion to dismiss, completed discovery, and filed a motion for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

summary judgment. If LeBron is permitted to supplement his amended complaint to add new defendants at this late juncture, defendants would be put to the burden of waiting for the new defendants to be served, answering the supplemental complaint, and potentially engaging in additional discovery long after the time for discovery has closed in a case they have defended for over four and one-half years. *See Besicorp Group, Inc. v. Thermo Electron Corp.,* No. 90-CV-434, 1993 WL 105163, at *3 (N.D.N.Y. Apr.6, 1993) (Munson, J.) (allowing plaintiff to file a supplemental complaint after discovery has closed would result in undue delay and prejudice to the opposing party); *see also Richardson Greenshields Sec. Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (undue prejudice warranted denial of leave to amend where proposed claim would have significantly increased scope of discovery when case was ready for trial).

***19** Therefore, because undue prejudice would occur to defendants at this late date and would significantly delay the resolution of this already long-pending action, LeBron's motion to supplement his amended complaint is denied.

**V. Motion to Strike**

LeBron filed a motion pursuant to Fed.R.Civ.P. 12(f) seeking to strike (1) papers attached to defendants' motion for summary judgment, and (2) Silverman's affidavit for insufficient personal knowledge. Docket No. 187. Under Fed.R.Civ.P. 12(f), a court may strike “from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.” However, motions to strike portions of affidavits or evidence of support thereof are not consistent with the purpose of Rule 12(f). *See Dragon v. I.C. Sys., Inc.,* 241 F.R.D. 424, 425-26 (D.Conn.2007). Such materials are not technically pleadings, but given the lack of other options to challenge affidavits, “courts have been willing to view motions to strike as calling the propriety of affidavits into question.” *Id.* (citations omitted).

In this case, the affidavit of defendants' counsel, Adam Silverman, addresses the remaining causes of action after the motion to dismiss was decided, the remaining defendants, the veracity of the documents submitted in support of the remaining defendants' arguments, and LeBron's pertinent administrative record. Silverman Aff. (Docket No. 179-2). Any discussion in the affidavit about the course of the litigation stemmed from personal knowledge as Silverman was directly involved in all stages. Additionally, all attached documents were relevant to the remaining causes of action, certified, and kept in DOCS' regular course of business. Thus, records which were utilized during the course of the disciplinary hearing are admissible and available for consideration.

Accordingly, LeBron's motion to strike is denied.

**VI. Conclusion**

For the reasons stated above, it is hereby

1. **RECOMMENDED** that:

A. Defendants' motion for summary judgment (Docket No. 179) be

i. **DENIED** as to LeBron's First and Fourteenth Amendment claims for retaliation and filing a false misbehaviour report as to defendants Sorenzon, Walcott, J. LeClaire, Smith, Boyton, Roque, Colby, Burke, Murphy, Selsky, and L. LeClaire; and

ii. **GRANTED** as to all other claims and all other defendants except defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders;

B. The amended complaint be **DISMISSED** without prejudice as to defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders; and

2. **ORDERED** that

A. LeBron's motion to supplement (Docket No. 186) is **DENIED;** and

B. LeBron's motion to strike (Docket No. 187) is **DENIED**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Not Reported in F.Supp.2d, 2009 WL 6312275 (N.D.N.Y.)

(Cite as: 2009 WL 6312275 (N.D.N.Y.))

**TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

LeBron v. Selsky
Not Reported in F.Supp.2d, 2009 WL 6312275 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Elvin LEBRON, Plaintiff,
v.
Donald SELSKY; Glenn S. Goord; Anthony J. Annucci; Lucien J. LeClaire, Jr.; John H. Nuttall; John J. Donelli; Thomas J. Ricks; S. Stuart; Bruce J. Smith; John J. LeClaire; R. Wells; Sgt. Sorenzon; Gregory L. Boyton; Lt. A.C. Rocque; Lt. J. Colby; Capt. Faulkner; David L. McNulty; B. Jarvis; William Burke; Kevin L. McLaughlin; Thomas C. Sanders; Peggy Walcott; Richard D. Roy; John Mehrmann; C.C. Pasquil; M. Leferve; Captain Racette; Joseph E. McCoy; Robert J. Murphy; Mr. Jeffrey Hale; C.O. McKernon; J. Litweiler; Lt. Marshall; Paul Chappins, Jr.; Supt. Michael McGinnis; D. Hillard; D. Sullivan; Lt. Donahue; Sgt. Wetzel; and Captain M. Sheahan, Defendants.
No. 9:05-CV-0172 (GTS/DRH).

March 31, 2010.
Elvin Lebron, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Stephen M. Kerwin, Esq., Assistant Attorney General, Albany, NY, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

***1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Elvin Lebron ("Plaintiff") against the forty above-captioned employees of the New York State Department of Correctional Services ("Defendants"), are the following: (1) Defendants' motion for summary judgment (Dkt. No. 179); (2) United States Magistrate Judge David R. Homer's Report-Recommendation recommending that Defendants' motion be granted in part and denied in part (Dkt. No. 194); (3) Defendants' Objections to the Report-Recommendation (Dkt. No. 197); and (4) Plaintiff's Objections to the Report-Recommendation (Dkt. No. 202). Also before the Court are Plaintiff's appeals from Magistrate Judge Homer's Orders denying (1) Plaintiff's motion to supplement the pleadings (Dkt.Nos.186, 194, 202), (2) Plaintiff's two motions to strike certain documents from the record (Dkt.Nos.187, 193, 194, 201, 202). For the reasons set forth below, the Report-Recommendation is adopted in part and modified in part; Defendants' motion for summary judgment is granted in its entirety; Magistrate Judge Homer's Order denying Plaintiff's motion to supplement the pleadings is affirmed; Magistrate Judge Homer's Orders denying Plaintiff's two motions to strike certain documents from the record are affirmed; and Plaintiff's Amended Complaint is dismissed in its entirety.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Amended Complaint**

On February 9, 2005, Plaintiff filed his Complaint in this action. (Dkt. No. 1.) On April 7, 2005, he filed an Amended Complaint. (Dkt. No. 6.) Construed with the utmost of liberality, Plaintiff's Amended Complaint alleges that, between approximately November 29, 2001, and February, 2004, while he was incarcerated at Adirondack Correctional Facility ("Adirondack C.F.") in Ray Brook, New York, his civil rights were violated in essentially the following six ways: (1) certain Defendants retaliated against him for filing grievances, in violation of his First Amendment rights; (2) certain Defendants unlawfully confiscated his mail, in violation of his First Amendment rights; (3) certain Defendants denied him access to the courts, in violation of his First Amendment rights; (4) certain Defendants denied him equal protection under the law, in violation of his Fourteenth Amendment rights; (5) certain Defendants denied him due process by refusing to answer and rectify his complaints, in violation of his Fourteenth Amendment rights; and (6) certain Defendants

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

denied him due process at a disciplinary hearing, in violation of his Fourteenth Amendment rights. (*See generally id.*)

On November 2, 2007, the Court issued a Decision and Order dismissing the following claims from Plaintiff's Amended Complaint: (1) the majority of Plaintiff's Fourteenth Amendment due process claims; (2) his First Amendment claim for denial of access to the courts; and (3) his Fourteenth Amendment equal protection claim. (Dkt. No. 132.) As a result, currently before the Court are the following claims: (1) Plaintiff's Fourteenth Amendment due process claim against Defendants Faulkner, McLaughlin, Wells, and Mehrmann for refusing to answer and rectify his multiple complaints; (2) Plaintiff's Fourteenth Amendment due process claim against Defendants Selsky, Goord, Annucci, L. Leclaire, Donelli, Ricks, Sanders, Roy, Pasquil, Hillard, Leferve, Racette, McCoy, and Murphy based on actions and inactions that occurred during his disciplinary hearing; (3) Plaintiff's First Amendment confiscation of mail claim against Defendants Chappins, McGinis, Wetzel, Marshall, Sullivan, Donahue, Sheahan, Litweiler, Nuttal, LeClaire, Annucci, McKernon, and Hale; and (4) Plaintiff's First Amendment retaliation and false misbehavior report claim against Defendants Sorenzon, Stuart, Walcott, McLaughlin, J. LeClaire, Smith, Boyton, Roque, Burke, L. LeClaire, Selsky, Murphy, Jarvis, Wells, Colby, Faulkner, and McNaulty. Familiarity with the factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.

**B. Defendants' Motion for Summary Judgement**

***2** On December 29, 2008, Defendants filed a motion for summary judgment seeking dismissal of Plaintiff's remaining claims. (Dkt. No. 179.) Generally, in support of their motion for summary judgment, Defendants argue as follows: (1) various Defendants should be dismissed based upon the Court's Decision and Order of November 2, 2007; (2) Plaintiff has failed to establish his procedural due process claim against Defendant Faulkner; (3) because Plaintiff has not established an underlying due process violation, his due process claims against the remaining Defendants must be dismissed; (4) Plaintiff has failed to adduce evidence establishing his retaliation and false misbehavior report claim; (5) he has failed to establish a claim for illegal confiscation of mail; (6) his claims against most Defendants should be dismissed on the alternative grounds that Plaintiff has failed to exhaust his available administrative remedies; and (7) the Defendants against whom he has claims regarding which he did exhaust his administrative remedies are entitled to qualified immunity. (*Id.*)

On April 28, 2009, after an extension of time was granted by the Court, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 185.) Generally, in his response, Plaintiff argues as follows: (1) he has introduced evidence from which a rational factfinder could conclude that Defendants violated his Fourteenth Amendment procedural due process rights during the disciplinary hearing; (2) he has introduced evidence from which a rational factfinder could conclude that Defendants did not have reasonable cause to inspect his outgoing mail, and therefore the subsequent confiscation violated his First Amendment rights; (3) he has introduced evidence from which a rational factfinder could conclude that Defendants retaliated against him for filing a grievance against Officer Woodruff, in violation of his First Amendment rights [FN1]; (4) he has exhausted his administrative remedies with respect to all Defendants; and (5) Defendants are not entitled to qualified immunity.[FN2]

FN1. According to Defendants, Plaintiff sent a letter to Defendant Walcott (of DOCS' office in Albany), which contained correction fluid (also known informally as "white-out"), a contraband substance pursuant to Adirondack C.F. rules. (Dkt. No. 194, at 5.) This letter, which has never been produced, is referred to by Plaintiff as the "phantom letter." (*Id.*)

FN2. On May 19, 2009, Defendants filed a reply to Plaintiff's response, in which they reiterated their argument that Plaintiff's Amended Complaint should be dismissed in its entirety based on Plaintiff's failure to adduce evidence establishing any of his claims. (Dkt. No. 190, Attach.3.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**C. Magistrate Judge Homer's Report-Recommendation and Orders**

On September 11, 2009, Magistrate Judge Homer issued a Report-Recommendation recommending that Defendants' motion be granted in part and denied in part. More specifically, Magistrate Judge Homer recommends as follows: (1) that Plaintiff's First Amendment claim for retaliation involving the cell search and subsequent issuance of a false misbehavior report *not* be dismissed due to the existence of genuine issues of material fact; (2) that Plaintiff's First Amendment claim for illegal confiscation of mail be dismissed; (3) that Plaintiff's Fourteenth Amendment due process claims be dismissed; and (4) that Defendants Leferve, McLaughlin, Mehrmann, Pasquil and Sanders be dismissed without prejudice for failure to effect service, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b). (Dkt. No. 194.) Familiarity with the grounds of Magistrate Judge Homer's Report-Recommendation is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties.

***3** In addition, on September 11, 2009, and November 18, 2009, Magistrate Judge Homer denied (1) Plaintiff's motion to supplement the pleadings (Dkt. Nos.186, 194, 202), (2) Plaintiff's two motions to strike certain documents from the record (Dkt.Nos.187, 193, 194, 201, 202).

**D. Objections to Magistrate Judge Homer's Report-Recommendation**

**1. Defendants' Objections**

On November 2, 2009, Defendants submitted their Objections to the Report-Recommendation. (Dkt. No. 197.) Generally, in their Objections, Defendants argue as follows: (1) Magistrate Judge Homer erred in not dismissing Plaintiff's retaliation and false misbehavior report claims because Plaintiff failed to introduce admissible record evidence that Defendant Walcott knew of his grievance against Woodruff, such that her notifying Defendant McLaughlin about his use of correction fluid could be deemed retaliatory, and "[t]he dismissal of Walcott dooms the remainder of [P]laintiff's retaliation claim"; and (2) even if Plaintiff's retaliation claim against Defendant Walcott remains, Defendants Sorenzon, Stuart, McLaughlin, J. LeClaire, Smith, Boyton, Roque, Burke, L. LeClaire, Selsky, Murphy, Jarvis, Wells, Colby, Faulkner, and McNaulty are entitled to qualified immunity as a matter of law because their actions were "objectively reasonable" based on the circumstances and the information they received. (*Id.*)

**2. Plaintiff's Objections**

On December 3, 2009, after being granted an extension of time to do so by the Court, Plaintiff filed his Objections to Magistrate Judge Homer's Report-Recommendation, and his Orders denying Plaintiff's three non-dispositive motions. (Dkt. No. 202.) Generally, in his Objections, Plaintiff argues, *inter alia,* as follows: (1) Magistrate Judge Homer erred in dismissing his due process claims because, *inter alia,* (a) Adirondack C.F. did not list or otherwise include correction fluid as a banned substance in any of its written materials, (b) certain testimony of Defendants LaClaire and Faulkner is missing from the hearing transcript and has not been produced, (c) Defendant Falkner improperly permitted a portion of the hearing to be conducted in Plaintiff's absence, without personally ensuring that Plaintiff understood the consequences of not participating in the "final day" of his hearing, and (d) Defendant Faulkner failed to make a "reasonable attempt" to locate Plaintiff's requested witness for the disciplinary hearing through the N.Y.S. Parole Board; (2) Defendants violated his constitutional rights by tampering with his mail because "their penological interest in maintaining compliance with facility rules via a mail watch was based on Directive 4421, ... not 4422[,] which was not followed"; (3) Defendants who were involved in the due process violations and mail tampering incidents are not entitled to qualified immunity because they violated his constitutional rights; and (4) his motion to supplement the pleadings and his motion to strike certain evidence should have been granted. (*Id.*) Although Plaintiff's appeals from two of the last three non-dispositive motions were not arguably timely in nature, the Court will consider them, out of special solicitude to Plaintiff.

**E. Defendants' Response to Plaintiff's Objections**

***4** On December 8, 2009, Defendants filed a response to Plaintiff's Objections. (Dkt. No. 203.) Generally, in their response, Defendants argue, *inter alia,* that Plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Objections contain an admission that the "phantom letter" that he sent to the DOCS in Albany contained whiteout (a contraband substance). (Dkt. No 203, at 2.)

**F. Plaintiff's Supplemental Objection**

On December 21, 2009, Plaintiff filed a Supplemental Objection to Defendants' Response, denying that he admitted sending a letter to an official in Albany that contained correction fluid, and clarifying Defendants' misreading of his statement for the Court. (Dkt. No. 204.)[FN3]

FN3. (*See also* Dkt. No. 202, at 1 [stating that "D.S.S. Mclaughlin never received a telephone call from Defendant Walcott on January 10th, 2002, *advising him* that Lebron possessed contraband because the letter Petitioner had sent to Albany contained white-out correction fluid (which was not banned from inmates.)"]; *see also* Dkt. No. 203, at 2 [stating that "the letter petitioner had sent to Albany contained white-out correction fluid (which was not banned from inmates)."].)

**II. APPLICABLE LEGAL STANDARDS**

**A. Standard of Review Governing a Report-Recommendation**

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN4] When only general objections are made a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN5] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN4. On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN5. *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing a Motion for Summary Judgment**

Magistrate Judge Homer correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 194, at 12-13.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A. Plaintiff's Retaliation Claim**

As stated in Part I.C. of this Decision and Order, Magistrate Judge Homer recommends that Plaintiff's First Amendment claim for retaliation involving the cell search and subsequent issuance of a false misbehavior report *not* be dismissed due to the existence of genuine issues of material fact. In their Objections, Defendants argue, *inter alia,* that Magistrate Judge Homer erred in not dismissing Plaintiff's retaliation claim because Plaintiff failed to introduce admissible record evidence that Defendant Walcott knew of Plaintiff's grievance against Woodruff, such that her notifying Defendant McLaughlin about his use of correction fluid could be deemed retaliatory. Defendants further argue that the dismissal of Walcott dooms the remainder of Plaintiff's retaliation claim.

***5** To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

As an initial matter, although the record establishes that Plaintiff sent a letter to DOCS' office Albany, which was reviewed by Defendant Walcott, [FN6] there is no admissible record evidence from which a rational factfinder could conclude that Defendant Walcott knew of Plaintiff's grievance against Officer Woodruff when she reviewed Plaintiff's letter.[FN7] Under the circumstances, Plaintiff's retaliation claim cannot survive Defendants' motion for summary judgment. *See Murray v. Pataki,* 03-CV-1263, 2009 WL 981217, at *10 (N.D.N.Y. Apr.9, 2009) (Suddaby, J. adopting Treece, M.J.) ("[T]here is no evidence on the record that Defendants ... knew about those Grievances; nor is there any indication as to why those Defendants would retaliate against Plaintiff for grievances filed against other officers. For their part, Forth and Jones swear they had no knowledge of Plaintiff's prior Grievances against Irwin and Travers. Plaintiff has failed to show any evidence of a causal connection between the Grievances he filed against Irwin and Travers and the alleged retaliatory actions of Forth, Jones, and Girdich. Therefore, it is recommended that Plaintiff's retaliation claims be dismissed against Defendants Forth, Jones, and Girdich.").

FN6. (Dkt. No. 179, Attach. 6, at 23-24; Dkt. No. 185, Attach. 4, at 66; *cf.* Dkt. No. 179, Attach. 2, at 68-69 [attaching pages 66-67 of Plaintiff's deposition transcript, in which he testified that he may have sent a letter containing correction fluid to someone in DOCS' office in Albany, which Defendant Walcott subsequently obtained].)

FN7. For example, Defendants have not been able to produce the letter in question, and the evidence in the record indicates that the subject matter of the letter is unknown. (Dkt. No. 185, Attach. 4, at 66.) Moreover, the evidence in the record indicates that Defendant Walcott, who works at DOCS' office in Albany, telephoned Adirondack C.F. on or about January 10, 2002, and told non-party Barbara Granish merely that she had reviewed a letter containing correction fluid from Plaintiff (i.e., not that she knew that Plaintiff had filed a grievance against Officer Woodruff and/or that she wanted to retaliate against Plaintiff for filing a grievance). (Dkt. No. 179, Attach. 14, at 5; Dkt. No. 179, Attach. 6, at 23; Dkt. No. 185, Attach. 4, at 66.) Finally, the evidence in the record indicates that DOCS' Central Office Review Committee ("CORC") in Albany received Plaintiff's appeal of his grievance filed against Woodruff on January 14, 2002-four days *after* Defendant Walcott's telephone call to Ms. Granish. (Dkt. No. 179,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Attach. 3, at 20.)

Moreover, even assuming that Defendant Walcott knew of Plaintiff's grievance against Officer Woodruff, "retaliatory searches are not actionable under § 1983." *Walker v. Keyser,* 98-CV-5217, 2001 WL 1160588, at *9 (S.D.N.Y. Oct.2, 2001) (citing, *inter alia, Higgins v. Artuz,* 94-CV-4810, 1997 WL 466505, at *4 [S.D.N.Y. Aug. 14, 1997] [finding that "[s]earches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature"] ).[FN8]

FN8. *See also Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1996) (Kaplan, J.); *Payne v. Axelrod,* 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) (Kaplan, J.); *Freeman v. Goord,* 02-CV-9033, 2005 WL 3333465 at *5 (S.D.N.Y. Dec.7, 2005); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005); *Salahuddin v. Mead,* 95-CV-8581, 2002 WL 1968329 at *5 (S.D.N.Y. Aug.26, 2002); *Walker v. Goord,* 98-CV-5217, 2000 U.S. Dist. LEXIS 3501, at *26 (S.D.N.Y. Mar. 21, 2000); *Bey v. Eggleton,* 96-CV-3302, 1998 WL 118158, at *4 (S.D.N.Y. Mar.17, 1998).

Furthermore, even assuming that a retaliatory cell search can constitute adverse action (either alone or in conjunction with the issuance of a misbehavior report that results in a disciplinary conviction that is subsequently reversed on appeal), Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his grievance against Officer Woodruff "was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). To the contrary, the record rather clearly establishes that Defendant McLaughlin ordered Defendants Smith and J. LeClaire to conduct a search of Plaintiff's cell because McLaughlin had been informed that Plaintiff had sent a letter containing correction fluid to DOCS' office in Albany, which had been reviewed by Defendant Walcott. (Dkt. No. 179, Attach. 6, at 24.) The record further establishes that the misbehavior report was issued not with retaliatory intent, but simply because contraband-including three bottles correction fluid-was in fact recovered from Plaintiff's cell during that search.[FN9] Finally, the Court cannot help but note that the record establishes that the cell search on January 10, 2002, was somewhat attenuated from the filing of Plaintiff's grievance against Defendant Wolcott on December 18, 2002, having occurred more than three weeks after that filing. Based on this record evidence, Plaintiff's retaliation claim cannot, and does not, survive Defendants' motion for summary judgment.[FN10]

FN9. The Court notes that, while Plaintiff's disciplinary conviction of January 23, 2002 (which was based on the misbehavior report of January 10, 2002) was subsequently reversed on appeal, no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false; rather, the reversal was based merely on a finding that the disciplinary hearing was incomplete. (Dkt. No. 185, Attach. 4, at 78 [attaching memorandum from Donald Selsky stating, "THE ABOVE-NOTED SUPERINTENDENT'S HEARING HAS BEEN REVERSED ON OCTOBER 23, 2002, FOR THE FOLLOWING REASON(S): REVERSED AFTER DISCUSSION WITH ATTORNEY GENERAL'S OFFICE DUE TO INCOMPLETE HEARING RECORD."].) The Court notes further that, in his deposition, Plaintiff indicated that he possessed correction fluid at least at some point in time, testifying that (1) he did not believe correction fluid to be contraband, (2) that he believed he could possess as much correction fluid as he wanted, (3) it was available throughout the facility, and (4) it was a "possibility" that he used it in a letter to DOCS' office in Albany. (Dkt. No. 179, Attach. 2, at 68, 69 and 75 [attaching pages 66, 67 and 73 of Plaintiff's deposition transcript].)

FN10. *See Jermosen v. Coughlin,* 86-CV-0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (granting summary judgment to defendants on plaintiff's retaliation claim because there was evidence demonstrating that "plaintiff in fact committed the prohibited conduct charged

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the misbehavior report," the filing of which was the retaliatory act); *Battice v. Phillip,* 04-CV-0669, 2006 WL 2190565, at *7 (E.D.N.Y. Aug.2, 2006) (finding that "defendants have submitted undisputed affidavits explaining that Plaintiff's cell was searched based on a tip that it contained contraband. Because defendants have carried their burden of demonstrating that the search would have been conducted in the absence of any retaliatory motive, and Battice has failed to put forth any evidence to dispute those assertions, summary judgment with respect to this claim is proper."); *Jordan v. Garvin,* 01-CV-4393, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004) (holding that search of cell to find written music recording contract after inmate had filed grievance challenging prison rule prohibiting inmate business transactions that precluded him from entering into contracts was not retaliatory because contract in question was contraband under relevant prison rules).

***6** For each of these alternative reasons, Plaintiff's retaliation claim is dismissed.[FN11]

FN11. The Court notes also that Defendants are entitled to qualified immunity on this claim because "it is not well-settled that cell searches can be the subject of a First Amendment retaliation (as opposed to an Eighth Amendment cruel-and-unusual punishment) claim." *Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009).

**B. Plaintiff's Remaining Claims and Motions**

The only Objections offered by Plaintiff to Magistrate Judge Homer's Report-Recommendation and Orders regarding the claims and/or motions not discussed above in Part III of this Decision and Order are simply reiterations of Plaintiff's previous arguments, and/or are merely general objections. (Dkt. Nos.202, 204.)

After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report-Recommendation and Orders, and Plaintiff's Objections thereto, the Court concludes that Magistrate Judge Homer's thorough Report-Recommendation and Orders regarding the claims and motions not discussed above in Part III of this Decision and Order are correct in all respects. Magistrate Judge Homer employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts.[FN12] As a result, the Court accepts and adopts the remainder of Magistrate Judge Homer's Report-Recommendation, and affirms his Orders on Plaintiff's three non-dispositive motions, for the reasons stated therein.

FN12. The Court notes that those portions of the Report-Recommendation would survive even *de novo* review.

**ACCORDINGLY,** it is

**ORDERED** that United States Magistrate Judge David R. Homer's Report-Recommendation (Dkt. No. 194) is ***ACCEPTED*** and ***ADOPTED*** as **modified** by this Decision and Order; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 179) is ***GRANTED*** in its entirety; and it is further

**ORDERED** that Plaintiff's claims against Defendants Leferve, McLaughlin, Mehrmann, Pasquil, and Sanders are ***DISMISSED*** from the action, without prejudice, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is further

**ORDERED** that all other Defendants are ***DISMISSED*** from this action with prejudice; and it is further

**ORDERED** that Magistrate Judge Homer's Order denying Plaintiff's motion to supplement the pleadings (Dkt. No. 186, 194) is ***AFFIRMED,*** and it is further

**ORDERED** that Magistrate Judge Homer's Orders denying Plaintiff's two motions to strike certain documents from the record (Dkt.Nos.187, 193, 194, 201) are ***AFFIRMED;*** and it is further

**ORDERED** that Plaintiff's Amended Complaint is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2010 WL 1235593 (N.D.N.Y.)

(Cite as: 2010 WL 1235593 (N.D.N.Y.))

***DISMISSED*** in its entirety.

N.D.N.Y.,2010.

LeBron v. Selsky
Not Reported in F.Supp.2d, 2010 WL 1235593 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O. Bouyea, Defendants.

FN1. Defendant John Doe has not been identified and therefore has not been served with the Amended Complaint or otherwise appeared in this action. *See* Dkt No 12.

FN2. Plaintiff mistakenly spells Defendant Bennett's name as "Bennet." *See* Dkt. No. 23, Answer at n. 1. The Court will refer to this Defendant by the proper spelling.

**No. 9:03-CV-1128 (NAM/RFT).**

Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New York, Senta B. Siuda, Esq., Assistant Attorney General, Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

***1** Presently before this Court is defendants' motion (Dkt. No. 105) for summary judgment dismissing the complaint in this civil rights action pursuant to 42 U.S.C. § 1983. In his amended complaint (Dkt. No. 8), plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment.

Defendants' motion was referred to United States Magistrate Judge Randolph F. Treece for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). In a thorough Report and Recommendation (Dkt. No. 110), Magistrate Judge Treece recommends that the Court grant the motion for summary judgment. Plaintiff objects (Dkt. No. 112). After the Court extended time for plaintiff to file additional objections to the Report-Recommendation (Dkt. No. 113), plaintiff filed a second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review of those parts of a magistrate judge's Report and Recommendation to which a party specifically objects. Where only general objections are filed, the Court reviews for clear error. *See Brown v. Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a Report and Recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

Plaintiff's objections include a variety of allegations. A number of them revisit issues which are the subject of the Report and Recommendation. They do not, however, demonstrate the existence of material questions of fact which would warrant denial of summary judgment. Other allegations concern events allegedly occurring subsequent to the filing of the amended complaint herein; these are not properly the subject of this action. Upon thorough *de novo* review, the Court accepts and adopts the Report and Recommendation.

It is therefore

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.
RANDOLPH F. TREECE, Magistrate Judge.

***REPORT-RECOMMENDATION and ORDER***

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

**I. FACTS**[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

***2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] *Id.* at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.,* Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] *Id.,* Grievance Lt., dated May 27, 2003.

FN4. Plaintiff does not provide any specific dates as to when he received rotten or spoiled

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

food.

FN5. It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[FN6] *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

FN6. The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

***3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[FN7] Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.,* Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .,* Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.,* Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.,* Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

FN8. Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

***4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books were not available at the facility.[FN9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id.,* Ex. C, Lt., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

FN9. Jean Botta is not named as Defendant in this action.

FN10. "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also* *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

***5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

**B. Eleventh Amendment**

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

**C. Exhaustion of Remedies**

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care; [FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also* *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

***6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See* *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 [FN12] & *Mendoza v. Goord,* 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

FN12. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d. Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also* *Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

***7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action.[FN13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

> FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.,* Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See* *Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

***8** Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also* *Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures were 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

### D. Eighth Amendment Claims

***9** Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

***10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June. 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

***11** Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

***12** Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted.**

**E. First Amendment Claims**

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord,* 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord,* 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Gill v. Riddick,* 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

***13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott,* 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

***14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

> FN14. The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds).* However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

***15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

***16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia, Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

***17** Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

FN15. Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory as to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

***18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

David ROBINSON, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF CORRECTION SERVICES, et al., Defendants.

No. 9:08–CV–0911.

Sept. 30, 2009.

David Robinson, pro se.

KRista A. Rock, Assistant Attorney General, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

***1** This *pro se* civil rights action pursuant to 42 U.S.C. § 1983 was referred to the Hon. Gustave J. Di Bianco, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report–Recommendation dated September 8, 2009 recommended that the Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12 be granted. Plaintiff filed objections to the Report–Recommendation arguing only that he did not consent to have his complaint adjudicated by a Magistrate Judge, the Magistrate Judge misconstrued the facts in litigation and the law governing its conduct, and it was the fault of the United States Marshal's service that service was not properly effectuated.

When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of the Magistrate Judge for the reasons stated in the Report–Recommendation.

It is therefore **ORDERED** that Defendants' motion to dismiss is **GRANTED** and the Complaint is **DISMISSED IN ITS ENTIRETY.**

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff, a former inmate, alleges that defendants delayed plaintiff's access to the United States Mail; assigned him to be double-bunked; subjected him to excessive searches; limited his use of a "warming stove"; harassed him; and refused to address plaintiff's grievances. (Dkt. No. 1 ("Compl.")). Plaintiff claims that defendants' actions violated the First, Fifth, Sixth, Eighth, Ninth, Tenth, and Fourteenth Amendments. Plaintiff cites 42 U.S.C. §§ 1983, 1985, 1986, 1987, and 1988. Plaintiff also claims that defendants have violated 18 U.S.C. §§ 241, 242.[FN1] Plaintiff seeks injunctive [FN2] as well as substantial monetary relief.

FN1. These statutes are criminal in nature, and there is no private right of action to enforce federal criminal laws. *See Dugar v. Coughlin* 613 F.Supp. 849, 852 n. 1 (S.D.N.Y.1985).

FN2. Because plaintiff is no longer incarcerated, any claims for injunctive relief may be dismissed as moot. *See Pugh v. Goord,* 571 F.Supp.2d 477, 489–90 (S.D.N.Y.2008) (where an inmate has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

as moot).

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 41). Plaintiff has filed a response in opposition to the motion. (Dkt. No. 46). For the following reasons, this court recommends that defendants' motion to dismiss be **GRANTED** and the complaint be dismissed in its entirety.

### DISCUSSION

**1. *Motion to Dismiss***

**\*2** To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)). *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007)). *See Ashcroft v. Iqbal,* ——— U .S. ———, 129 S.Ct. 1937, 1949 (May 18, 2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 93–94 (2007) (citations omitted).

The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (per curiam). In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)).

**2. *Facts***

Plaintiff states that he has nine claims in this action. (Compl. at ¶¶ 112–29). The complaint is comprised of three parts. In the first part, plaintiff gives a generally chronological recounting of the events that are the bases of the alleged

constitutional violations. (Compl. at ¶¶ 24–111). In the second part, plaintiff summarizes his nine causes of action. (Compl. at ¶¶ 112–29). The third part of the complaint consists of 52 pages that include copies of his "grievances," legal arguments, and supporting documents for some of his claims. (Dkt. No. 1, *Exhibits*[FN3]). The court will attempt to discuss the facts separately as to each claim.

> FN3. When filing the complaint on the court's electronic filing system, the Clerk divided the Complaint into two parts. On the docket, the first part is entitled "Main Document" and includes the first two sections of plaintiff's Complaint as described above. These sections are consecutive numbered paragraphs 1–159. On the docket, the second part is entitled "Statement of Facts" and includes the third 52–page section of plaintiff's Complaint as described above. While the first page is titled "Statement of Facts," the document appears to be a grievance. Plaintiff also includes a variety of other documents. For ease, the court will refer to this as the Exhibits. The court has numbered the pages consecutively for citation purposes.

*A. Interference with Mail*

Plaintiff's first two claims (Compl. at ¶¶ 112–13, 114–15) relate to the handling of his mail. Plaintiff asserts that the New York State Department of Correctional Services ("NYSDOCS"), the Central Office Review Committee ("CORC"), and individual defendants Rivera, Glover, and Jessen[FN4] violated plaintiff's rights under the First, Fifth and Fourteenth Amendments. (Compl. at ¶¶ 113, 115).

> FN4. George Jessen is listed in the caption of the Complaint, and is mentioned several times in the Complaint. However, it appears that Mr. Jessen was not listed on the docket in the list of defendants. Furthermore, no attempt was made to serve defendant Jessen.

Plaintiff discusses in detail three instances of problems with his mail, March 16, April 8, and June 5, 2008. (Compl. at ¶¶ 24, 26, 34). Plaintiff alleges that on March 16, 2008, he submitted two items to be mailed, one was legal correspondence, and the other personal correspondence. (Compl. at ¶ 24). Plaintiff alleges that the legal correspondence "was issued to the Postal Service by defendant Glover, the Senior Mail Clerk, on or about March 19, 2008," but that the

personal correspondence was returned to plaintiff on March 28, 2008. *Id.* Plaintiff argues that defendant Glover, “unlawfully obstructed/delayed/tampered with plaintiff's correspondence.” *Id.* Plaintiff alleges that this conduct interfered with his right to correspond and access to the court. *Id.* Plaintiff states that he submitted a written inquiry, and that defendant Glover responded in writing

> ***3** admitting that she unlawfully obstructed/delayed/tampered with plaintiff's afore-stated correspondence. Attributing her actions upon DOCS policy of prohibiting prisoner's access to their accounts the day before and the day of prisoner's scheduled commissary date, the busy volume of mail due to the approaching holiday and unintended negligence on her part.

(Compl. at ¶ 25).

Plaintiff states that the second incident occurred on April 8, 2008. (Compl. at ¶ 26). Plaintiff states that he submitted legal correspondence, together with a disbursement form to pay the cost of postage. *Id.* Plaintiff states that this piece of mail was not given to the Postal Service for mailing until April 14, 2008. *Id.* Plaintiff alleges that defendant Glover was responsible for this delay. *Id.* The third occasion was on June 5, 2008. (Compl. at ¶ 34). Plaintiff states that he submitted legal correspondence on June 5, 2008, and on June 6, 2008, the correspondence “was rejected by defendant Glover, per directions of defendant Jessen.” *Id.* Plaintiff argues that this was an unlawful rejection of his correspondence. *Id.* at ¶ 35.

In addition to the three incidents detailed above, plaintiff also lists approximately eight other occasions where submission of his mail to the United States Postal Service was delayed [FN5]. (Compl. at ¶ 32).

> FN5. Plaintiff did not include information about what day of the week he submitted his mail to the Mail Clerk. The court was able to reconstruct that information based on a calendar.

| *Date Submitted by Plaintiff/Day* | *Type of Correspondence* | *Date Submitted to U.S.P.S./Day* |
| --- | --- | --- |

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | | |
|---|---|---|
| April 28, 2008/Mon. | Legal | May 2, 2008/Fri. |
| May 29, 2008/Thurs. | Legal | June 2, 2008/Mon. |
| June 5, 2008/Thurs. | Legal | June 9, 2008/Mon. |
| June 8, 2008/Sun. | Legal | June 12, 2008/Thurs. |
| June 19, 2008/Thurs. | Legal | June 23, 2008/Mon. |
| July 3, 2008/Thurs. | Legal | July 7, 2008/Mon. |
| July 3, 2008/Thurs. | Legal | July 10, 2008/Thurs. |
| July 15, 2008/Tues. | Legal | July 18, 2008/Fri. |

*Id.* Plaintiff submits a number of completed forms titled "Disbursement or Refund Request," which appear to be the forms used by inmates to draw on their available funds to pay for postage. (Dkt. No. 1, *Exhibits* at 4, 6, 8, 11–15) (IAS-**2706** Forms). The forms are largely illegible, but generally seem to confirm that plaintiff submitted these forms with his correspondence to pay for the postage. *Id.*

Plaintiff basically alleges that defendant Glover violated NYSDOCS policy requiring all mail to be processed and delivered to the United States Postal Service "the next day." (Compl. at ¶ 33). Plaintiff claims that defendants were "practicing" a policy, requiring the approval of his disbursement form prior to issuing the inmate any required postage for mail. This policy prevented an inmate who was attempting to purchase postage from accessing his account for three days if he had purchased something from the commissary. (*Id.* at ¶ 30). Plaintiff claims that, as a result of this "practice," his mail was delayed until the IAS-***2708*** advance form was approved.

***B. "Double–Bunking"***

***4** Plaintiff states that his third cause of action is against defendants State Commission on Corrections ("SCOC"), NYSDOCS, Rivera, and Neuwirth. (Compl. at ¶ 116). Plaintiff states that on March 26, 2008, he submitted a request to defendant Supt. Rivera to be moved to a "single" cell. (Compl. at ¶ 37). Plaintiff claims that his assignment to double-bunked cell was unlawful and discriminatory. *Id.*

Plaintiff states that on April 1, 2008, he met with defendant Neuwirth to discuss the double-bunking. (Compl. at ¶ 38). During the conversation, defendant Neuwirth asked plaintiff "for specific statutes prohibiting double-bunking." *Id.* Plaintiff gave a general answer that it was the obligation of the employees of the correctional facility to understand the statutes that govern the policies at the facility. *Id.* Plaintiff states that defendant Neuwirth threatened to give plaintiff a ticket for refusing a direct order. *Id.* Plaintiff claims that he was not refusing a direct order, but needed time research the issue. *Id.* Plaintiff states that defendant Neuwirth then threatened to issue a Misbehavior Report. *Id.*

Plaintiff filed a grievance on May 16, 2008 to complain about defendant Neuwirth's conduct, and about plaintiff's housing situation. (Compl. at ¶ 42). Plaintiff states that his "grievance has not been disposed, unlawfully suppressed." *Id.* at ¶ 50. Plaintiff argues that

> SCOC issued a variance in accordance with the relevant statute of NYCRR, (Double occupancy housing units *originally designated for double occupancy* ), which unlawfully allowed Wallkill to convert 72 units to house two inmates. Wallkill;s [sic] units are not double occupancy units originally designated and constructed for double occupancy, rendering SCOC's variance, void and unlawful on its face.

*Id.* at ¶ 43 (emphasis in original). Plaintiff further argues that these conditions subject "all Wallkill prisoners" to standards that are "below the minimum standards governing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

other state prisoners." *Id.* at ¶ 48.

***C. Cell Searches***

Plaintiff's fourth cause of action is against defendants Rivera, Amado, Jessen, Calender [FN6], and Scott. (Compl. at ¶ 118). However, in plaintiff's statement of this claim, he includes allegations against defendant Neuwirth.

FN6. Defendant Calender was not served with process. A summons in his name was issued in November 2008 (Dkt. No. 12), but was returned unexecuted in March 2009 (Dkt. No. 42). The docket indicates that service was not attempted a second time.

Plaintiff states that his "living quarters and property" were searched by defendant Scott on March 20 and March 26, 2008. (Compl. at ¶ 52). On March 26, 2008, he asked defendant Amado to provide plaintiff with "copies of the documents that authorized these searches." *Id.* Plaintiff states that on March 29, 2008, he met with defendant Calender, and plaintiff was informed that random searches were selected by computer program. *Id.* Plaintiff stated that he informed defendant Calender that the searches were too frequent, and the policy authorizing them was unlawful. *Id.*

Plaintiff states that his "living quarters and property" were searched again by defendant Scott on May 7, 2008, allegedly authorized by defendant Calender. (Compl. at ¶ 53). Plaintiff states that he filed a grievance, and that the grievance "has not been disposed, unlawfully suppressed." *Id.* Plaintiff states that he witnessed frequent searches of other inmates, and that this issue of "perpetual, harassing searches" was brought up at the Inmate Liaison Committee, which took the issue up with defendants Rivera, Amado, Jessen, and Neuwirth, during the May 29, 2008 meeting. *Id.* at ¶ 54. Plaintiff states that his quarters were also searched on May 20, June 18, June 22, July 24, August 6, August 7, and August 13, 2008. (Compl. at ¶ 55).

***D. Warming Stove Privileges***

***5** Plaintiff's fifth and sixth claims are about three separate revocations of the privilege to use warming stoves. (Compl. at ¶¶ 120–23). The fifth cause of action names defendants Rivera, Amado, Scott, and Calender. *Id.* at 120–21. The sixth cause of action names only defendant Marrero.[FN7] *Id.* at 122–23. Plaintiff states that Wallkill Correctional Facility allows the use of warming stoves. He argues that "[r]evocation of this privilege, must be in accordance to a constitutionally sound policy, and never be arbitrary or caprious [sic], or administered for the purpose of retaliation or revenge." (Compl. at ¶ 59). Plaintiff challenges the method by which the warming stove privileges were revoked, claiming that defendants' actions did not comply with due process.

FN7. This defendant was also not served with process.

Plaintiff states that he first lost his warming stove privileges during January, when the facility revoked the warming stove privilege "of the entire AB Wing 1, 2, 3, arbitrarily depriving 300 prisoners of secured privileges .... " (Compl. at ¶ 65). Plaintiff argues that because defendant Amado "has the overall charge of the security of the facility," his approval of the revocation of privileges "was mandatory." *Id.* at ¶ 66.

Plaintiff states that on June 23, 2008, defendant Calender informed the population of "AB 1" that "use of the stoves would be restricted for at least a week, due to defendant Scott's report that someone put a substance on the supply room door knob ...." (Compl. at ¶ 60). Plaintiff states that he explained to defendant Calender that there was a long "list of suspects" who could have put the substance on the door knob. *Id.* at ¶ 61. Defendant Calender "replied that it is *his practice,* when he cannot identify the individual guilty of misconduct, he punishes the population, as to pressure the population to find and address the 'guilty' individual." [FN8] *Id.* at ¶ 61–62 (emphasis in original).

FN8. Plaintiff also states that on June 25, 2008, he complained about the warming stove privileges to Lieutenant Baker, who is not named as a defendant in this action. (Compl. at ¶ 63). Plaintiff claims that Lieutenant Baker confirmed that it was also his practice to punish the entire population when the guilty individual could not be identified. *Id.* at ¶ 64.

Plaintiff states that on the same day that the substance was found on the door knob, an "AB 1 porter, admitted to defendant Scott that, he was the individual who inadvertently, put cleaning substance from his glove on the supply room door knob, when he entered the closet to get a mop head." (Compl. at ¶ 67). Plaintiff states that notwithstanding the porter's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

admission, the Wallkill staff, "with vindictiveness and no justification" still deprived plaintiff and 100 other prisoners of their stove privilege for (7) days." *Id.*

Plaintiff states that he filed a grievance about the loss of warming stove privileges with defendant Supt. Rivera on June 25, 2008. (Compl. at ¶ 70). Plaintiff alleges that the grievance "was not disposed, unlawfully suppressed." *Id.*

Plaintiff states that the third occasion that he lost his privilege to use a warming stove was between July 29 and August 2, 2008. (Compl. at ¶ 71). Plaintiff alleges that defendant Marrero revoked the use of the stoves because they were not clean. *Id.* Plaintiff states that it is the duty of the "assigned porter" to clean the stoves, and that when the stoves are not cleaned, the policy is to issue a Misbehavior Report. *Id.* Plaintiff argues that instead of issuing a Misbehavior Report to the porter, defendant Marrero unlawfully revoked the privilege to use the stoves. *Id.*

***E. Harassment***

***6** Plaintiff's seventh cause of action alleges harassment of plaintiff, and names defendants Rivera, Roy, Amado, Holmes, Valuc [FN9], Marrero, Curfman, Galbally, Heal, Dunham, and Chenneham [FN10]. (Compl. at ¶ 124).

FN9. This defendant was not served with process. The docket does not indicate when a summons was issued, but the docket shows that as to Mr. Valuc, the summons was returned unexecuted in December 2008 (Dkt. No. 18). The Clerk's Office wrote to plaintiff, and explained that there was no Lt. Valuc employed by Wallkill Correctional Facility. The clerk suggested another possible name of this particular defendant. (Dkt. No. 40). Plaintiff was also provided with an additional USM–285 form in order to effect service on the potential defendant. *Id.* Plaintiff did not respond to the court's letter.

FN10. This defendant was not served with process. A summons was issued for this defendant in November 2008. (Dkt. No. 12). The summons was returned unexecuted in December 2008 (Dkt. No. 19). The Clerk's Office wrote to plaintiff, and explained that there was no employee with a last name of "Chenneham" employed at Wallkill Correctional Facility. (Dkt. No. 40). The clerk asked plaintiff if he had any other identifying information about this defendant. *Id* . Plaintiff was also provided with an additional USM–285 form in order to effect service on the potential defendant. *Id.* Plaintiff did not respond to the court's letter.

Plaintiff alleges that on May 5, 2008, defendant Heal approached plaintiff and instructed him to step outside of the mess hall. (Compl. at ¶ 73). Plaintiff alleges that defendant Heal stated that he suspected plaintiff was carrying a weapon on the string of plaintiff's pants. *Id.* Plaintiff showed defendant Heal the string which held a key to plaintiff's room. *Id.* Plaintiff states that defendant Heal conducted a search of plaintiff "before the view of at least (20) prisoners waiting to enter the messhall and the messhall duty Sgt, Burns [sic]." *Id.* Plaintiff argues that once defendant Heal saw that the string on plaintiff's pants held only a key, defendant Heal had no reason to search plaintiff. *Id.* at ¶ 74. Plaintiff argues that the reason for the search was "to abuse [defendant Heal's] Official Capacity to quench his individual desire to harass/intimidate and retaliate against plaintiff for filing grievances/complaints against his co-workers." *Id.* Plaintiff states that he filed a grievance with defendant Supt. Rivera, but that the "grievance was never disposed, unlawfully suppressed." *Id.*

Plaintiff states that after he filed the grievance regarding the May 5, 2008 search, defendant Heal

> in retaliation conspired with other officers (who are soon to be charged), by lambasting him with a barrage of threatening, reckless eyeballing and hostile/profane language/jester. Previous documented complaints/grievances lodged by other prisoners against defendant Heal, in addition to the fact that Heal, reported to work for (3) weeks. With blackened eyes, which were the obvious result of an off duty fight. Clearly exhibits that defendant Heal, lacks a disposition which is conducive to the discharge of his duties of Correction Officer.

(Compl. at ¶ 75). Plaintiff states that he filed an additional grievance complaint on May 16, 2008 with defendants Amado and Roy as to defendant Heal's "conspiracy" with other officers "to harass/intimidate plaintiff in retaliation to grievance submitted by plaintiff." *Id.* at ¶ 78. Plaintiff argues that defendants Amado and Roy "neglected to Prevent these and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

future acts of retaliation." *Id.* at ¶ 77.

Plaintiff states one instance of retaliation occurred on May 21, 2008 during the 9:30 p.m. count of the inmates. (Compl. at ¶ 79). Defendant Heal conducted the count, and "stopped in front of plaintiff's room, stood there for 30 seconds looking into the room, while writing on a clipboard. Then defendant Dunham, on her "swing" of the count, stopped and stood in front of plaintiff's room, looking in the room for 30 seconds while writing on a clipboard." *Id.* Plaintiff states that he attempted to ask defendant Heal if they could speak, but that defendant Heal "replied in a hostile/ profane manner, get the [expletive] out of here, stop harassing me, before I give you ticket." *Id.* at ¶ 80. Plaintiff then states that he approached defendant Dunham, and asked if there was a problem with his room during the count. *Id.* "Dunham replied are you harassing me. Plaintiff said no more and returned to his room." *Id.* Plaintiff states that he filed a grievance on this issue, but that it was "never disposed, unlawfully suppressed." *Id.* at ¶ 81.

***7** Plaintiff states that defendant Heal issued a Misbehavior Report on May 21, 2008 to retaliate against plaintiff for filing the grievance and the May 16, 2008 complaint to defendants Amado and Roy. (Compl. at ¶ 82). Plaintiff states that defendant Dunham signed the Misbehavior Report as a witness. *Id.* Plaintiff argues that defendants Dunham and Heal committed "perjury by falsely, fabricating charges in order to retaliate against plaintiff for filing grievances, and May 16, 2008 complaint." *Id.* Plaintiff alleges that defendant Holmes "approved" the retaliatory Misbehavior Report. *Id.*

Plaintiff states that he was called to defendant Galbally's office on May 23, 2008 to discuss the Misbehavior Report filed by defendant Heal. (Compl. at ¶ 84). Plaintiff stated that the Misbehavior Report should be dismissed as retaliatory. *Id.* Plaintiff argues that defendant Galbally neglected his official duty when he failed to dismiss the Misbehavior Report and commenced a hearing on the Report. *Id.* at ¶ 86 [FN11]. Plaintiff states that he requested the opportunity to present witnesses, but that defendant Galbally stated that the rules for a Tier I hearing did not afford plaintiff the opportunity to present witnesses, or for the hearing to be recorded. *Id.*

FN11. There is no Paragraph 85.

Plaintiff alleges that defendants Heal and Dunham harassed plaintiff while conducting the inmate count, "then conspired to fabricate a fraudulent report to cover-up their improprieties and retaliate." *Id.* Plaintiff argues that defendant Galbally's "affirmation of the fraudulent report affirms his part of the conspiracy by officers." *Id.* at ¶ 87. Plaintiff further argues that since defendants Rivera and Amado were "properly appraised [sic] of the improprieties of their subordinates, [and they] neglected to curtail this unlawfulness affirms that they condone the conspiracy to retaliate." *Id.*

Plaintiff states that he filed a grievance with defendant Rivera on May 24, 2008 regarding the Tier I Disposition, but he received no relief. (Compl. at ¶ 88). Plaintiff argues that defendants Rivera, Amado, Holmes, Galbally, Heal, and Dunham "conspired to harass/intimidate, issue/affirm fraudulent retaliatory misbehavior report, defraud plaintiff's rights to substantive/procedural due process to grieve/ appeal, present evidence in his favor, equal protection, subjecting cruel [sic] and unusual punishment." *Id.*

Plaintiff alleges another instance of harassment that occurred on July 5, 2008, when defendants Heal and Curfman "directed Threatening stares/Gestures upon plaintiff." (Compl. at ¶ 89). Plaintiff states that as he was leaving the mess hall, defendant Curfman "accosted plaintiff, threateningly, screaming with hostility, pull your pants up." *Id.* Plaintiff states that six other Corrections Officers laughed at plaintiff, and that defendant Heal's laughter was the loudest. *Id.* Plaintiff argues that defendant Curfman's behavior on the morning of July 5, 2008 "confirms that he conspired" with defendant Heal. *Id.* Plaintiff argues that defendants Roy and Amado violated plaintiff's civil rights "by their willful Neglect to Prevent, the perpetual campaign to threaten, harass, intimidate plaintiff in retaliation, as substantiated in numerous afore-mentioned grievances, by plaintiff all of which have been WHITE WASHED." *Id.* at ¶ 90.

***8** Plaintiff next alleges that defendant Curfman harassed plaintiff by implementing *"his own unlawful policy/custom* of arbitrarily prohibiting plaintiff/ Wallkill prisoners from taking rolls, buns, biscuits. i.e. bread [sic] from the messhall." (Compl. at ¶ 91) (emphasis in original). Plaintiff asserts that the Wallkill Facility Guide states that bread may be taken out of the mess hall at the noon and evening meals. *Id.* It is unclear when defendant Curfman allegedly engaged in the enforcement

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of his policy about the bread.

In the next paragraph, plaintiff states that on July 10, 2008, plaintiff was summoned to defendant Marrero's office for a hearing regarding a grievance about the bread. (Compl. at ¶ 92). Much of this section of plaintiff's complaint references the Ku Klux Klan, and refers to some defendants as "Grand Wizard", "Regional Grand Wizard", or other combinations of defendants' title and Ku Klux Klan references. Plaintiff states, in essence, that the grievance was never resolved. *Id.*

Plaintiff also states that defendant Marrero conducted the grievance hearing, and that in Marrero's opinion, "the fact that no one made any racist remarks, shows that grievance is an unsubstantiated, anger fueled, written document that no court would believe." *Id.* Plaintiff states that another instance of harassment occurred on July 7, 2008 at around 8:00 a.m., while plaintiff walked toward the "P.C. window" in the basement. (Compl. at ¶ 94). Plaintiff states that defendant Chenneham "physically bumped" into plaintiff. *Id.*

Plaintiff states that the next instance of harassment occurred on July 12, 2008 around 12:30 p.m., when he was on the telephone. (Compl. at ¶ 94). Plaintiff states the defendant Valuc "fraudulently stat[ed]" to defendant Scott that plaintiff had his feet on the wall, and that plaintiff should have to paint the wall. *Id.* Plaintiff argues that defendant Valuc has become "the latest Nazi, to abuse his Official Capacity, by cracking the whip of Unlawful Slave Labor, in order to degrade, harasss, and intimidate plaintiff in retaliation." *Id.* Plaintiff argues that the defendants act with "impunity, which fuels their recklessness, to the inevitable point of assaulting plaintiff." *Id.* at ¶ 96. Plaintiff argues that his personal safety is threatened by "the escalating campaign of harassment, intimidation, threats, physical abuse, MUST BE CURTAILED." *Id.* at ¶ 97.

***F. Grievances***

Plaintiff's eighth cause of action is against defendants CORC, Rivera, Henn, and Scott. This claim includes several allegations about how defendants handled plaintiff's grievances. Plaintiff alleges that defendant Rivera "willfully pervert[ed] state statute [sic] governing Inmate Grievance Program, by unlawfully suppressing all grievances submitted to him by plaintiff." (Compl. at ¶ 98).

Plaintiff states that on June 17, 2008, he submitted to CORC all of the grievances that plaintiff had submitted up until that date (May 5, May 8, May 16, May 16 (complaint), May 21, May 24 (grievance and complaint), and June 8, 2008). (Compl. at ¶ 98). Plaintiff states that defendant CORC rejected the group of documents and returned them to plaintiff. *Id.*

***9** Plaintiff states that his copies of correspondence from the CORC and his grievances were stolen by defendant Scott on May [FN12] 13, 2008. (Compl. at ¶ 100). Plaintiff states that this theft occurred "under the guise of a 'random search' ". *Id.* Plaintiff alleges that Defendants Rivera, Henn, CORC, conspired to willfully deprive plaintiff of his constitutional rights by unlawfully suppressing his grievances. *Id.* at ¶ 101.

> FN12. Plaintiff wrote "May," but this may have been a typographical error. Plaintiff alleges that the theft took place after August 10, 2008, when plaintiff submitted certain documents to Wallkill's business office that indicated that plaintiff had begun this civil action.

***G. NYSDOCS***

Plaintiff's ninth cause of action names only NYSDOCS. (Compl. at ¶ 128). Plaintiff argues that the policy of electronic monitoring of prisoners' telephone conversations violates plaintiff's federal constitutional and state statutory rights. (Compl. at ¶ 103). Plaintiff also alleges that he was the subject of an investigation, involving electronic surveillance of his telephone conversations. *Id.* at ¶ 104. Plaintiff also makes some claims that there were undercover "agents" and inmate "agents" conspiring to fabricate charges against plaintiff. *Id.* Plaintiff states that, as a result, his spiritual, mental, and physical well-being were in "clear and present danger." *Id.* Plaintiff requested that the court initiate an investigation into the matter. [FN13] *Id.* at ¶ 105.

> FN13. As stated above, plaintiff has been released from custody, and therefore, any requests for injunctive relief may be dismissed as moot. *Pugh,* 571 F.Supp.2d at 489–90.

**3. *Eleventh Amendment Immunity***

It is well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

interpretation of section 1983. *Id.* at 815 n. 3. This immunity also applies to suits against state agencies. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) (holding that "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Burnette v. Carothers,* 193 F.3d 52, 57 (2d Cir.1999), *cert. denied,* 531 U.S. 1052 (2000).

However, a state official acting in his official capacity may be sued in a federal forum ***to enjoin conduct*** that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Papasan v. Allain,* 478 U.S. 265, 276–77 (1986); *Pennhurst,* 465 U.S. at 102; *Hutto v. Finney,* 437 U.S. 678, 692 (1978). Under *Edelman v. Jordan,* "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief ... and may not include a retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan,* 415 U.S. 651, 677 (1974).

NYSDOCS and SCOC are both state agencies.[FN14] These agencies are entitled to Eleventh Amendment immunity, and thus, the claims against the New York State Department of Correctional Services and the State Commission of Corrections should be dismissed. Additionally, the claims against the remaining defendants in their "official" capacities, should be dismissed to the extent that plaintiff sues them for money damages.

> FN14. It appears that the court issued a summons for the DOCS Central Office Review Committee ("CORC"). (Dkt. No. 12). The CORC is a Committee within DOCS, it is neither an agency of the state, nor is it a "branch" of an agency. Thus, the CORC is not an entity that can be served. The court agrees with defendants that even if service on CORC had been somehow effected, plaintiff's claims against CORC would be barred by the Eleventh Amendment.

***10** This court recommends dismissal of plaintiff's ninth claim, and all other claims against NYSDOCS and SCOC, and the court also recommends dismissal of the claims against the remaining defendants in their official capacities, to the extent that plaintiff seeks money damages. Although the plaintiff's claims for injunctive relief would not necessarily have been barred by the Eleventh Amendment, plaintiff has been released from incarceration, thus, as stated above, any claims for injunctive relief must be dismissed as moot. *Pugh,* 571 F.Supp.2d at 489–90.

**4. *Service of Process***

The Federal Rules require that a defendant be served within 120 days of filing the complaint. FED. R. CIV. P. 4(m). The failure to serve a defendant within 120 days of filing the complaint may be a ground for dismissal of the complaint unless good cause is shown for an extension of that time. *Id.* A dismissal may be initiated by motion or *sua sponte* by the court after notice to plaintiff. *Id.* Generally, if the court chooses to dismiss the action against the unserved defendants, the dismissal must be without prejudice. *Id.*

In this case, defendants C.O. Chenneham; Sgt. Calender; Lt. Valuc; Lt. Marrero; and the CORC have not been served with process. As stated above, the CORC may not be named as a defendant in any event, thus, the court will recommend dismissal with prejudice as against the CORC. On December 22, 2008 and February 12, 2009, the Clerk wrote to plaintiff explaining that defendants Marerro, Valuc, and Chenneham had not been served and explaining potential reasons for the failure of service. (Dkt. Nos. 39–Def. Marerro, 40–Defs. Valuc & Chenneham). On March 6, 2009, the summons was returned "unexecuted" as to defendant Calender, and plaintiff was informed that he must notify the Marshal's Service if plaintiff wished any further attempt to serve this defendant. (Dkt. No. 42 at 2).

Plaintiff has taken no further steps to serve these defendants, notwithstanding the court's letters and the Marshal's notice. Thus, this court will recommend dismissal as to defendants Calender, Valuc, Marerro, and Chenneham for failure to serve.[FN15]

> FN15. Understandably, the moving defendants did not include the unserved defendants in their motion. However, the arguments made by the moving defendants also justify dismissal as to the unserved defendants. Thus, although the court recommends dismissal against these defendants for failure to serve, the court also finds that it would have recommended dismissal as against these defendants in any event.

**5. *Interference with the Mail***

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

Plaintiff alleges that delays in processing his mail have violated his constitutional rights under the First, Fifth, and Fourteenth Amendments. Under the First Amendment, prisoners have a right "to the free flow of incoming and outgoing mail." *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (citing *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). A prisoner's right to receive and send mail may, however, be regulated. *Davidson v. Mann,* 129 F.3d 700, 702 (2d Cir.1997). A regulation affecting an inmate's attempt to send or receive mail "is valid if it is reasonably related to legitimate penological interests." *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

***11** "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." [FN16] *Davis,* 320 F.3d at 351 (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989); *Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986); *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982)). Interference with ***legal*** mail may implicate a prisoner's right to access to the courts as guaranteed by the First and Fourteenth Amendments. *Davis,* 320 F.3d at 351. A denial of access to courts, however, requires an additional finding of "actual injury." *Lewis v. Casey,* 518 U.S. 343 (1996). Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis v. Casey,* 518 U.S. at 353).

FN16. Generally, when the issue involves only censorship or tampering with legal mail as opposed to an alleged denial of access to courts, the inmate alleges that the defendants either read his mail, censored his mail, or otherwise interfered with the mail. *Davis, supra.* Outgoing mail, whether legal or personal is entitled to greater protection from review or censorship because of the lesser security concerns presented. *Id.* at 532 (citing *Thornburgh,* 490 U.S. at 413).

**A. Correspondence Regulations**

In this case, plaintiff alleges only that his mail was delayed pursuant to a practice whereby an inmate is denied "access to his account" for three days while a commissary purchase is processed. Although plaintiff alleges one delay regarding non-legal mail, most of his complaints involve a delay in processing his legal mail. Plaintiff claims that this "practice" violates the DOCS policy requiring all mail to be processed to the postal service "the next day."

The DOCS Directives governing both "general" and "privileged" correspondence outline the procedures required to obtain postage for outgoing mail. DOCS Directive Nos. 4421, § 721.3(a)(3) [FN17] (privileged), 4422(III)(D) [FN18] (general). If an inmate has sufficient funds in his inmate account, he may purchase postage for both personal and legal (privileged) correspondence through the sale of stamps in the commissary. DOCS Directive No. 4422(III)(D)(1) (c). In certain circumstances, an inmate may purchase stamps by attaching an IAS–2706 Form to a letter. *Id.* 4422(III)(D)(1) (d). The IAS-***2706*** is a form that requests disbursement from an inmate's existing account ***if there are sufficient funds.***

FN17. Directive 4421 is a copy of the New York State Regulations governing correctional services. N.Y. CODE RULES & REGS. (N.Y.CRR), tit. 7 §§ 721.1–.3.

FN18. The information contained in Directive 4422 is also contained in 7 NYCRR §§ 720.2–720.8.

An inmate is entitled to a weekly free postage allowance for privileged correspondence. DOCS Directive No. 4421 § 721.3(a)(3) (ii). If an inmate does not have sufficient funds for the purchase of postage,[FN19] he is entitled to obtain an advance from the facility for a certain amount of postage for ***privileged*** correspondence, including legal mail by submitting an IAS-***2708*** Form with his request. DOCS Directive No. 4421 § 721.3(a)(3)(iv)(a)-(c). Another Directive governs the procedure for obtaining funds when the inmate is in need of photocopying services. DOCS Directive No. 4483(III)(I). This Directive provides that photocopying requests must be accompanied by either an IAS–2706 Form (for disbursements) or an IAS–2708 Form (for advances) .[FN20] *Id.* The Directive warns that the inmate must receive the requested photocopies within five business days, however "[t]wo day commissary holds, where applicable, might increase the delivery deadline to seven days." *Id.*

FN19. The court would note that in order to utilize the IAS–2708 Form to obtain an advance of funds,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the inmate must meet additional conditions that are specified in the Directive. DOCS Directive No. 4421 § 721.3(a)(3)(iv)(a)-(c).

FN20. Directive No. 2788 provides the procedure for collection and repayment of money due from inmates as the result of advances or other obligations. Directive No. 2788(III). This Directive has specific sections that relate to postage. *Id.* Directive No. 2788(III)(A)(1)-(3).

***12** It appears that, as plaintiff claims, an inmate's request for funds for postage or other disbursements may be delayed when there has been a commissary purchase. Plaintiff submits a completed form dated March 26, 2008 titled "Inmate Accounts," stating that his money was "held for Commissary for 2 days." (Dkt. No. 1, *Exhibits* at 5). The form also states that as soon as plaintiff's money was "released," his postage and disbursement requests were processed immediately. *Id.* Another of plaintiff's exhibits is a letter from defendant Glover, dated March 25, 2008, stating that when she received plaintiff's mailings, he had insufficient funds to cover the postage, and that she was unable to contact plaintiff for him to complete the "advance form for [his] Legal mailing". (Dkt. No. 1, *Exhibits* at 7). The court notes that defendant Glover's letter states that she sent out plaintiff's legal mail in any event, but that there was an error regarding a personal mailing. *Id.* In response to plaintiff's grievance, the Superintendent stated that "[t]he state accounting system that is currently in place prevents an inmate from overspending his account before a commissary buy." (*Id. Exhibits* at 9).

To the extent that plaintiff challenges the Directives regulating how the facility processes mail and the policy of holding an inmate's request for disbursement until his account can be cleared, these regulations are not unreasonable. Holding an inmate's request for funds for a short period of time to make sure that he has sufficient funds to cover the disbursement is reasonably related to legitimate penological interests and the administration of the inmate account system.[FN21] The delays cited by plaintiff are not excessive, and in themselves do not rise to the level of First Amendment violations.

FN21. The court would simply point out that non-prisoners must often wait for accounts to clear prior to banks disbursing funds.

Plaintiff also alleges that his account was ***improperly*** labeled as having insufficient funds for postage, when, in fact, he did possess sufficient funds. (Dkt. No. 1, *Memo.* at 2). Plaintiff claims that Defendant Glover "willful[ly] violat[ed]" his rights. However, during the investigation of plaintiff's grievance, defendant Rivera found that "[a]ny delay in the grievant's personal outgoing mail being processed is attributed to human error and no malice by staff can be substantiated." (Dkt. No. 1, *Memo.* at 9). Similarly, the CORC stated that any delay was "inadvertent." *Id.* at 10. An inadvertent or negligent delay in processing plaintiff's mail would not rise to the level of a constitutional violation.[FN22] *See Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983).

FN22. Plaintiff alleges that DOCS had a policy whereby all mail was to be processed by "the next day," however, he cites no statutory or regulatory basis for this requirement. Even if DOCS had a policy that encouraged the immediate processing of an inmate's mail, the violation of a DOCS policy would not necessarily violate plaintiff's constitutional rights. *See Salahuddin v. Coughlin,* 781 F.2d 24, 27 n. 4 (2d Cir.1986) ( "[e]very violation of state law is not necessarily a denial of constitutional right").

**B. Access to Courts**

Because plaintiff claims that his legal mail was delayed, he also alleges that defendants violated his right to access the courts. (Compl. at ¶¶ 24, 26, 32, 34). Though plaintiff alleges delays,[FN23] and perhaps inconvenience, he has not alleged ***any actual harm*** to any legal action, resulting from the alleged delays. Plaintiff has not argued that defendants' conduct resulted in the dismissal of an otherwise meritorious legal claim. Without an actual injury, plaintiff has not stated a claim that can survive this motion to dismiss. *Lewis v. Casey, supra.* Mere "delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986)).

FN23. The longest delay alleged by plaintiff was seven days. Compl. ¶ 32. Most of the delays were four days, one was three days, and one was six days.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Id.*

***13** Plaintiff does claim that one piece of legal mail "was rejected by defendant Glover", and that the mail was returned to plaintiff. (Compl. at ¶ 35). However, plaintiff does not state that he was ultimately unable to mail that one piece of legal correspondence, and he does ***not*** allege any harm to a pending action as the result of this alleged "rejection."

Based upon the complaint and the documents attached, plaintiff fails to state a constitutional violation associated with either his right to send and receive mail or his access to courts. Thus, plaintiff's claims relating to the processing of his mail should be dismissed.

**6. *Double–Bunking***

Plaintiff claims that his assignment to "double-bunked quarters is unlawful/ discriminatory." (Compl. at ¶ 37). Plaintiff is challenging a "variance" [FN24] issued to Wallkill, allowing the facility to convert single occupancy cells to double occupancy. Plaintiff claims that this variance was unconstitutional, subjecting "all Wallkill prisoners" to standards "below the minimum standards governing other state prisoners." *Id.* at ¶ 48.

FN24. It is unclear what plaintiff means when he states that Wallkill was issued a "variance," however, because this is a motion to dismiss, the court assumes the truth of plaintiff's statement for purposes of this report.

The Supreme Court has held that "double celling" [FN25] is generally permissible under the Eighth and Fourteenth Amendments. *Rhodes v. Chapman,* 452 U.S. 337, 352 (1981). There is no "one man, one cell" principle embodied in the Constitution. *Bell v. Wolfish,* 441 U.S. 520, 542 (1979). However, combined with other adverse conditions, double-celling may amount to an Eighth Amendment violation. *Bolton v. Goord,* 992 F.Supp. 604, 626 (S.D.N.Y.1998). In order to violate the constitutional prohibition against cruel and unusual punishment, the conditions of confinement must result in an "unquestioned and serious deprivation of basic human needs," and the defendants must have imposed those conditions with "deliberate indifference." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 475 U.S. 312, 319–20 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)).

FN25. Double-celling involves housing two inmates in a cell that was originally designed for one person. *Jones v. Goord,* 435 F.Supp.2d 221, 227 (S.D.N.Y.2006).

In *Jones v. Goord,* the court analyzed the double-celling issue at length. *Jones v. Goord,* 435 F.Supp.2d 221 (S.D.N.Y.2006). *Jones* was a class action case in which plaintiffs challenged a double-celling program that was instituted in New York State due to a large increase in prison population. *Jones,* 435 F.Supp.2d at 228. Plaintiffs argued that the practice deprived inmates of the "minimal civilized measure of life's necessities." *Id.* Plaintiffs claimed that New York's double-celling policy violated the Eighth Amendment because of "the general conditions of confinement in double cells, the risk of inmate against inmate violence, injury and disease, and secondhand smoke." *Id.* at 236. The court found that none of the conditions alleged by plaintiffs resulted in constitutional violations, and dismissed the claims. *Id.* at 236–53.

Under DOCS regulations, inmates must consent to being housed in a double cell for more than sixty days, and there exists a screening process, which prevents certain kinds of inmates from being housed together in a double cell. *Jones,* 435 F.Supp.2d at 230–31, 247–49. In this case, plaintiff appears to challenge the policy as a whole, rather than alleging that ***he*** suffered some hardship or adverse condition. He merely alleges that this "variance" [FN26] subjected all Wallkill inmates to constitutionally inadequate conditions and cites numbers of bathrooms, toilets, urinals, and showers. (Compl.¶ 48). This conclusory allegation, without any specific claim that plaintiff suffered any deprivation, does not rise to the level of an Eighth Amendment violation. Any claim that defendants violated state law or regulations, without more, does not state a constitutional claim. *Salahuddin v. Coughlin,* 781 F.2d 24, 27 n. 4 (2d Cir.1986). Plaintiff's claim about "double-bunking" does not rise to the level of a constitutional violation and may be dismissed.

FN26. The court must also note that plaintiff cites the incorrect section of the NYCRR. Plaintiff cites the text of a section governing double occupancy housing units originally designated for "double occupancy"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

and argues that by converting single occupancy cells to double occupancy, Wallkill violated this regulation. *See* 9 NYCRR § 7621.6–b. The regulations do, however, also provide for "Double occupancy housing units originally designed for ***individual occupancy."*** *Id.* § 7621.6–a. The regulations contain a formula for maximum facility capacity and provide for an application to the SCOC if a change in maximum facility capacity becomes necessary. 9 NYCRR §§ 7621.10, 7621.11. Thus, the conversion of which plaintiff complains is authorized by the regulations, and the variance is not "void" on its face.

**7. *Cell Searches and Privacy***

***14** Plaintiff claims that his "quarters and property" were subject to an excessive number of searches. Plaintiff claims that defendant Scott searched plaintiff's cell on March 20, March 26, and May 7, 2008. (Compl. at ¶¶ 52–53). Plaintiff alleges that some of these searches were authorized by defendant Calender. *Id.* at ¶ 53. Plaintiff alleges that his cell was searched an additional seven times: May 20, June 18, June 22, July 24, August 6, 7, and 13, 2008. *Id.* at ¶ 55. Plaintiff states that other inmates were similarly searched, and that defendants Rivera, Amado, Jessen, and Neuwirth were advised of the issue at the May 29, 2008 meeting of the Inmate Liaison Committee. *Id.* at ¶ 54. As proof of the excessive nature of these searches, plaintiff argues that while incarcerated at Franklin Correctional Facility for three years, he was subjected to only one random search. *Id.* at ¶ 55.

It is well-settled that the prohibition against unreasonable searches and seizures does not apply to a prison cell. *Hudson v. Palmer,* 468 U.S. 517, 526 (1984. Inmates have no reasonable expectation of privacy in their cells. *Willis v. Artuz,* 301 F.2d 65, 67–69 (2d Cir.2002); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005). In *Rodriguez,* the court held that an inmate has no right to be free from searches of any kind, including those alleged to be "retaliatory." *Id.* (citing cases).

Plaintiff cites all the occasions when his cell was searched and mentions that other inmates suffered from excessive searches. (Compl.¶¶ 53–55). He then states that his claim is substantiated "res ipse loquitur" because he was subjected only to one "random" search in the three years that he was incarcerated at Franklin Correctional Facility. *Id.* ¶ 55. The fact that Wallkill officials choose to search inmates' cells more frequently, even if true, does not change this court's finding. There is no protection from unreasonable searches of one's prison cell. Thus, any cell search claims must be dismissed.

**8. *Warming Stove and Other Privileges***

Plaintiff's fifth and sixth causes of action are related to three separate occasions when plaintiff's ***housing block*** lost the privilege to use "warming stoves" in their cells. (Compl. at ¶¶ 59–72). Plaintiff also complains about his loss of the privilege to remove bread products from the mess hall. *Id.* at ¶ 91. Plaintiff argues that the defendants' policy of punishing the entire housing block when defendants are unable to identify who committed some particular misbehavior is unconstitutional. Plaintiff argues that the deprivation of these privileges must be in accordance with a "constitutionally sound policy," and must not be "arbitrary and capricious" or retaliatory. Plaintiff is clearly attempting to make a due process argument regarding the denial of these privileges.

Plaintiff cannot make claims on behalf of his "housing block." *See Singleton v. Wulff,* 428 U.S. 106, 114 (1976) (plaintiff cannot assert claims on behalf of other individuals). However, to the extent that plaintiff is making his own due process claim, the claim must also fail. In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

***15** In this case, plaintiff is complaining ***only*** about the loss of privileges. Plaintiff has ***not*** alleged that any atypical and significant hardship was imposed upon him. *Sandin,* 515 U.S. at 483–84. Plaintiff does ***not*** claim that the loss of the warming stove privilege or that the inability to take bread out of the mess hall was harmful to his health.[FN27] There is simply nothing "atypical" or "significant" that would create the right to any particular process prior to losing these privileges.

FN27. Plaintiff also does not state a separate Eighth Amendment claim with respect to this denial of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> privileges. He does not claim that the conditions of confinement due to the deprivation of these privileges resulted in an "unquestioned and serious deprivation of basic human needs." *See Jolly v. Coughlin,* 76 F.3d at 480. Plaintiff does claim that by punishing the entire block, defendants were "endangering the security of the facility." (Compl.¶¶ 64–65). Plaintiff appears to claim that defendants were endangering the security of the facility because defendants' actions would pressure the inmates to determine who was the guilty party, fostering unrest among the inmates. *Id.* ¶ 61. However, plaintiff is speculating about this claimed result of defendants' actions. Nowhere does he claim that there was ever an incident of inmate unrest due to defendants' actions.

To the extent that plaintiff uses the word "retaliation," he does not state a constitutional claim. In order to state a constitutional claim, a plaintiff must allege that the defendants retaliated against plaintiff for the exercise of a constitutional right. In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

In this case, plaintiff claims that the privileges were initially revoked "in retaliation" for someone leaving a substance on the doorknob. (Compl.¶ 60). Defendants' alleged "retaliation" had nothing to do with plaintiff exercising a constitutional right. Thus, plaintiff's claim of denial of privileges must be dismissed.

**9. *Harassment***

Plaintiff alleges that he has been subject to several different kinds of harassment by a number of corrections officers, and that some of the defendants have engaged in a conspiracy to harass plaintiff. These behaviors include the following allegations:

1. Defendant Neuwirth told plaintiff that he was "going to have a hard time [at Wallkill]," and wrote a false misbehavior report against plaintiff in conjunction with plaintiff's complaint about being assigned to a double cell. (Compl. at ¶¶ 40–41).

2. Defendant Heal illegally escorted plaintiff from the mess hall, and searched plaintiff in front of at least twenty other prisoners, in retaliation for plaintiff's filing of grievances against defendant Heal's co-workers. (Compl. at ¶¶ 73–74).

3. On May 21, 2008, while performing the "evening count," Defendants Heal and Dunham, "stopped in front of plaintiff's room, stood there for 30 seconds looking into the room, while writing on a clipboard." (Compl. at ¶ 79). Defendant Dunham then accused plaintiff of harassment, and defendant Heal wrote an allegedly false misbehavior report regarding the incident that was "affirmed" after a disciplinary hearing conducted by defendant Galbally. (*Id* . at ¶¶ 82, 86–87).

***16** 4. Defendant Curfman told plaintiff to pull his pants up, causing defendant Heal and other officers to laugh at plaintiff. (Compl. at ¶ 89).

5. Defendants Roy and Amado failed to prevent the harassment. (Compl. at ¶ 90).

6. Defendant Curfman instituted a policy prohibiting inmates from taking bread out of the mess hall. (Compl. at ¶ 91).

7. Defendant Chenneham bumped into plaintiff. (Compl. at ¶ 94).

8. Defendant Valuc told defendant Scott that plaintiff had his feet on the wall during a telephone conversation, and suggested that defendant Scott should have plaintiff paint the wall as punishment. (Compl. at ¶ 95).

***A. Verbal Harassment***

To the extent that plaintiff alleges that defendants verbally harassed him, whether by threatening to file a Misbehavior Report or suggesting that plaintiff should paint the walls, the claims should be dismissed. Verbal harassment and name-calling, absent "appreciable injury," simply are not constitutional violations cognizable under Section 1983.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Vega v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y., Mar. 26, 2009).

In his response to defendants' motion to dismiss, plaintiff claims that defendants violated various New York State statutes; regulations; and the DOCS Employee Manual. (Dkt. No. 46). Even if defendants had violated New York law or the DOCS Employee Manual prohibiting verbal harassment, the violation of state law, absent a constitutional violation, is not actionable under section 1983.[FN28] *Salahuddin v. Coughlin,* 781 F.2d 24, 27 n. 4 (2d Cir.1986).

FN28. The court also notes that where the plaintiff lacks a valid federal claim, a district court has the discretion to decline to exercise supplemental jurisdiction over any pendent state law claims. *Matican v. City of New York,* 524 F.3d 151, 154–55 (2d Cir.1008).

***B. Retaliation***

Plaintiff alleges throughout his complaint that defendants retaliated against him for filing grievances. As stated above, in order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d at 137.

The court in *Dawes* stated that in order to survive summary dismissal, the plaintiff's "non-conclusory" allegations must establish

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

239 F.3d at 492 (citations omitted). Subsequent Second Circuit cases have held that, in a prison context, all that is required is that the adverse conduct by defendant would have deterred a similarly situated individual of ordinary firmness from exercising his First Amendment rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). In *Gill,* the court held that this objective test applied, even where a particular plaintiff was ***not subjectively deterred*** and continued to file grievances and lawsuits. *Id.*

***17** The filing of grievances is constitutionally protected conduct. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Thus, the court will assume that plaintiff engaged in "constitutionally protected conduct." As to the second element of retaliation, plaintiff has not alleged a single instance of the kind of "adverse action" that would deter a similarly situated inmate from exercising his constitutional rights. Most of the "retaliation" that plaintiff alleges is verbal harassment. Plaintiff described the harassment as being "lambast[ed] ... with a barrage of threatening, reckless eyeballing and hostile/profane language/jester [sic]." Plaintiff generally alleges that defendants were "mean" to him, that they "eyeball[ed]" him, and even that these conducts constituted "terrorizing conduct." These are not the kinds of unconstitutional "adverse actions" that would make up a retaliation claim.

Contrary to plaintiff's claim that the allegedly "false" misbehavior report written by defendants Heal and Dunham was "affirmed" by defendant Galbally, it is clear from plaintiff's own exhibits that defendant Galbally found plaintiff "not guilty" of two of the charges and only sentenced plaintiff to a seven day work detail. (Compl. *Exhibits* at 42–43). This is not the type of "adverse action" that would deter a similarly situated individual from asserting his rights. Plaintiff makes passing reference to one instance where defendant Chenneham "physically bumped into" plaintiff. (Compl. at ¶ 94). Plaintiff alleges no injury or any adverse consequences whatsoever from the incident. It is unclear how plaintiff claims that this "bump" would have deterred him from asserting his rights. Thus, plaintiff's "retaliation" claims may be dismissed.

**10. *Grievances***

Plaintiff's eighth claim is that defendants, defendant Superintendent Rivera in particular, "willfully pervert[ed] state statute [sic] governing Inmate Grievance Program, by unlawfully suppressing all grievances submitted to him by plaintiff." (Compl. at ¶ 98). Plaintiff alleges that defendants Rivera, Henn, and CORC were engaged in a conspiracy to deprive him of his right to grieve his complaints. *Id.* at ¶ 101.

The law is clear that plaintiff has no constitutional right to have his grievances processed at all, or if processed, to have the procedure done properly. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003). A violation of the inmate grievance procedures does ***not*** give rise to a claim under

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

section 1983. *Cancel v. Goord,* No. 00–Civ.2042, 2001 U.S. Dist. LEXIS 3440 (S.D.N.Y. Mar. 29, 2001). A claim that defendants improperly or inadequately investigated plaintiff's grievance is not actionable. *See* *Davis v. Buffardi,* No. 0:01–CV–0285, 2005 U.S. Dist. LEXIS 45487, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted); *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) ( "[i]nmate grievance programs created by state law are not required by the Constitution") (citations omitted); *Cancel v. Goord,* No. 00. CIV.2042, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983") (citations omitted).

***18** Because there is no constitutional right to the Inmate Grievance Program, there can be no constitutional violation for officials' alleged failure to abide by the proper procedures. Plaintiff alleges that because of defendants' alleged "suppression" of his grievances, he submitted all of his "grievances" to the CORC. (Compl.¶ 98). Plaintiff then complains that the CORC rejected these grievances and returning them to plaintiff and to defendants Rivera and Henn. *Id.* Rejection of plaintiff's attempt at sending all of his grievances directly to the CORC is perfectly reasonable. The CORC is the final appeal for grievances that have been denied at the Superintendent's level. N.Y. COMP.CODES R. & REGS., tit. 7 § 701.5(d).

The court also notes that a review of plaintiff's exhibits shows that plaintiff's letters and "grievances" were not all "suppressed." Plaintiff received a response to his mail claims and his double bunking claims. (*Exhibits* at 7, 9–10 (mail), 20–25 (double bunking)). Of the letters that plaintiff labels "GRIEVANCE," many appear to have been sent directly to defendant Rivera or Deputy Superintendent Amado. (*Exhibits* at 20–25; 32–33; 34; 35–37; 40; 44–46; 48–49). The grievance regulations in New York require that "grievances" be submitted first to the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC is then appealed to the Superintendent. *Id.* § 701.5(c).

By submitting claims directly to the Superintendent, the Deputy Superintendent or the CORC, plaintiff was not using the grievance procedure properly and appears to have been attempting to bypass the required steps. Thus, plaintiff cannot claim that defendants were "suppressing" his grievances. Thus, his claims that his grievances were somehow "suppressed," or that defendants engaged in a conspiracy [FN29] to prevent plaintiff from availing himself of the Inmate Grievance Program should be dismissed.

FN29. Plaintiff sprinkles the entire complaint with allegations of "conspiracy." He alleges conspiracy under both section 1983 and 1985. The relevant part of section 1985 provides a narrower protection that section 1983. Section 1985(3) prohibits conspiracies to deprive persons of equal protection of the law. *Davila v. Secure Pharm. Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004) (citing 28 U.S.C. § 1985(3). Section 1986 provides that every person who is aware of a conspiracy under section 1985, but does not prevent or aid in preventing the injury, while having the power to do so will be liable in damages. 28 U.S.C. § 1986. A claim under section 1986 is contingent to a valid claim under section 1985 and must be commenced within one year after the cause of action accrued. *Id.*

The protection afforded by section 1985 is "narrower" than that afforded by section 1983 because section 1985 requires the conspiracy to be motivated by a racial or other class-based animus. *Davila,* 329 F.Supp.2d at 317. In order to state a claim under section 1985(3), Plaintiff must allege a conspiracy for the purpose of depriving him of equal protection; an overt act in furtherance of that conspiracy; and an injury to plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Id.* (citing *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999)). Mere conclusory allegations of conspiracy are also insufficient to state a claim under either section 1983 or 1985. *Id. See also* *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( section 1983). Plaintiff's claims of conspiracy in this case are completely conclusory and cannot survive the motion to dismiss.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendant's motion to dismiss (Dkt. No. 41) be **GRANTED,** and the complaint dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.

Robinson v. New York State Dept. of Correction Services
Not Reported in F.Supp.2d, 2009 WL 3246818 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Samuel CABASSA, Plaintiff,

v.

Craig GUMMERSON, Corrections Captain, Auburn Correctional Facility; Donald Selsky, Assistant Deputy Commissioner, Director of Special Housing/Disciplinary Program; Anthony Graceffo, Chief Medical Officer, Auburn Correctional Facility; Glenn S. Goord; Hans Walker; Gary Hodges; D.W. Seitz; Terry Halcott; Christine Coyne Nancy O'Connor; Ann Driscoll; John McClellen; John Rourke, Captain, Security Services at Auburn Correctional Facility; Koors, Head Pharmacist at Auburn Correctional Facility; Robrt Mitchell, Correctional Counselor at Auburn Correctional Facility; and Androsko, Registered Nurse, Auburn Correctional Facility, Defendants.

No. 9:01-CV-1039.

Sept. 24, 2008.

Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, David L. Fruchter, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

***1** Plaintiff, Samuel Cabassa, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated June 30, 2008, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' second motion for summary judgment (Docket No. 81) be granted in part and denied in part. Objections to the Report Recommendation have been filed by the parties.

Based upon a de novo review of the portions of the Report-Recommendation to which the parties have objected, the Report-Recommendation is accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in its entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to the extent that it asserts:

(a) Any Fourteenth Amendment procedural due process claim whatsoever;

(b) A First Amendment access to courts claim against defendant Hans Walker;

(c) A First Amendment retaliation claim against defendant Hans Walker;

2. Defendants' second motion for summary judgment is otherwise DENIED, so that, surviving that motion is:

(a) Plaintiffs First Amendment access-to-courts claim against defendants D.W. Seitz and Craig Gummerson asserted in the Fourth Amended Complaint's Fifth Cause of Action; and

(b) Plaintiffs First Amendment retaliation claim against defendants D.W. Seitz and Craig Gummerson also asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

***2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) [FN1] For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

**I. APPLICABLE LEGAL STANDARD**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN3]

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN4] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN5] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN6]

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN8] (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.) [FN9] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. [FN10] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN11] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN12]

FN7. *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN8. *See* *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g.,* *Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.[FN13] In one of those actions, he was awarded $1,000 following a jury trial.[FN14] (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.[FN15]

FN13. *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

**II. ANALYSIS**

**A. Plaintiff's Fourth Cause of Action**

***3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,[FN16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

***4** Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

**1. Continuing Violation Doctrine**

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[FN17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

FN18. *Compare* *Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See* *Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord,* *McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also* *Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

***5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) [FN20] Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) [FN21]

FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ....") [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf*. Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

***6** 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [FN22]

> FN22. I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false.[FN23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.[FN24] The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

> FN23. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

> FN24. A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

For example, there is no record evidence that Defendant Seitz issued his written recommendation of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) FN25

FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

***7** Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) FN26

FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin,* 775 F.Supp. 84, 87-88 (W.D.N .Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. [FN27]

FN27. *See* *Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also* *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

***8** The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[FN28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

> where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6 [23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

***9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were part of an express and openly espoused *policy.* Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

***10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor,* 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

***11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

FN29. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

FN30. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN31. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN32. *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

FN33. *See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-andsignificant-hardship analysis.) [FN34]

FN34. *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998.[FN35] For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

  FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

***12** As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) FN36 The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were

retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) FN37

FN36. I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

FN37. For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

***13** Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandlin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin's* atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

***14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

**2. Claims Under the First Amendment**

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**a. Access-to-Courts Claim**

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson. [FN39]

FN39. *See* *Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

***15** Plaintiff's "Fifth Cause of Action" alleges as follows:

> The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [FN40]

> FN40. I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

***16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [FN41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

> FN41. "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act.[FN45]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN42. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN43. *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN44. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

***17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [*v. Connor,* 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles,* 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[FN46]

FN46. *Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See* *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord,* *Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official liable *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

> ***18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin [v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also* *Acre,* 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf.* *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

> FN47. *Accord,* *Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. FN48 The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

***19** Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan,* 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady,* 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments). FN49 In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN49. *Cf. Brass v. County of Los Angeles,* 328 F.3d 1192,1195,1199-1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

FN50. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN51. *See* *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

***20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment accessto-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and written notice of its entry [FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998). [FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional accessto-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay).[FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

FN52. *See Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state court").

FN53. (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54. N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55. *See Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

***21** In order to convert the claim raised in this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of*] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) [FN56]

FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [FN57] Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se. See Albert v. Carovano,* 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord, Wynder v. McMahon,* 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), *Northrup v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997).

FN57. It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (*"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [FN58] in his complaint in order to assert a retaliation claim. *See Williams v. Manternach,* 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").[FN59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

FN58. *See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

***22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 28

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[FN60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

> FN60. To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

> FN61. (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

***23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[FN62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary.[FN63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground .[FN64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 29

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning].") [internal quotation marks omitted].) As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

FN64. (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be ***GRANTED*** in part and ***DENIED*** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be ***DISMISSED*** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be ***DISMISSED*** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment accessto-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise *DENIED*** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

***24 ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** FN65

FN65. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.

Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.